RICHARD MARMARO (Bar No. 91387)
rmarmaro@skadden.com
JACK P. DICANIO (Bar No. 138782)
RONDA J. MCKAIG (Bar No. 216267)
RYAN WEINSTEIN (Bar. No. 240405)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Tel: (213) 687-5000
Fax: (213) 687-5600

CHRISTOPHER J. GUNTHER (admitted *Pro Hac Vice*)
cgunther@skadden.com
4 Times Square
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Defendant GREGORY L. REYES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY L. REYES, ANTONIO CANOVA, and STEPHANIE JENSEN,<br><br>Defendants. | CASE NO. C 06-04435 CRB<br><br>**(1) NOTICE OF MOTION AND DEFENDANT GREGORY L. REYES'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ELEMENT OF MATERIALITY; and**<br><br>**(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**<br><br>***FILED UNDER SEPARATE COVER*:**<br>**(3) DECLARATIONS OF DAVID GULLEY, CHRISTOPHER CRESPI, STEVEN STANTON AND RYAN WEINSTEIN IN SUPPORT THEREOF;**<br>**and**<br><br>**(4) [PROPOSED] ORDER**<br><br>Date: March 16, 2007<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Courtroom: 8, 19th Floor |

## NOTICE OF MOTION AND STATEMENT OF RELIEF REQUESTED

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 16, 2007, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the above-reference court, before Honorable Charles R. Breyer, Defendant Gregory Reyes will, and hereby does move this Court for an order granting partial summary judgment on the element of materiality.

The Motion is based on this Notice, the Memorandum of Points and Authorities attached hereto, the pleadings and papers previously filed, the Declarations of Ryan H. Weinstein, David A. Gulley, Steven F. Stanton and Christopher Crespi, and accompanying exhibits, and arguments of counsel.

DATED: February 5, 2007 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Richard Marmaro
RICHARD MARMARO
Attorney for Defendant
GREGORY L. REYES

# TABLE OF CONTENTS

Page


I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ..... 1

II. FACTUAL BACKGROUND ..... 8

A. Brocade, Mr. Reyes and the Use of Stock Options to Attract and Retain Talent ..... 8

B. The Accounting Rules for Non-Cash ESO Expense ..... 9

C. Brocade's First Internal Inquiry and Related Announcements ..... 12

D. Brocade's Second Internal Inquiry and Related Announcements ..... 17

III. ARGUMENT ..... 19

A. The Summary Judgment Standard and the Issue of Materiality ..... 19

B. The "Total Mix" of Information Included Clear and Comprehensive Disclosure of Brocade's ESOs and Related Expenses ..... 22

C. Investors Consider the Amount of Reported Non-Cash Stock Option Compensation Expense Immaterial to Investment Decisions ..... 24

1. Analysts universally regarded stock-option expenses as irrelevant to company value ..... 25

2. Brocade's earnings releases to Wall Street, like those of most public companies, reported performance measures that excluded stock-option compensation expenses ..... 26

3. Academic studies find no link between stock-option compensation expense and declining equity values ..... 27

D. Movements in Brocade's Stock Price Following Restatement-Related Disclosures Offer No Evidence of Materiality ..... 28

E. Adjustments Related to ESOs Identified in the SEC's Complaint Were Immaterial to Brocade's Financial Statements. [fix space] ..... 30

F. The Vast Majority of Options at Issue Were Never Exercised, and the Associated Expenses Were No More Than Hypothetical, Paper Valuations. ..... 32

G. The Conduct Alleged By the SEC – If True – Would Have *Deflated* Rather Than *Inflated* Brocade's Share Price. ..... 32

IV. CONCLUSION ..... 33

## TABLE OF AUTHORITIES

### CASES

*3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994)........................................................7

*In re Ariba, Inc. Securities Litigation*, 2005 WL 60828 (N.D. Cal. March 16, 2005)..........................................................6

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .................................................... 4, 6, 19, 21

*In re Carter-Wallace, Inc.*, 150 F.3d 153 (2d Cir. 1998) .................................................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 19, 20

*In re Convergent Technologies Second Half 1984 Securities Litigation*, 1990 WL 606271, at *10 (N.D. Cal. Jan. 10, 1990)................................................30

*In re Corning, Inc. Securities Litigation*, 349 F. Supp. 2d 698 (S.D.N.Y. 2004) .........................................................20

*Epstein v. Washington Energy Co.*, 83 F.3d 1136 (9th Cir. 1996) .................................21

*Gart v. Electroscope*, 24 F. Supp. 2d 969 (D. Minn. 1998) ...........................................23

*Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003).....................................6

*Goldkrantz v. Griffin*, 1999 WL 191540 (S.D.N.Y Apr. 6), *aff'd mem.*, 201 F.3d 431 (2d Cir. 1999)..................................................................................29

*Greenhouse v. MCG Capital Corporation*, 392 F.3d 650 (4th Cir. 2004).........................8

*Hockey v. Medhekar*, 30 F. Supp. 2d 1209 (N.D. Cal. 1998)...........................................6

*In re IBM Corp. Sec. Litigation*, 163 F.3d 102 (2d Cir. 1998).......................................20

*Kahn v. Wien*, 842 F. Supp. 667, 676 (E.D.N.Y. 1994), *aff'd*, 41 F. 3d 1501 (2d Cir. 1994)..........................................................................................23

*In re Northern Telecom Ltd. Sec. Litigation*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......20

*Paddack v. Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) ..........................................7

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997).........................................21

*In re PetSmart, Inc. Securities Litigation*, 61 F. Supp. 2d 982 (D. Ariz. 1999)... 21, 24, 30

*Recupito v. Prudential Securities, Inc.*, 112 F. Supp. 2d 449 (D. Md. 2000).....................6

*Schuster v. Symmetricon, Inc.*, 2000 WL 3315909 (N.D. Cal. Aug. 1, 2000)..................30

*In re Seagate Technology II Securities Litigation*, 1989 WL 222969 (N.D. Cal. May 3, 1989) ................................................................. 4, 21, 24

*SEC v. Geotek*, 426 F. Supp. 715 (N.D. Cal. 1976) *aff'd sub nom.*, *SEC v.*

*Arthur Young & Co.,* 590 F.2d 785 (9th Cir. 1979) .......... 24

*SEC v. Hoover*, 903 F. Supp. 1135 (S.D. Tex. 1995) .......... 20

*SEC v. McCaskey*, 56 F. Supp. 2d 323 (S.D.N.Y. 1999) .......... 7

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) .......... 7

*SEC v. Talbott*, 430 F. Supp. 2d 1029 (C.D. Cal. 2006) .......... 19

*SEC v. Truong*, 98 F. Supp. 2d 1086 (N.D. Cal. 2000) .......... 20, 21

*In re Sportsline.com Securities Litigation*, 366 F. Supp. 2d 1159 (S.D. Fla. 2004) .......... 1, 10

*In re Stac Electronics Securities Litigation*, 89 F.3d 1399 (9th Cir.1996) .......... 21

*In re Stratosphere Corp. Securities Litigation*, 66 F. Supp. 2d 1182 (D. Nev. 1999) .......... 20

*In re Sybase Securities Litigation*, 48 F. Supp. 2d 958 (N.D. Cal. 1999) .......... 20, 21

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .......... 19, 20, 21

*Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216 (9th Cir. 1995) .......... 20

*In re Tellium Inc. Securities Litigation*, 2005 WL 2090254 (D.N.J. Aug. 26, 2005) .......... 28

*Werner v. Werner*, 267 F. 3d 288 (3d Cir. 2001) .......... 24

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

As set forth more fully herein, this motion presents the following facts among others:

- The "total mix" of information in Brocade's public filings included *clear and comprehensive disclosure* of Brocade's stock options and related expenses.
- Non-cash stock-option compensation expenses are *immaterial* to investors and analysts.
- Companies, including Brocade, routinely remove non-cash expenses when reporting their results in earnings releases to investors.
- Analysts routinely reported valuation metrics that excluded stock-based compensation expenses because such expenses are irrelevant to company value.
- What analysts and investors alike focus on are cash revenues, cash expenses, cash flows and revenue growth – not non-cash expenses.
- Net expense adjustments related to the options identified in the SEC's complaint were *immaterial* to Brocade's financial statements.
- More than 95% of the options at issue were *never exercised*, meaning that the associated expenses were no more than hypothetical, paper valuations.
- The conduct alleged by the SEC would have *deflated* rather than inflated the price of Brocade's shares.

This case presents an unprecedented extension of the law of securities fraud into heretofore uncharted waters: alleged understatements of non-cash compensation expenses on a company's financial statements. Never before has the SEC even alleged, let alone proved, that a company or individual committed securities fraud by understating non-cash expenses.[1] **This is for one very sound and irrefutable reason: non-cash expenses are not material to a company's financial statements**. By expanding the concept of securities fraud to reach the theoretical and speculative

[1] In Congressional testimony, the SEC Chairman could cite only a single prior SEC enforcement case (involving ESO *exercise* issues) and no prior criminal prosecutions involving ESO grants. *See Testimony Concerning Options Backdating Before the S. Comm. on Banking, Housing & Urban Affairs*, 109th Cong. (Sept. 6, 2006) (statement of Christopher Cox, Chairman, U.S. Sec. & Exch. Comm'n), *available at* http://www.sec.gov/news/testimony/ts090606cc.htm; Ex. 1 to the Declaration of Ryan Weinstein ("Weinstein Decl."). In the one reported decision addressing a private securities fraud suit grounded on alleged improper accounting for stock-based compensation, the court dismissed the complaint for failure to plead facts giving rise to the strong inference of scienter required by the Private Securities Litigation Reform Act. *See In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159 (S.D. Fla. 2004). The court concluded that the alleged "GAAP violations were not obvious, nor of great importance or magnitude." *Id.* at 1170.

correctness of a company's non-cash expense, the SEC complaint completely untethers the notion of "fraud" from "securities fraud." It brings us to the point where there is no victim, and without a "victim" there can be no fraud.[2] The vast majority of the stock options at issue in this case – 95% – were never exercised. They were either cancelled, unvested or "under-water."

Investors deciding whether to purchase or sell a technology growth stock like Brocade Communications, Inc. ("Brocade") analyzed revenues and revenue growth, cash flows, and cash operating expenses. From 2000 through 2004, Brocade's financial statements reported those metrics accurately and in accordance with Generally Accepted Accounting Principles ("GAAP"); there has never been any allegation to the contrary.

Brocade's 2005 restatements of its financial results to recognize certain "non-cash expenses" in prior years had *no* impact on its sound economic health. Historical reporting of revenues, cash flows, and cash operating expenses were **unaffected**. Thus, after an exhaustive Audit Committee review (with independent law and accounting firms), "[t]he Company affirmed that none of the [accounting] adjustments impact historical revenues, cash positions, or non-stock option related operating expenses. The Company emphasized that its core business remains strong and the financial restatement does not affect the underlying fundamentals of the business." (Weinstein Decl., Ex. 3 (Brocade Jan. 24, 2005 Press Release).) When Brocade announced its restatement on January 24, 2005, Brocade shares did not suffer a statistically significant drop and two days later closed at the precise pre-announcement price. Since then, Brocade's core performance metric of annual net revenues has continued to surge, from $596 to $750 million, an increase of 25%. Brocade's share price not only recovered from the initial drop of January 7, 2005, following announcement of an internal review – it is actually up 33% from that point.

In short, Brocade's history bears **none** of the earmarks of securities fraud – *i.e.*, phony or premature revenue recognition; undisclosed cash obligations; hidden cash operating expenses; or

[2] *See* Weinstein Declaration, Ex. 2 (Peter J. Henning, Are Backdating Cases Really Securities Fraud? (Law.com, July 27, 2006) ("While the concept of fraud is certainly flexible, as witnessed by the variety of cases in which the government has prosecuted it successfully, 'securities fraud' still requires the prosecution to prove that the defendants used a 'manipulative or deceptive device or contrivance' to defraud a victim. Lies alone will not turn misconduct into fraud.")

fabricated earnings projections. Indeed, the SEC Commissioners themselves appear to be unsure whether the alleged "backdating" at Brocade caused any harm.[3] Gregory Reyes, who did not profit from the stock options at issue in this case, built Brocade from start-up to industry leader in six years, with a remarkable record of growth and performance. Unlike every other securities fraud case permitted to go to trial, there is no victim here.

With its fraud allegation in this case, the SEC has ventured into an entirely novel realm: the way financial statements reflect non-cash "expenses" from granting employee stock options ("ESOs") – a theoretical "expense" concept with zero cash impact and a tortured history of widely varying disclosure and valuation methodologies. The backdrop is a marketplace in which ESO expenses were widely regarded as having little or no relation to the economic value to employees of the ESOs issued or the costs incurred by the companies issuing them. One basic reason for the market's viewpoint is the inherent uncertainty of whether ESOs will ever vest or be exercised, and at what price. **Indeed, 95% of the ESOs at issue in this case were never exercised – meaning, quite literally, that no exchange of cash for securities ever occurred, and no financial impact to Brocade, its option holders, or anyone ever materialized.**[4]

The SEC theory is that Brocade's financial statements omitted a **material** fact – *i.e.* that certain ESOs were granted "in the money" and therefore had "intrinsic value" (strike price minus prevailing market on the date of grant) which would have resulted in a charge against earnings. (Nowhere is it alleged that cash actually left the company.) The following claims in the SEC complaint are premised on this core allegation: Claims One, Two, and Four through Six all have "materiality" as an essential element.[5] To establish "materiality" of an undisclosed fact, which is one

[3] Brocade's own $7 million settlement with the SEC, announced in July 2006, has not been approved by the Commission. As Bloomberg has reported, two Commissioners "have questioned whether and how the company profited, the people with knowledge of the deliberations said. The SEC's office of economic analysis, which initially concluded that backdating yielded a financial benefit, is now re-examining the issue." (Weinstein Decl., Ex. 4 (Otis Bilodeau, *SEC's Cox Stalls Options Crackdown by Delaying Vote* (Bloomberg News Jan. 31, 2007).)

[4] In that light, Brocade's financial restatements in 2005 can be seen as a triumph of theoretical accounting form over real-world economic substance.

[5] Claims Three, Seven, and Eight allege violations of the requirement to keep accurate books and records, and do not require proof of materiality. This motion does not seek summary judgment on those claims.

of the essential elements of proof in the securities fraud allegations, the SEC must prove that there is "'a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). The SEC cannot meet its burden here because the evidence demonstrates that Brocade's financial statements in fact **disclosed** the economic costs associated with ESO grants, and in any event, reasonable investors did not care about non-cash accounting charges associated with ESOs – *i.e.*, the stock option compensation expenses allegedly understated were "immaterial."

First, the non-disclosure alleged in this case is belied by the content of Brocade's financial statements and how they compared with then-prevailing financial reporting practice.[6] From the SEC complaint, one would think that Brocade said nothing to investors about ESO expense. To the contrary, from 2000 through 2004, a standard note to Brocade's financial statements disclosed – in chart form and with explicit clarity – the reduction in Brocade's earnings that would result from charging the "fair value" of ESOs as a non-cash expense. In the disclosure note, Brocade estimated the fair value expense of its ESO grants using the now-standard Black-Scholes pricing model. Notably, the ESO expense that Brocade reported in the disclosure note was more conservative – *i.e.*, the expense was *higher* – than the "intrinsic value" expense calculation that the SEC contends was appropriate for Brocade to recognize in its income statement. The disclosure note was not unique to Brocade but rather was dictated by then-prevailing accounting rules and was the means by which virtually all public companies at the time disclosed the theoretical non-cash "expense" associated with ESO grants. Moreover, Brocade's public filings offered comprehensive disclosure on all option grants, permitting interested investors to assess both the potential dilutive impact of all ESOs and their economic value. Accordingly, a hypothetical investor who cared about theoretical non-cash ESO expenses – and reasonable investors did not – saw in Brocade's financial statements a fair valuation of that expense and how it would impact earnings, and those figures could be compared with similar disclosure notes

[6] It is a complete defense to a "nondisclosure" or "concealment" allegation that the information allegedly not disclosed was actually disclosed. *See generally In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3 (N.D. Cal. May 3, 1989) ("[I]f the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission.").

publicly reported throughout corporate America.[7] The SEC's non-disclosure theory relies on an incomplete reading of the financial statements and therefore is fundamentally flawed.

Second, the economic evidence conclusively demonstrates that investors did not consider ESO expenses to be important in valuing the equity securities of Brocade or deciding whether to buy or sell Brocade stock or the stock of its peer companies. A number of econometric tests consistently prove that Brocade's disclosure of ESO expense data did not negatively influence share price. Rather, revenues and cash expenses (or, as commonly articulated, "cash in and cash out") along with revenue growth were the pertinent financial metrics. That is why Brocade's announcement of the accounting charges underlying the SEC complaint – the result of what the SEC has termed "backdating" – did *not* have a statistically significant impact on the price of Brocade shares. Indeed, when other Silicon Valley companies most recently announced substantial ESO accounting charges – Broadcom ($2.2 billion charge announced January 23, 2007) and CNet ($105.7 million charge announced January 29, 2007) – their stock price *rose* more than 4% and 9.1%, respectively.[8] These scenarios stand in stark contrast to shareholder reactions in true cases of securities fraud at Enron, Worldcom and Adelphia Communications, where those stock prices dropped precipitously in value, ultimately taking those companies into a "death spiral" towards bankruptcy.

Third, the economic evidence is powerfully confirmed by evidence of how real-world market participants actually viewed – which is to say, *ignored* – ESO expenses at companies like Brocade during the relevant period. Professional investment analysts considered ESO expenses **irrelevant** to their valuation of companies like Brocade, and the companies' own reports to investors recognized this economic reality by factoring out non-cash expenses. For example, Cisco's shares continued an upward climb despite more than $1 billion in new ESO charges spurred by a change in

---

[7] Indeed, errors in Brocade's financial reporting practices for ESO grants as alleged in the SEC complaint mirror the errors experienced, and recently announced, by some 200 public companies, including such icons of the business world as Apple Computer. That fact speaks volumes about whether the non-disclosure alleged in this case can fairly be classified as misleading. In addition to Brocade, seventy-four other companies have announced that they intend to restate their financials or record a charge related to stock-based compensation grants. (*See* Weinstein Decl., Ex. 5 (Wall Street Journal Options Scorecard).)

[8] (*See* Weinstein Decl., Ex. 6, *Broadcom Corporation,* Reuters Company Research (Jan. 24, 2007); *id.,* Ex. 7 (Andy Fixmer, *CNet Shares Surge Most in 19 Months on Revenue Gain*, Bloomberg (Jan. 30, 2007)).)

applicable accounting rules. Similarly, the marketplace ignored so-called "cheap stock" charges, *i.e.*, stock-option compensation expenses incurred by newly public Silicon Valley firms.[9] Because ESO expense was **irrelevant**, stock analysts reviewed and reported on "pro forma" or "non-GAAP" calculations[10] of financial performance, which reversed the effects of ESO expenses and other similar non-cash accounting charges that obscured true operating performance. Issuers in turn responded by announcing and providing guidance on such pro forma results. The structure and content of Brocade's earnings releases and the published analyst reports on Brocade from the relevant period confirm that ESO expense were entirely **irrelevant** to the marketplace.

Fourth, the SEC complaint's heavy reliance upon dramatic figures from the restatements of Brocade's financial results in 2005 is both misplaced and grossly misleading.[11] As publicly reported by Brocade, the restatements consist of several different buckets of alleged accounting errors, and only the very smallest bucket – which Brocade's independent auditors found *immaterial* – related to the "backdating" conduct alleged by the SEC. In addition, there is a fundamental temporal disconnect between the accounting charges that Brocade took in the restatements and the "backdating" allegations

[9] Under the typical "cheap-stock" scenario, a company undergoing an IPO records a compensation charge equivalent to the difference between the exercise price of options issued as a private company and the IPO price. Such charges were routinely ignored by investors and market professionals, as further described *infra.*

[10] "Pro forma" or "Non-GAAP" financial measures exclude stock-option compensation expenses and other charges that do not affect a company's business fundamentals. (*See* Weinstein Decl., Ex. 47, Nilabhra Bhattacharya, et al, *Assessing the Relative Informativeness and Permanence of Pro Forma Earnings and GAAP Operating Earnings* (concluding that "pro forma numbers are cleaner and more permanent measures of firm profitability than GAAP earnings" and that market participants view pro forma earnings as closer to "core earnings").)

[11] The mere fact that a public company determines that it has misapplied accounting rules and must restate its financial results means only that the company concluded the error was "material" to the financial statements from a GAAP accounting perspective. That does not mean that that the restatement was "material" to the investing public for purposes of establishing securities fraud. *Basic Inc.*, 485 U.S. at 238 ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."); *Hockey v. Medhekar*, 30 F. Supp. 2d 1209, 1224 (N.D. Cal. 1998) ("[E]ven a deliberate violation of GAAP, without more, does not amount to fraud."); *Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 829 (8th Cir. 2003) (restating earnings does not make the original restatement *per se* misleading, especially in cases where the company is required to restate its earnings no matter how small the discrepancy); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998) ("[O]ne cannot state a claim for securities fraud merely by alleging a GAAP violation. . . ."); *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 459 (D. Md. 2000) ("[T]here is a distinction between misleading financial statements and audit opinions and ones that are materially so."); *see also In re Ariba, Inc. Sec. Litig.*, 2005 WL 608278, at *8 (N.D. Cal. Mar. 16, 2005) (company's restatement to account for undisclosed cash compensation insufficient to plead scienter; publication of financial statements in violation of GAAP is not sufficient)

of the complaint. Broadly construed, the SEC complaint alleges misconduct relating to grants issued between May 1, 2000 and October 30, 2004. (*See* Compl. Apps. A & B.)[12] **By contrast, 87% of the dollar value of accounting charges in the restatements is attributable to ESO grants awarded prior to May 1, 2000.[13]** In short, the restatements do not establish a material magnitude for the ESO expenses attributable to the "backdating" scheme alleged by the SEC. To the contrary, the restatements themselves prove the immateriality of the ESO grants at issue in this case.[14]

Because there is no triable issue of fact on the question of materiality, the Court should grant summary judgment in favor of the Mr. Reyes on all claims in the SEC complaint that include the element of materiality.[15] The distinction must be drawn between what reasonable investors actually considered important to valuing Brocade shares in 2000-04, on the one hand, versus the public frenzy surrounding a wide array of corporate conduct which the SEC has branded collectively "backdating" in 2006-07, on the other. The latter exploits the wave of outrage with executive pilfering and self-dealing not raised by the facts of *this* case. Mr. Reyes was not self-enriched by the conduct alleged; he did not exercise any of the options at issue.

The "materiality" issue here is crucial both to this case and to the over 200 cases currently under investigation in the regulatory frenzy over executive compensation. "It follows that no

---

[12] In the parallel criminal case, the prosecution has emphasized an even narrower period. (*See* Weinstein Decl., Ex. 7 (United States' Memorandum Regarding Anticipated Evidence at Trial, *United States v. Reyes,* No. CR-06-0556 (Dec. 20, 2006), at 2-3) ("Moreover, the government anticipates that most of the evidence will focus on particular grants that occurred between the first quarter of Brocade's 2001 fiscal year and the third quarter of Brocade's 2003 fiscal year").)

[13] Additionally, 71% of the cumulative adjustments in Brocade's January 24, 2005 restatement resulted from option grants issued before January 1, 2000.

[14] The SEC's reliance upon the restatements faces two additional restrictions. First, because the restatements themselves are hearsay and inadmissible at trial, the SEC may not rely upon them as proof in opposition to this motion. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984) (compliance audit reports not admissible as business records where not made or kept in the ordinary course of business); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1220 n.8 (S.D.N.Y. 1992) (audit review report prepared by Arthur Anderson inadmissible hearsay). Instead, the SEC must adduce relevant and admissible testimony to prove that Brocade's financial results were misstated as a result of defendants' alleged violations of the securities laws. Second, as to those claims in the complaint seeking monetary penalties, the SEC may not rely upon ESO grants beyond the five-year statute of limitations, *i.e.*, before July 20, 2001. *SEC v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999) ("The parties agree that the five year statute of limitations embodied in 28 U.S.C. § 2462 applies to the civil penalty claims."); *3M Co. v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir. 1994) ("The provision before us, § 2462, is a general statute of limitations, applicable . . . to the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise.")

[15] The SEC's First, Second, Fourth, Fifth, and Sixth Claims require the essential element of materiality.

matter the attendant outcry or opprobrium about a lie, if the specific *fact* misrepresented is immaterial, a suit cannot succeed." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004).

## II. FACTUAL BACKGROUND

### A. Brocade, Mr. Reyes and the Use of Stock Options to Attract and Retain Talent

Brocade provides technology for storage area networks. In July 1998, at age 36, Gregory Reyes joined Brocade as CEO. Mr. Reyes's background was in sales, and he had no formal training in accounting or finance. Prior to its initial public offering, Brocade hired Michael Byrd, a former partner at Ernst & Young, to serve as Brocade's CFO. Mr. Reyes left the finance and accounting functions of Brocade to Mr. Byrd. After KPMG was engaged as Brocade's auditing firm in 2002 (after its prior auditing firm, Arthur Anderson, had been put out of business), Mr. Reyes told the KPMG engagement partner that "he relied on the CFO a lot," and, unlike most CEOs, Mr. Reyes did not attend Audit Committee meetings. (*See* Weinstein Decl., Ex. 10, Miotto Tr. 48, 55-56, 66.)

Mr. Reyes's tenure as CEO of Brocade was a remarkable success story, with the fledgling start-up ($68 million in annual revenues) becoming a technology industry leader ($600 million in annual revenues) within six years. Brocade's dramatic growth required the hiring of substantial numbers of employees. Like other companies, particularly those in Silicon Valley, Brocade used employee stock options ("ESOs") as an important component of its effort to recruit and retain talent. As permitted by law, the board of directors delegated to Mr. Reyes the sole authority, as a "committee of one," to grant ESOs to non-executive employees, without providing any guidance on how to "document" his granting decision.. Because Mr. Reyes as sole member of the committee authorized ESO grants, his decision to make a grant typically was memorialized by compensation committee "minutes" drafted for him by the Human Resources department and signed by Mr. Reyes. As the Administrator of the ESO Plan, Mr. Reyes was permitted to grant options either in the money or out of the money. (*See* Weinstein Decl., Ex. 11 (Brocade 1999 Nonstatutory Stock Option Plan, at

5.).) The board of directors retained the authority to grant ESOs to Mr. Reyes and other Section 16(b) officers. Brocade's outside auditors considered the company's ESO program to be "low risk," because there was low likelihood of material fraud (due to the lack of importance of non-cash ESO expenses),[16] and indeed the KPMG engagement partner responsible for the Brocade relationship was unaware of fundamental components of Brocade's ESO program. (*See* Weinstein Decl., Ex. 10 (Miotto Tr. 79, 87, 103).)

**B. The Accounting Rules for Non-Cash ESO Expense**

It is axiomatic that companies experience no cash outlay upon granting ESOs. The theoretical "expense" incurred by a company upon granting ESOs has been the subject of debate among accountants for decades. The uncertainty of the economic cost associated with ESOs derives from many of their attributes. For example, ESOs often are never exercised by the grantee due to cancellation, failure to vest (*e.g.*, employee departures), or expiration while the ESO is "underwater."[17]

APB 25 was an accounting pronouncement from 1972 that established the first set of rules governing the accounting treatment for ESOs. Under the so-called "fixed accounting" rules of APB 25, companies reported compensation expense only if ESOs were granted "in the money," meaning their exercise price was less than market on the date of the grant.[18] The theory was to use the

---

[16] In other words, if one were intent upon falsifying a company's financial statements in order to prop up the stock price, one would look to overstate revenues or understate cash expenses; one would not look to jimmy the non-cash expenses, and the auditors knew this in establishing their audit priorities.

[17] Richard Deranleau, Brocade's current CFO, captured this point in his investigative testimony before the SEC in this case, as follows: "I find it curious that . . . under [FAS] 123 you end up taking expenses through your P&L, that are economically not real. . . . We learned that stock options were being valued under those types of models for . . . millions of dollars. Well, what economically happened at the end of the day? You would . . . run all that through your P&L, but yet . . . the ultimate economic value that was recognized by the individual or the firm, it bears no relationship to that. So, I think that's bad accounting." (*See* Weinstein Decl., Ex. 12 (Deranleau Tr. 27).) As noted, the ESO expense charges reported in Brocade's 2005 restated financial results fit this mold, because 95% of the options that the SEC contends were "backdated" were, in fact, never exercised.

[18] APB 25 was anything but clear. On September 19, 2006, the Office of the Chief Accountant of the SEC issued a nine page release attempting to clarify the rule, which had been on the books for 34 years. (*See* Weinstein Decl. Ex. 13 (SEC Chief Accountant letter).) Moreover, the only reported decision to address the accounting rule found that APB 25 was so opaque that its violation failed to

*(cont'd)*

"intrinsic value" of ESOs, their theoretical value if immediately exercised on the date of the grant. ESOs granted at the prevailing market price ("at the money") had no intrinsic value and therefore gave rise to no such theoretical, non-cash expense. For decades most companies granted ESOs "at the money" and reported no expense in their income statements for those grants. Critics of this well established practice argued that more information should be disclosed about the economic costs of ESO grants.

In 1995, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 123, *Accounting for Stock-Based Compensation* (SFAS 123), which encouraged companies to expense the "fair value" (using an estimate such as Black-Scholes) of stock options in their income statements. However, SFAS 123 permitted companies to continue to apply APB 25 (and to report zero expense in the income statement for "at the money" grants) **provided a note to financial statements disclosed a pro forma presentation of earnings as if the value of ESO grants had been charged as an expense**. Because continuing reliance upon APB 25 was widespread, the SFAS 123 disclosure notes overwhelmingly became the vehicle through which public companies disclosed ESO information, including expense and dilution. In 2001, for example, Winn Dixie and Boeing were the only two companies among the 500 in the S&P 500 Index that reported ESO expense in the income statement; the rest disclosed ESO expenses through a FAS 123 note to the financial statements. (*See* Weinstein Decl., Ex. 14 (April 19, 2004 Fortune article).)

From 2000 through 2004, like virtually all companies, Brocade stated in the notes to its financial statements that it accounted for ESOs pursuant to APB 25. The financial statements also included the disclosure note required by FAS 123. Brocade's disclosure note clearly advised investors of the impact on earnings if the fair value of ESOs were charged as an expense in the income

(cont'd from previous page)
raise *even an inference* of scienter for securities fraud. *See In re Sportsline.com Sec. Litig.*, 366 F. Supp.2d 1159, 1168 (S.D. Fla. 2004) (observing that "interpretations of the measurement date criteria embodied in APB No. 25 are far from obvious" and granting defendants' motion to dismiss).

statement. For example, Brocade's Form 10-K filed January 20, 2004 contained in the FAS 123 disclosure note the following chart, which clearly presented for the years 2001 through 2003 the net income and earnings per share reported in the income statement and compared those figures with how those metrics would be calculated if the fair value of ESOs had been expensed (in thousands except per share amounts):

| | Fiscal Year Ended (in thousands except per share amounts) | | |
|---|---|---|---|
| | **October 25, 2003** | **October 26, 2002** | **October 27, 2001** |
| Net income (loss) — as reported | $ (136,240) | $ 59,746 | $ 2,848 |
| Add: Stock−based employee compensation expense included in reported net income (loss), net of tax | 389 | 688 | 649 |
| Deduct: Stock−based compensation expense determined under fair value based method, net of tax | (138,739) | (471,573) | (595,189) |
| Pro forma net loss | $ (274,590) | $ 411,139) | $ (591,692) |
| Basic earnings (loss) per share: | | | |
| As reported | $ (0.54) | $ .26 | 0.01 |
| Pro Forma | $ (1.10) | $ (1.78) | $ (2.68) |
| Diluted earnings (loss) per share: | | | |
| As reported | $ (0.54) | $ 0.25 | $ 0.01 |
| Pro Forma | $ (1.10) | $ (1.78) | $ (2.68) |

(*See* Weinstein Decl., Ex 15 at 51.)

Because the disclosure table was standardized by SFAS 123, investors could compare the disclosure note in Brocade's financial statements against like tables for other public companies. Fair value calculations typically resulted in the assignment of a higher expense value to ESOs than the intrinsic value calculation underlying APB 25. **In Brocade's case, its disclosure notes for 2000 through 2004 all calculated the fair value of ESO expense as a higher charge against earnings than the charge presented in Brocade's restated financial statements.**[19]

[19] Finally, in December 2004, FAS 123 was revised – becoming FAS 123(R) – which ended the practice of a disclosure note to the financial statements and required instead that the fair value of all ESO grants be charged against earnings in the income statement. In effect, the old FAS 123 disclosure note presentation became the mandatory income statement presentation or the financial statements would not comply with GAAP.

The process of developing a real-world economic estimate of the fair value of ESOs – rather than the Black Scholes academic model – is a continuing front-burner issue for the SEC, accounting policymakers and corporations, due to dissatisfaction with the current methods of estimating . On January 25, 2007, the SEC Chief Accountant approved a program at Zions Bancorp that will value ESO expense based on market forces as reflected by securities that mimic the ESOs issued to Zions employees. As the Wall Street Journal reported on January 30, 2007:

> Both the SEC and accounting rule makers have said they believe market-based approaches are best for valuing options. [SEC Chief Accountant] Hewitt said yesterday that the problem is that the models currently in use produce “hypothetical numbers.” Market-based approaches produce what “may be a real number,” he added.

David Reilly & Serena Ng, *SEC Clears Market-Based Way to Value Staff Stock Options*, Wall St. J., Jan. 30, 2007, at C5 (Weinstein Decl., Ex. 8). The fact that the SEC itself is still searching for a meaningful, real-world, market-based methodology for estimating non-cash stock option expenses underscores that the prior methodologies have been rejected because of their lack of market relevance.

**C. Brocade’s First Internal Inquiry and Related Announcements**

In November 2004, counsel for a former Brocade sales executive wrote to Brocade’s in-house counsel alleging, among other things, irregularities in Brocade’s ESO granting practice. After a preliminary review by Brocade’s regular outside counsel, the Audit Committee engaged Morrison & Foerster and PricewaterhouseCoopers to conduct an investigation.

The Audit Committee first addressed two ESO granting programs at Brocade – the so-called “offer acceptance” and “part time” programs – which Mr. Byrd had instituted and Brocade’s outside auditors had approved.[20] The SEC makes no mention of misconduct related to either of these

[20] KPMG described these programs as follows:
· Offer Acceptance Program – "From May 1999 (date of IPO) through July 2000, the Company granted options to certain new hires before they started full time service. The Company believed that once the employee signed an offer letter, they were eligible to receive option grants and would be eligible for 'fixed accounting' as described in APB Opinion No. 25."

*(cont'd)*

two programs, nor can it: the programs were implemented with the knowledge and support of Brocade's former auditors, Arthur Andersen, and were well within the range of reasonable accounting judgments under the then existing accounting rules and interpretative guidance. *(See* Weinstein Decl, Ex. 17 (Read 11/17/04 Memo at 2) ("The questions were addressed with the Company's auditors, Arthur Andersen."); *id.,* Ex. 18 (Read Tr. 81:17-82:3[21]).) Moreover, these programs were well-known within Brocade's Finance and HR Departments, and Mr. Reyes played no role in formulating or implementing them.

Nonetheless, by January 6, 2005, the Audit Committee elected to change the Company's historical accounting for the two programs on the advice of KPMG, which had replaced Arthur Andersen as Brocade's outside auditor in 2002. Accordingly, after the market closed on January 6, 2005, Brocade publicly disclosed the Audit Committee's decision, announcing that it expected to restate financial statements "to record additional stock-based compensation expense," because "the way in which [the Company] accounted for stock option grants" under the part-time and offer-acceptance programs was "incorrect."[22] (*Id.*, Ex. 19 (January 6, 2005 Press Release).) **This announcement had nothing to do with the alleged unreliability of the compensation committee minutes signed by Mr. Reyes – the basis for the "backdating" allegations in the SEC's complaint**. (*Id.,* Ex. 10 (Miotto Tr. 156); *id.,* Ex. 18, (Read Tr. 121:15 – 123:20).) Indeed, the testimony is

(cont'd from previous page)
· Part Time Program – "From July 2000 to October 2002, the Company granted options to certain employees before they started full time service. . . . The Company believed that employees who were in the part time program met the definition of an employee as described in [a recent accounting pronouncement] and that they were eligible to receive stock options before full time service and receive 'fixed accounting' under APB No. 25." (Weinstein Decl., Ex. 16 (Miotto 2/2/05 Memo).)

[21] As Charles Read, Brocade's controller explains: "I believe this it's a situation where reasonable minds can differ." *Id.*

[22] The announcement provided: "Specifically, the Company has determined it incorrectly accounted for, and will record historical stock-based compensation charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002." *Id.*.

uniform that the Audit Committee had not even raised the issue of reliability of the compensation committee minutes (the issue underlying the SEC's "backdating" allegations) by January 6, and Brocade had made no public announcements disclosing it. (*Id.,* Ex. 10 (Miotto Tr. 158, 171); *id.,* Ex. 18 (Read Tr. 121:15 – 123:20).)

As the Company further explained in the January 6 release, the restatement would not include "any material adjustments to its historical revenues, non-stock option related operating expenses or cash positions." (*Id.,* Ex 19 (January 6, 2005 Press Release).) Brocade also announced that the Audit Committee's review of the Company's historical stock option granting practices was ongoing. (*Id.*)

Because the adjustments related solely to non-cash stock option compensation expense and would not impact the Company's historical pro forma (or non-GAAP) results, analysts concluded that the restatement was immaterial to Brocade's business fundamentals.[23] (*See* Weinstein Decl., Ex. 20 (January 6, 2005 A.G. Edwards Report) ("[W]e do believe Brocade's underlying fundamental position remains solid – retaining Buy rating"); *id.,* Ex. 21 (January 7, Merrill Lynch Report) ("[W]e are not changing our estimates" and "[w]e believe that Brocade's business fundamentals remain intact"); *id.,* Ex. 22 (January 7, 2005 Adams Harkness Report) ("[W]e continue to believe the company's fundamentals are strong and getting stronger"; the effect of the restatement "should be minimal" and "has no effect on business fundamentals.").)[24] Analysts were, however, concerned about

---

[23] As one Silicon Valley CEO remarked to Business Week regarding ESO expense: "[W]hat difference did it make? . . . It was going to be removed for the pro forma reports anyway, and that's all the investment community cared about." (*See* Weinstein Decl., Ex. 23 (Peter Burrows, *Witch Hunt in Silicon Valley*, Business Week (Aug. 15, 2006)); *see also id.,* Ex. 24 (James S. Granelli, *Chip Maker to Restate Earnings*, L.A. Times (July 15, 2006)("These restatements are noncash events and are nothing that will affect cash flow or the future of the company. So you look at this and say, 'So what?'").)

[24] *See also, Id.,* Ex. 25 (January 6, 2005 Citigroup Report) ("[W]e expect no material impact on revenue, cash or Non-GAAP earnings"); *id.,* Ex. 26 (January 7, 2005 Punk Ziegel & Company Report) (The restatement will not affect revenue or non-stock operating expense . . . such as the kind we typically publish or are found in First Call."); *id.,* Ex. 27 (January 7, 2005 Baird Report) ("Restatement related to accounting for stock options expense versus revenue or operating expense adjustments. We initially believe this is more of an accounting housekeeping matter versus a negative reflection on

*(cont'd)*

uncertainty raised by the ongoing review. (*See, e.g.*, *Id.,* Ex 21 (January 7, 2005 Merrill Lynch Report) ("[W]e are somewhat concerned that the ongoing review could reveal additional mistakes"); *id.,* Ex. 27 (January 7, 2005 Baird Report)("Although the issue appears minor we will be more comfortable once the 10K is formally filed).)

As a result of this lingering uncertainty (to be resolved a mere two weeks later), Brocade's stock declined slightly. (Gulley Decl., ¶ 23 (explaining that uncertainty caused the stock drop following the January 6 release).)[25] Of Brocade's four restatement-related disclosures, this was the only disclosure that preceded a stock decline of any statistical significance. (*Id.,* ¶ 21 & Ex. C.) **Nonetheless, market reaction to the January 6 release was unrelated to conduct alleged by the SEC; it was not until a subsequent press release on January 24, 2005, that there was any public disclosure of "unreliability" in connection stock-option documents or processes.**

In the January 24, 2005 release, Brocade announced that its internal investigation was complete, and that in addition to the conclusions announced on January 6, the Audit Committee had further determined that "there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003."[26] Brocade's decision to restate ESO expense because of this

---

(cont'd from previous page)
fundamental business issues"); *id.,* Ex. 28 (January 7, 2005 J.P. Morgan Report) ("The restatements should not have any impact of Brocade's non-GAAP results, revenues or cash position," and "[y]esterday's announcement does not appear to impact Brocade's economic fundamentals, though uncertainty surrounding the issue may pressure the shares until the matter is fully resolved"); *id.,* Ex. 29 (January 7, 2005 First Albany Capital Report) ("We believe these restatements won't materially impact Brocade's historical revenue, cash, or operating (pro forma) income (EPS). In addition, they do not impact the company's current outlook nor its fundamentals, which we believe remain solid. Maintain Buy rating").)

[25] Dr. Gulley's declaration is filed under separate cover.

[26] This statement about the reliability of documentation was a conclusion that the paperwork memorializing ESO grants was inadequate. KPMG was concerned that Mr. Reyes, as "committee of one," had no fellow directors to corroborate grant dates and that the recordkeeping for granting decisions was not sufficiently contemporaneous even though Mr. Reyes was given no guidelines or instructions on how to document the grant date. KPMG's engagement partner, who had been unaware of the unhidden "committee of one" arrangement prior to the Audit Committee investigation,

*(cont'd)*

paperwork deficiency involved defaulting to so-called "variable accounting" to calculate the intrinsic value of ESO grants – an approach rarely applied during the relevant period (2000 through 2004) or even today.[27] The release further disclosed that Brocade's Audit Committee had found "improprieties in connection with the documentation of stock option grants … of a small number of employees prior to mid 2002, which resulted in immaterial adjustments included in this restatement." (*Id.*, Ex. 3 (January 24, 2005 Press Release).) That same day, and in a separate release, the Company announced that Michael Klayko would replace Greg Reyes as Chief Executive Officer. (*Id.,* Ex. 30 (January 24, 2005 Press Release entitled "Brocade Announces Executive Appointments").) That release also announced that Mr. Reyes would remain as a director and serve "as an advisor to the Board and the new CEO, focusing on customer and strategic matters."[28] (*Id.*)

Once again, because the restatement did not affect historical revenue, cash positions, or non-stock option related expenses, analysts viewed the adjustments as immaterial to Brocade's stock valuation and business fundamentals. (*See Id.*, Ex. 31 (January 25, 2005 RBS Capital Markets Report) ("Given the accounting restatement indicates no changes to historical revenue, cash positions, or non-stock option related operating expenses, we are maintaining our financial estimates."); *id.,* Ex. 32

(cont'd from previous page)
addressed this supposed evidentiary deficiency in investigative testimony before the SEC: asked what might constitute sufficient evidence that a "committee of one" meeting actually occurred to grant stock options, the KPMG partner replied: "Well, you could ask for a representation, but still, **short of being there you would have no specific proof**." (Weinstein Decl., Ex. 10 (Miotto Tr. 87 (emphasis added).) It was the board of directors' decision to establish a "committee of one," and it is unfair to lay any deficiencies in that arrangement at the feet of Mr. Reyes.

[27] Brocade's decision to restate under a variable accounting model due to lack of supporting paperwork has been called into serious doubt by accounting guidance subsequently issued by the SEC's Chief Accountant. (Weinstein Decl., Ex. 13 (SEC Chief Accountant Letter) ("[T]he staff does not believe that the lack of complete documentation being available several years after the activities occurred should necessarily result in a 'default' to variable accounting or to treating the awards as if they have never been granted. Rather, a company must use *all available relevant information* to form a reasonable conclusion as to the most likely option granting actions that occurred and the dates on which such actions occurred in determining what to account for.").)

[28] In the release, Mr. Klayko said that Mr. Reyes "will continue to be a very important and valuable contributor to our customer relationships and to the continued success of Brocade." He also noted that "Greg has built an outstanding company brand and organization during the past six years, and we appreciate the breadth and depth of his contributions to Brocade." (*Id.*, Ex. 30 (January 24, 2005 Press Release entitled "Brocade Announces Executive Appointments").)

(January 25, 2005 Adams Harkness Report) ("The restatement does not affect any pro-forma earnings" and "[w]e reiterate our Strong Buy rating on Brocade Communications"); *id.,* Ex. 33 (January 24, 2005 Citigroup Report) (reiterating a "Buy" rating and noting that "[r]evenue, non-GAAP EPS, and cash balances were not affected"); *id.,* Ex. 34 (January 25, 2005 Lehman Brothers Report) (noting that the restatement involved "[n]o adjustments to revs and cash").)

Analysts did, however, express concern about Greg Reyes's departure. (*See Id.,*, Ex. 35 (January 24, 2005 CIBC World Markets Report) ("Mr. Reyes was a major force at Brocade. It is possible Mr. Klayko might pick up and work along the same lines, but unlikely."); *id.,* Ex. 36 (January 25, 2005 American Technology Research Report) ("In our opinion, Greg Reyes was a hard-driving and results-oriented CEO who helped propel BRCD from a $66 million yearly revenue run-rate company to over $600 million today. We believe his shoes may prove difficult to fill.").)

On January 25, 2005, Brocade's stock dropped slightly, but by a statistically insignificant amount. (Gulley Decl., ¶ 21 & Ex. C, D.) Within two days, the stock rebounded to the same price at which it traded immediately prior to the January 24 releases. (*See* Weinstein Decl., Ex. 37 (Stock Price Charts).)

**D. Brocade's Second Internal Inquiry and Related Announcements**

The Audit Committee launched a second investigation in the spring of 2005 when an HR employee, Grace Ward, acknowledged that she had lied to Morrison & Foerster about the manner in which **she** had processed certain ESO grant paperwork.

Then, before the market opened on May 16, 2005, Brocade announced another restatement "to record additional charges for stock-based compensation expense." The Company stated that it "had not appropriately accounted for the cost of stock-based compensation for certain employees on leaves of absence and in transition roles," and, as a result expected to incur an additional

compensation expenses between $31 million and $52 million.[29] The Company also noted that it "could not rely on the documentation used to support the recorded measurement dates for stock options granted" between August 2003 and November 2004." It therefore would record an additional $800,000 in non-cash stock option compensation expense for these grants. [30] The May 16 release included no mention of fraud, and this time did not even allude to "improprieties." The release further affirmed that "none of the charges will have an impact on Brocade's historical revenues, cash positions or non-stock option related operating expenses." (Weinstein Decl., Ex. 38 (May 16, 2005 Press Release).)

On May 16, 2005, after the press release, Brocade's stock closed just four cents below its price on the prior trading day (May 13, 2005). (*See, id.,* Ex. 37.) This slight drop had no statistical significance. (Gulley Decl., ¶ 21 & Ex. C.)

Finally, six months later, Brocade announced the formal completion of its Audit Committee's second review. A November 14, 2005 press release reported that Brocade had restated financial statements for fiscal 2002 through fiscal 2004 to record $72.2 million in additional stock-based compensation expenses, consistent with the Company's May 16 announcement. Brocade again affirmed that "none of the charges affected its historical revenues, cash positions, or non-stock option related operating expenses." (Weinstein Decl, Ex. 39 (November 14, 2005 press release).)

On the same day, Brocade filed an amended 10-K incorporating adjustments to stock-option compensation expense. The amended 10-K reported that, as a result of the Audit Committee's conclusion that it could not "rely on the documentation used to support the recorded measurement

[29] The errors relating to the Leave of Absence Program had nothing to do with the conduct underlying the SEC's "backdating" allegations. KPMG's view was "that it was an administrative breakdown. . . . It[] seemed to be a breakdown in communications between HR and stock administration." (Weinstein Decl., Ex. 10 (Miotto Tr. 236).) Mr. Reyes was uninvolved in any of this.

[30] The first restatement announced on January 24, 2005 restated grants issued prior to August 14, 2003. The $800,000 adjustment announced on May 16, 2005 restated grants issued between August 2003 and November 2004. (*See* Weinstein Decl., Ex. 38 (May 16, 2005 Press Release at 1).)

dates for stock options granted in the period from August 2003 through November 2004," the Company would record approximately $900,000 in non-cash stock-option compensation expense. The 10-K/A further disclosed that the Company "had not appropriately accounted for the cost of stock–based compensation for certain employees on leaves of absences ("LOA") and in transition or advisory roles prior to ceasing employment" with Brocade, resulting in $80 million in cumulative adjustments to fiscal years 1999 through 2004.(Weinstein Decl., Ex. 40 at 3).)[31]

The market responded by bidding up the price of Brocade's shares by 17% above the previous day's close, a statistically significant increase in Brocade's share price. (Gulley Decl., ¶ 21 & and Ex. C); (Weinstein Decl., Ex. 37 (Stock Price Charts).)

## III. ARGUMENT

### A. The Summary Judgment Standard and the Issue of Materiality.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c))[32]; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (finding that standard of materiality set forth in *TSC Industries* (cited *infra*) is appropriate in § 10(b) and Rule 10b-5 context); *SEC v. Talbott*, 430 F. Supp. 2d 1029, 1036 (C.D. Cal. 2006).

A party seeking summary judgment bears the initial burden of identifying evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by either (1) negating an essential element of the non-

[31] The 10-K/A also identified another issue relating to "documentation used to support the recorded dates for certain stock option exercises," resulting in cumulative adjustments of just $400,000. This issue had nothing to do with the purported unreliability of Brocade's option granting documents or processes. (Weinstein Decl., Ex. 18 (Read Tr. 251:8-20).)

[32] In *Celotex*, the Supreme Court found that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322.

moving party's case or (2) by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish an element essential to that party's case . . . on which that party will bear the burden of proof at trial." *Id.* at 322. Once this burden is met, the party opposing the motion must respond with "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F. 3d 1216, 1221 (9th Cir. 1995)

Summary judgment is appropriate where the SEC fails to meet its burden of adducing sufficient evidence of materiality. *See, e.g.*, *SEC v. Truong*, 98 F. Supp. 2d 1086, 1096 (N.D. Cal. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The Supreme Court established that summary judgment is properly granted on the issue of materiality if the established omissions are "'so obviously [un]important to an investor, that reasonable minds cannot differ on the question of materiality.'" *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 435, 450 (1976) (citation omitted); *see also Basic Inc.*, 485 U.S. at 238. In *Truong*, the Court granted summary judgment in favor of the defendants, dismissing the allegations brought by the SEC, because the SEC had failed to show that the defendant possessed "material" information that could have altered the "total mix" of information available to investors.[33] *Truong*, 98 F. Supp. 2d at 1099. **It is noteworthy that in the one reported decision addressing a private securities fraud suit grounded on alleged improper accounting for stock-based compensation, the court dismissed the case at the pleading stage for**

[33] For some of the legion of other cases granting summary judgment or upholding its grant to defendants on the issue of materiality, *see SEC v. Hoover*, 903 F. Supp. 1135, 1146 (S.D. Tex. 1995) (granting summary judgment to defendant because the total mix of information available to investors would not have changed based on a 0-2% decrease in earnings); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) (affirming summary judgment where statements regarding company's dividend were not material); *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1199 (D. Nev. 1999) (dismissing claims relating to statements of general optimism or "vaguely positive statements that could not, as a matter of law, have been relied upon by the reasonable investor"); *In re Sybase, Inc. Sec. Litig.,* 48 F. Supp. 2d 958, 961 (N.D. Cal. 1999) (granting summary judgment on the bases that the false statements were immaterial because the information was known to the market); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462-63 (S.D.N.Y. 2000) (finding no triable issue as to statements of corporate optimism); *In re Corning, Inc. Sec. Litig.*, 349 F. Supp. 2d 698, 720-22 (S.D.N.Y. 2004) (granting summary judgment for the defendants because the failure to disclose breast implant litigation was immaterial, given that during the non-disclosure period, the facts about breast implant suits and claims were highly favorable to the companies).

**failure to allege facts giving rise to a strong inference of scienter, as required by the Private Securities Litigation Reform Act. *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159 (S.D. Fla. 2004). The court concluded that the alleged "GAAP violations were not obvious, nor of great importance or magnitude." *Id.* at 1170.**

It is well-settled that the test for materiality is an objective one: for an omitted fact to be material, there must be a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32; (quoting *TSC Indus.,* 426 U.S. at 449; *see Truong,* 98 F. Supp. 2d at 1099. In addition, for an omission or misstatement to be material, the information must not have already entered the market.[34]

As the Eighth Circuit has stated, "[t]here are a variety of reasons why an alleged misrepresentation or omission may, as a matter of law, be immaterial," including that the data at issue is so insignificant that it simply would not matter to a reasonable investor. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546-47 (8th Cir. 1997). In *Parnes*, the court advised, "'[t]he role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time.'" *Id.* at 547 (quoting *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994)).

---

[34] *See, e.g.*, *In re PetSmart, Inc. Sec. Litig.,* 61 F. Supp. 2d 982, 996 (D. Ariz. 1999) ("As a matter of law, the price of PetSmart's stock cannot be overinflated based on an omission if the market was otherwise aware of the information."); *In re Sybase,* 48 F. Supp. 2d at 961 ("'[A]n omission is materially misleading only if the information has not already entered the market.'") (citation omitted); *Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir. 1996) (statements regarding potential benefits of applied-for rate increase but failing to disclose past rejections of similar rate requests were not actionable since market was alerted to the regulatory nature of rate-making proceedings); *In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3 (N.D. Cal. May 3, 1989) ("[I]f the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission. In a similar vein, if the information to be disclosed is already known, even if through another source, it cannot be considered material."); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409-10 (9th Cir. 1996) (fraud on the market claim failed since market was already aware of possibility that corporation's product could become obsolete).

### B. The "Total Mix" of Information Included Clear and Comprehensive Disclosure of Brocade's ESOs and Related Expenses.

In stark contrast to the SEC's allegations of non-disclosure, Brocade's filings actually included voluminous disclosure on its stock-option grants and associated expenses. For example, far from hiding expenses, Brocade actually disclosed **$1.45 billion** in stock-option compensation expense in the footnotes to its financial statements, as required under Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). (*See* Stanton Decl., ¶¶¶ 14-17 & Ex. 4.)[35] The importance of financial-statement footnotes is well established. (*See* Weinstein Decl., Ex. 41 (SEC "Beginner Guide to Reading Financial Statements") ("It's so important to *read the footnotes*. The footnotes to financial statements are packed with information.).) Per standard practice, a note to Brocade's financial statements advised investors that "[t]he accompanying notes are an integral part of these consolidated financial statements." (*See, e.g.*, Weinstein Decl., Ex. 15 (Brocade Fiscal Year 2003 10-K at 42).) Even the SEC Complaint in this action cites to the notes to the Brocade financial statements as though they were representations by Mr. Reyes. (*See* Compl. ¶ 17.)

All of Brocade's footnote disclosures reported stock-option expense under the "fair value" methodology, the now-required method for reporting stock-option expense that superseded APB 25 in 2005. The disclosures also reported stock-option expenses in clear, tabular format – displaying both the sum of stock-option expenses by fiscal year, and the impact those expenses had on annual net income.[36] (*See, e.g.* Weinstein Decl., Ex. 15 (Brocade Fiscal Year 2003 10-K at 51) (SFAS 123 footnote disclosure).) **Significantly, the sum of expenses originally disclosed in these footnotes - $1.45 billion in total – far exceeded expenses ultimately recorded in Brocade's**

---

[35] Steven Stanton is a CPA and expert forensic accountant who reviewed work papers underlying the restatements and analyzed ESO grant data from Brocade's Equity Edge database. His declaration is filed under separate cover.

[36] Arguably, the SFAS 123 footnote offered clearer disclosure of stock-based compensation expense than conventional reporting under APB 25. Under SFAS No. 123, the total amount of stock-based compensation expense is included as one line item in the footnote disclosures, along with the impact on reported net income. Under APB No. 25, the amount of expense is rolled up into broader categories of income-statement expenses, such as sales and marketing expenses, and general and administrative expenses, making the total impact on net income less clear.

**restatements.** (Stanton Decl., ¶ 16 and Ex. 4.) Thus, the SEC must contend that Brocade's alleged misreporting of expenses under a now-defunct accounting rule (APB 25) substantially altered the "total mix" of information – a mix that included clear disclosure of billions in stock-option expenses under an accounting methodology now mandated by FASB.

The "total mix" also included comprehensive disclosure on virtually every characteristic of Brocade's ESOs – thereby permitting interested investors to assess both the potential dilutive impact of all ESOs granted and their paper value to the grantees.[37] (*See, e.g.*, Weinstein Decl., Ex. 15 (Brocade Fiscal Year 2003 at 66).) Specifically, Brocade's filings fully and accurately disclosed:

- the number of options granted, exercised, and cancelled (*see, e.g., id.,* Ex. 15 (Brocade Fiscal Year 2003 10-K at 66));
- the weighted-average strike price of all outstanding, exercisable, exercised and cancelled ESOs, aggregated by fiscal year (*see, e.g., id.,* Ex. 15 (Brocade Fiscal Year 2003 10-K at 66));
- the weighted-average expected life of ESOs from their vesting dates; (*see, e.g., id.,* Ex. 15 (Brocade Fiscal Year 2003 10-K at 51));
- the number of shares and strike prices of all ESOs granted to section 16(b) officers, directors, and stockholders (*see, e.g. ,id.,* Ex. 43 (Form 4 for Greg Reyes filed 7/11/03); Ex. 42 (Brocade Fiscal Year 2003 Proxy Statement at 17-20));
- the vesting schedules of all ESO granted to section 16(b) officers (*see, e.g., id.,* Exs. 43 and 42 (Form 4 for Greg Reyes filed 7/11/03) and (Brocade Fiscal Year 2003 Proxy Statement at 18-19));
- the expected volatility of the stock underlying the ESOs (*see, e.g., id.,* Ex. 15 (Brocade Fiscal Year 10-K at 51)); and
- the potential dilutive impact of all ESO exercises; *(see, e.g., id.,* Ex. 15 (Brocade Fiscal Year 10-K at 66)); (*id.,* Ex. 44 (1Q03 Earnings Release at 2) (disclosing diluted net income per share)).

Given the volume of information disclosed, Brocade's disclosures belie any notion of concealment or fraud.[38] Courts have found that note disclosures are integral parts of public filings and

---

[37] To the extent investors care about stock option grants, they care only about the potential dilutive effect. (*See* Crespi Decl., ¶ 16).)

[38] (*See* Weinstein Decl., Ex. 45 at 2, ¶ 6 (Larry E. Ribstein, Harvard Law School Corporate Governance Blog)("There is no indication that the backdating itself fooled the market. The firms, after all, disclosed the option price and the number of options. This is the key data, and there is every reason to believe that, as the *New Yorker*'s James Surowiecki points out, "accounting legerdemain doesn't fool the market.")); (*see also id.*, Ex. 46 (NERA White Paper at 1-2) ("[T]he number of options granted, their strike prices, and other terms were disclosed in several different public filings. Whether
*(cont'd)*

that the existence of such disclosures may provide a basis for summary judgment. *See, e.g., Kahn v. Wien*, 842 F. Supp. 667, 676 (E.D.N.Y. 1994), *aff'd*, 41 F. 3d 1501 (2d Cir. 1994) (granting summary judgment to defendant in part because correct figure for total secondary overage rent appeared in notes to the financial statements); *Gart v. Electroscope*, 24 F. Supp. 2d 969, 973 (D. Minn. 1998) (securities fraud complaint dismissed where defendants included adequate disclosure in the notes to financial statements included in the prospectus); *SEC v. Geotek*, 426 F. Supp. 715, 751-52 (N.D. Cal. 1976) (finding financial statements not fraudulent or misleading in light of note disclosures regarding method for determining expenses and a line by line summary of the expenses charged), *aff'd sub nom.*, *SEC v. Arthur Young & Co.,* 590 F.2d 785 (9th Cir. 1979); *Madonick v. Denison Mines Ltd.*, 1974 WL 3821, at *6 (S.D.N.Y. 1974) (granting summary judgment to defendant because plaintiff failed to demonstrate there was inadequate or misleading disclosure where facts were disclosed in notes to proxy statement); *see also Werner v. Werner*, 267 F. 3d 288, 297 (3d Cir. 2001) (upholding District Court's finding that restricted stock plan was adequately described in notes of annual report); *In re Seagate Tech. II*, 1989 WL 222969, at *3 ("[I]f the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission."); *see also In re PetsMart, Inc. Sec. Litig.,* 61 F. Supp. 2d 982, 996 (D. Ariz. 1999) ("As a matter of law, the price of PetsMart's stock cannot be overinflated based on an omission if the market was otherwise aware of the information.").

### C. Investors Consider the Amount of Reported Non-Cash Stock Option Compensation Expense Immaterial to Investment Decisions.

Overwhelming evidence demonstrates that investors do not care about the amount of stock-option compensation expense that companies report in their financial statements. The market's lack of interest in stock-option compensation expenses is confirmed by the following indisputable facts:

- Analysts considered stock-option expenses irrelevant to company value, and excluded stock-option expenses from their computation of critical performance metrics;

(cont'd from previous page)
or not one concludes that executives were overpaid as a result of these grants, in general, investors were not misled as to the economic value of the options actually granted.").)

- Companies - including Brocade - reported "pro forma" earnings that excluded stock-option expenses to better elucidate financial performance;
- Academic studies consistently find no evidence linking stock-option expenses to reductions in share price.

1. <u>Analysts universally regarded stock-option expenses as irrelevant to company value</u>.

The market's disinterest in stock-option compensation expenses is underscored by the practices of Wall Street investment analysts. In valuing publicly traded companies, analysts calculated (and still calculate) valuation metrics that **exclude stock-based compensation expenses and other non-cash charges**.[39] (Crespi Decl., ¶ 9.)[40] Investors and market professionals refer to these metrics as "pro forma" or "non-GAAP" measures. As Christopher Crespi explains, analysts rarely look to GAAP earnings when valuing companies, and instead analyze non-GAAP EPS when making buy-or-sell recommendations.

Analysts exclude non-cash expense items such as stock-based compensation expenses because they do not affect economic fundamentals. (*See* Weinstein Decl., Ex. 47 (Nilabhra Bhattacharya, et al., *Assessing the Relative Informativeness and Permanence of Pro Forma Earnings and GAAP Operating Earnings* (concluding that "pro forma numbers are cleaner and more permanent measures of firm profitability than GAAP earnings" and that market participants perceive pro forma earnings to be closer to "core earnings.").) Indeed, as Mr. Crespi states, "**[p]rofessional investment analysts uniformly consider stock-option compensation expenses irrelevant to the valuation of publicly traded securities**." (Crespi Decl., ¶ 8). The reason for this is that "analysts widely regard stock-option compensation expense as having little or no relation to the value of the options issued or to the costs incurred by companies issuing them." (*Id.)*

---

[39] Items left out of pro forma or non-GAAP calculations of net income include depreciation, goodwill, restructuring and merger costs, interest and taxes, stock-based employee pay, losses at affiliates and one-time expenses. (*See* Weinstein Decl., Ex. 47 (Nilabhra Bhattacharya, et al, *Assessing the Relative Informativeness and Permanence of Pro Forma Earnings and GAAP Operating Earnings*).)

[40] Christopher Crespi is an investment fund manager and from 1994 to 2004 worked as an award-winning equity analyst specializing in technology growth stocks. Although Mr. Crespi did not in his analyst career cover Brocade specifically, he did cover network equipment providers in the same business sector as Brocade. His declaration is filed under separate cover.

The fact that analysts focus on non-GAAP or pro forma performance measures - rather than on measures inclusive of stock-option compensation expense – is evident from the analyst reports themselves. (*See, e.g.,* Weinstein Decl., Ex. 25 ((January 6, 2005 Citigroup Report) ("[W]e expect no material impact on revenue, cash or *Non-GAAP Earnings*")); *id.,* Ex. 26 ((January 7, 2005 Punk Ziegel & Company Report) ("The restatement will not affect revenue or non-stock operating expense such as the kind we typically publish or are found in First Call.")); *id.,* Ex. 28 ((January 7, 2005 J.P. Morgan Report) ("The restatements should not have any impact on Brocade's *non-GAAP results*, revenues or cash position")); *id.,* Ex 29 ((January 7, 2005 First Albany Capital Report) ("We believe these restatements won't materially impact Brocade's historical revenue, cash, or operating *(pro forma) income* (EPS).")); *id.,* Ex. 48 ((May 14, 2003 Wachovia Securities Report) ("BRCD reported . . . *pro forma EPS* of break-even")); *id.,* Ex. 49 ((August 11, 2003 Unterberg Report) ("On the bottom line we look for Brocade to post *non-GAAP earnings* of $0.01.")); *id.,* Ex. 50 ((February 13, 2003 Deutsche Bank Securities Report (analyzing "*pro forma EPS results*" and reporting "*pf EPS*" estimates) (emphasis added).). Indeed, the sheer ubiquity of valuation metrics that purposefully exclude stock-option compensation expense confirms the irrelevance of such expenses to investors.

2. <u>Brocade's earnings releases to Wall Street, like those of most public companies, reported performance measures that excluded stock-option compensation expenses</u>.

The market's indifference to stock-option compensation expenses is further corroborated by the earnings releases of *nearly all publicly traded companies*. Most companies – including Brocade – reported and continue to report "pro forma" or "non-GAAP" earnings measures, *i.e*., measures that purposefully exclude non-stock compensation expense from earnings calculations. (*See, e.g.*, Weinstein Decl., Ex. 51 (Cisco release reporting pro forma earnings that exclude stock-based compensation expense); Ex. 52 (McData release reporting pro forma earnings that exclude stock-based compensation expense); Ex 53 (WebEx earnings release reporting pro forma earnings that exclude stock-based compensation expense).) This fact is also confirmed by Mr. Crespi, who explains that publicly traded companies took their cue from Wall Street analysts, who were already using pro forma figures in their communications with investors. Companies disclosed earnings in this way because investors demanded a clear view of financial performance, **unobstructed by accounting**

**trivialities with zero effect on company cash flows**. As Brocade's own earnings releases explained, "[t]he non−GAAP results … provide what we believe is a more complete understanding of our underlying operational results and trends. Specifically, we believe the non-GAAP results provide useful information to both management and investors by excluding . . . certain expenses . . . that we believe are not indicative of our core operating results." (*Id.,* Ex. 54 (November 20, 2003 Brocade Press Release).)[41]

3. <u>Academic studies find no link between stock-option compensation expense and declining equity values</u>.

Empirical studies also show no link between stock-option compensation expense and drops in share price. For example, Dr. David Gulley, a PhD economist and professor at Columbia University, constructed a multivariate regression model to determine if the magnitude of stock-option expenses had any impact on equity values for Brocade or its industry peers. Dr. Gulley found that, controlling for all other accounting entries, **there is no statistically significant, negative relationship between stock-option expense and the share price.**[42] (*See* Gulley Decl., ¶¶ 7 *et seq.*.) In other words, any negative relationship between stock-option expense and share price is statistically indistinguishable from zero. Put simply, Dr. Gulley's study shows that the market does not care how much value Brocade or any of its industry peers gives to employees in the form of stock-option grants – no matter whether such value is disclosed under APB 25 or in the SFAS 123 footnote. At the same time, Dr. Gulley finds that financial metrics known to affect stock – *e.g.*, net revenues – did have a significant effect on Brocade's stock price. (*See* Gulley Decl., at 6 n.5).) This result correlates with the practices of Wall Street analysts, who considered revenue growth a strong indicator of company

[41] Brocade's press release further explains that "these non-GAAP results are one of the primary indicators management uses for planning and forecasting of future periods. Brocade management refers to these non-GAAP financial measures in making decisions regarding [the Company's] operational performance and to facilitate internal comparisons to [both the Company's] historical operating results and to competitors' operating results." *Id.*

[42] Dr. Gulley found this conclusion to be true both of Brocade *and* its industry peers.

value. (*See* Crespi Decl., ¶ 13.) Moreover, Dr. Gulley's conclusions align with both common sense and the other academic literature on the subject.[43]

**D. Movements in Brocade's Stock Price Following Restatement-Related Disclosures Offer No Evidence of Materiality**.

Dr. Gulley's analysis of marketplace reaction to Brocade's four restatement-related disclosures finds zero connection between Brocade's share price and either 1) the conduct alleged in the SEC's complaint, or 2) adjustments to stock-option compensation expense.[44]

Dr. Gulley's "event-study" analysis of the four restatement-related disclosures reveals that only one preceded a statistically significant drop in stock price: the January 6, 2005 press release (Gulley Decl. ¶¶ 18-22 & Ex. C). As noted above, Brocade's January 6 release announced that the Company expected to restate financial statements "to record additional stock-based compensation expense," because "the way in which the Company had accounted for stock option grants" under the part-time and offer-acceptance programs was "incorrect." The SEC has not alleged that those programs – instituted by Mr. Byrd and approved by outside auditors – were fraudulent in any manner. No one believed them to be fraudulent then or now. Nor does the SEC contend those programs were the responsibility of Mr. Reyes. Indeed, the programs are nowhere mentioned in the SEC complaint.[45]

The January 6 disclosure is most significant for what it *does not* disclose: It says nothing about the Audit Committee's conclusion, announced on January 24, that it could not rely option-granting documents and processes – the very basis of the SEC's allegations. (*See* Weinstein Decl., Ex. 3 (January 24, 2005 Press Release).) Indeed, the January 6 press release could not have

---

[43] (*See, e.g.*, Weinstein Decl., Ex. 55 (Timothy B. Bell, et al., *The Valuation Implications of Employee Stock Option Accounting for Profitable Computer Software Firms,* The Accounting Review *(October 2002)); id.,* Ex. 56 (Lynn Rees, et. al, *The Value Relevance of Stock-Based Employee Compensation Disclosures,* Journal of Applied Business Research).)

[44] The market's lack of interest in restatements of stock-based compensation expense is a fact conceded even by the securities-litigation plaintiffs' bar. As Melvin Weiss of Milberg Weiss stated, "to file a federal class-action suit, lawyers have to show that shareholders lost money as a result of the backdating." However, "[a] lot of these stocks aren't reacting with big drops in price, …[o]r, if they drop initially, they come back over a short period of time." *See* Weinstein Decl., Ex. 57 (September 5, 2006 New York Times article).

[45] Thus, no matter what the reason for the drop in share price following the January 6, 2005 announcement, one thing is beyond dispute: nothing that Greg Reyes was involved in caused that drop in price.

mentioned or even implied this conclusion because the Audit Committee had not yet reached it. The stock drop following the January 6 disclosure therefore cannot be said to relate to the alleged misconduct.[46] *Cf. In re Tellium, Inc. Sec. Litig.,* [No. 02CV5878,] 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) (*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.") (citing *Dura Pharmaceuticals*, *Inc.* v. Brudo, 125 S.Ct 1627, 1631 (2005).)

When Brocade announced on January 24, 2005 that the Audit Committee had determined that "there was insufficient basis to rely on the Company's process and related documentation," the market yawned. (*See* Weinstein Decl., Ex. 3 (January 24, 2005 Press Release).) Indeed, this disclosure resulted in no statistically significant decline in Brocade's share price. (Gulley Decl., ¶¶ 18-21, Exhibit C.) In other words, the temporary stock drop on January 24 cannot be distinguished from the everyday variance in Brocade's stock, and therefore cannot establish materiality. *Cf. Goldkrantz v. Griffin*, [No. 97 Civ. 9075,] 1999 WL 191540, at *4-5 (S.D.N.Y Apr. 6, 1999) (granting summary judgment for defendant because plaintiff failed to show a statistically significant change in stock price upon the corrective disclosure), *aff'd mem.*, 201 F.3d 431 (2d Cir. 1999). Moreover, just two days after the January 24 announcement, Brocade's stock price returned to its pre-announcement price.

On May 16, 2005, Brocade announced that the Company was restating stock-option expenses relating to the vesting of options for employees on leaves of absences and in transition roles. The Company also noted that it "could not rely on the documentation used to support the recorded measurement dates for stock options granted" between August 2003 and November 2004," and would therefore record an addition $800,000 in non-cash stock option compensation expense. Like the

[46] Nor does the January 6 stock drop relate to the announced adjustments in stock-based compensation expense. As Dr. Gulley explains, given the non-existent correlation between stock-option compensation expenses and stock-price declines, it is far more likely that investor uncertainty triggered the momentary decline in equity values. Indeed, analyst reports chronicle the market's temporary uncertainty about the investigation. (*See, e.g.*, Weinstein Decl., Ex. 28 (January 7, 2005 J.P. Morgan Report) ("Yesterday's announcement does not appear to impact Brocade's economic fundamentals, though uncertainty surrounding the issue may pressure the shares until the matter is fully resolved."); *id.,* Ex. 27 (January 7, 2005 Baird Report) ("Although this issue appears minor, we will be more comfortable once the 10K is formally filed.").)

January 24 disclosure, the May 16 release resulted in a small and statistically insignificant drop in Brocade share price. (Gulley Decl., ¶¶ 18-21, Exhibit C.)

Brocade released its final restatement-related disclosure on November 14. On that day, the price movement was both statistically significant and *positive;* indeed, the stock price increased 14% even though Brocade announced a $72.3 million restatement of stock-option related expenses. This reaction is consistent with recent announcements of stock-option related restatements: despite the significant sums restated, the market recognizes that the company's cash remains unaffected, and investors react with more relief (*e.g.*, relief from the risks of litigation, management upheaval and the uncovering of a true cash-impact problem) than consternation.[47]

**E. Adjustments Related to ESOs Identified in the SEC's Complaint Were Immaterial to Brocade's Financial Statements. [fix space]**Not only were Brocade's stock-option expenses immaterial to investors, but the expense adjustments associated with options identified in the SEC's Complaint were immaterial to Brocade's financial statements. Courts routinely hold that alleged omissions associated with relatively small financial-statement adjustments are immaterial as a matter of law. *See In re Convergent Techs. Second Half 1984 Sec. Litig.,* 1990 WL 606271, at *10 (N.D. Cal. Jan. 10, 1990) (transactions amounting a small percentage of revenue are immaterial as a matter of law); *Schuster v. Symmetricon, Inc.*, 2000 WL 3315909, at *7 (N.D. Cal. Aug. 1, 2000) (finding improper recording of 2% of revenue immaterial as a matter of law); *In re PetsMart, Inc. Sec. Litig.,* 61 F. Supp. 2d 982, 994 (D. Ariz. 1999) ("[U]nder Ninth Circuit precedent, shortfalls of 10% or less may be immaterial as a matter of law."). Here, the options identified in the SEC's Complaint resulted in small or non-existent adjustments to Brocade's financials.

First, Steven Stanton, a CPA and expert forensic accountant, demonstrates using Brocade's own data that the specific ESO grants made to the employees identified in the SEC's complaint resulted in **zero adjustments** to Brocade's financial statements. This includes grants to Dan

[47] (*See* Weinstein Decl*.*, Ex. 7 (Andy Fixmer, *Cnet Shares Surge Most in 19 Months on Revenue Gai*n, Bloomberg (Jan. 30, 2007)); Ex. 6. (*Broadcom Restates Earnings By $2.22B*, Associated Press (Jan. 23, 2007) ("Despite the huge recognition of expenses, analysts did not seem overly worried about the effect of the charges.)); Ex. 58 (*Stock Options Backdating Issue Haunts Jobs*, USA Today (Jan. 9, 2007) ("Most financial analysts and investors have so farshrugged off the on-going stock option scandal. They expect little impact as long as Jobs remains untouched … Reflecting that faith, investors have boosted Apple's stock to $86.16 a share, near its 10-year high.").)

Cudgma (Compl.¶¶ 52-53), Richard Geruson (Compl. ¶ 50) and Dean Traut (Compl.¶ 50). Brocade's internal documents show that these three individuals were part of a group of just five employees who the Audit Committee believed received problematic grants.[48] **An analysis of these grants by Brocade's Finance department shows – and Mr. Stanton confirms – that the adjustments associated with the five individuals were immaterial to Brocade's financial statements.** In deposition testimony, Brocade's controller Charles Read also confirmed that these grants were immaterial to the Company's financials. (Weinstein Decl., Ex. 18 (Read Tr. 210:13- 211:17).) Indeed, Brocade said as much to investors on three separate occasions: in a January 24 press release, in a January 31 10-K/A, and in a November 14 10-K/A. Each of these disclosures reported that "improprieties in connection with the documentation of stock option grants and related employment records" related to "***a small number of employees*** prior to mid 2002" and "resulted in ***immaterial adjustments*** included in this restatement."

<u>Second</u>, Mr. Stanton shows that the vast majority of net adjustments to Brocade's stock-based compensation expenses resulted from options granted outside the time frame broadly established by the SEC's complaint (2000-2004). Indeed, **71%** of net adjustments to Brocade's January restatements are associated with options granted before January 1, 2000. Moreover, if the relevant time period begins with the first grant identified by the SEC (May 23, 2000), more than **83%** of the net adjustments recorded in the restatements fall outside the period of alleged "backdating." (Stanton Decl., ¶ 12, Ex. 2)

<u>Third</u>, the SEC's complaint includes at least 25 option grants issued after August 2003 that resulted in **small**, **quantitatively immaterial** adjustments to Brocade's financial statements. (*See* SEC Compl., ¶¶ 20, 30 & App. A.) As Brocade's internal documents and auditor work papers explain, these grants played no role whatsoever in Brocade's January restatement, and resulted in immaterial adjustments in Brocade's November restatement. (*See* Weinstein Decl., Ex. 59 (KPMG Memo for Record) (noting that, for the January 2005 restatement, "the investigation team concluded that stock

[48] This point cannot be overstated: out of the $279 million net restatement of non-cash expenses, only five employees were even alleged to have received "problematic" grants. And net stock option compensation expense associated with those five employees was ZERO. (*See* Stanton Decl., ¶¶ 13, 14 and Ex. C.)

compensation committee meeting minutes for August 15, 2003 and subsequent could be relied upon.); *id.*, Ex. 61 (May 9, 2005 Audit Committee Minutes) (noting "additional compensation charges in connection with stock option accounting matters are *not quantitatively material to the respective financial statements*).) This much is plain from Brocade's November 14 10-K/A, which reported that, as a result of issues with documentation for grants made between August 2003 and November 2004, Brocade recorded just $900,000 in additional compensation expense. (Weinstein Decl., Ex. 40 (Brocade November 14 Form 10-K/A at 3); *see also id.,* Ex. 18, (Read. Tr. 247:15-247:25) (confirming the amount as quantitatively immaterial.") Yet these post-August 2003 grants appear regularly throughout the SEC's complaint and appendices as purported evidence of material misstatements.

### F. The Vast Majority of Options at Issue Were Never Exercised, and the Associated Expenses Were No More Than Hypothetical, Paper Valuations.

Again using Brocade's own option data, Mr. Stanton demonstrates that **95%** of the options granted between 2000 and 2004 were never exercised, and 87% were cancelled before they had even vested. As a result, expenses associated with these options were nothing more than **hypothetical paper valuations** with no connection whatsoever to real-world transactions. In a sense, the expenses were an accounting fiction: rough approximations of value never realized by the grantee, and never conferred by the grantor. This fact was no secret to investors. On several occasions, Brocade disclosed that the majority of options it granted prior to 2003 - 58.7 million in total - were cancelled as part of a formal re-grant program to replace underwater ESOs. *See* Weinstein Decl., Ex. 60 (Brocade Fiscal 2004 10-K at 63). The SEC nonetheless prominently features these cancelled, pre-2003 options in the text and appendices of its Complaint.

### G. The Conduct Alleged By the SEC – If True – Would Have *Deflated* Rather Than *Inflated* Brocade's Share Price.

As Mr. Crespi explains, the scheme alleged by the SEC makes little sense as a means to inflate stock price.[49] Indeed, such a scheme could actually have the opposite effect, reducing a

[49] This may explain why, in the 70-plus years that the securities laws have been on the books, and with the thousands of securities fraud cases brought, there had never been a case where the conduct *alleged*

*(cont'd)*

company's valuation by *depressing* the performance metric analysts use to make buy and sell recommendations. As noted above, analysts look to growth of pro forma earnings per share (pro forma EPS) in valuing publicly traded companies. (*See* Crespi Decl., ¶ 14.) The "earnings" component of pro forma EPS would be unchanged by a "backdating" scheme because stock-based compensation expense plays no role pro forma earnings. A "backdating" scheme resulting in lower strike prices increases the "per share" component of pro forma EPS. This is because the share count is calculated by summing the diluted shares outstanding *and* the number of new shares potentially created by unexercised, in-the-money options. Granting in-the-money options would tend to increase the number of shares in the share count, thereby *decreasing* pro forma EPS. By increasing the pro forma EPS denominator, the scheme alleged by the SEC would actually *lower* pro forma EPS, thereby *reducing* Brocade's valuation and stock price. Thus, in reaching to identify a purported "scheme," the SEC alleges one that actually *decreases* rather than increases the price of Brocade's shares. (Crespi Decl., ¶¶ 18-21.)

## IV. CONCLUSION

For securities fraud to exist, there must be fraud. For "fraud," there must be a victim and a materially false statement. Here, there is neither. The SEC's charges against Mr. Reyes, Mr. Canova and Ms. Jensen have taken us into uncharted waters. The charges are unsupportable for four independent reasons: (i) Brocade disclosed its theoretical non-cash compensation "expense" in a clear format consistent with the prevailing disclosure format employed throughout corporate America; (ii) the economic evidence conclusively establishes that these "expenses" were not important to investors and did not result in a statistically significant drop in Brocade's share price; (iii) marketplace participants during 2000-04 uniformly ignored these "expenses" by deliberately factoring them out of the *pro forma* and "non-GAAP" earnings metrics that formed the basis for valuing Brocade's stock, as contemporaneous analyst reports confirm; and (iv) the net expense adjustments relating to the stock options identified in the SEC complaint were immaterial to Brocade's financial statements. Any one

(cont'd from previous page)
was a scheme to inflate share price by intentional understating non-cash stock-option compensation expenses.

of these four points refutes materiality; in combination they are overwhelmingly compelling. Because the element of materiality is so thoroughly lacking here, the law does not permit a trial on those claims for which the SEC must prove materiality. For the reasons set forth above, the Mr. Reyes respectfully request an order granting summary judgment on claims One, Two, and Four through Six in the SEC complaint.

DATED: February 5, 2007 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Richard Marmaro
RICHARD MARMARO
Attorney for Defendant
GREGORY L. REYES