NORMAN J. BLEARS (Bar No. 95600)
ROBERT B. BUEHLER (*pro hac vice motion pending*)
ROBIN E. WECHKIN (*pro hac vice motion pending*)
ALEXANDER M. R. LYON (Bar No. 211274)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Telephone: +1.650.324.7000
Facsimile: +1.650.324.0638
Email: norman.blears@hellerehrman.com
robert.buehler@hellerehrman.com
robin.wechkin@hellerehrman.com
alexander.lyon@hellerehrman.com

Attorneys for Defendant
ANTONIO CANOVA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>GREGORY L. REYES, ANTONIO CANOVA, and STEPHANIE JENSEN,<br><br>Defendants. | Civil Action No.: C-06-4435 CRB<br><br>**DEFENDANT ANTONIO CANOVA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE SCIENTER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: June 8, 2007<br>Time: 9:00 a.m.<br>Before: Hon. Charles R. Breyer, Courtroom 8, 19th Floor |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on June 8, 2007, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Charles R. Breyer, 450 Golden Gate Avenue, San Francisco, California, 94102, defendant Antonio Canova ("Mr. Canova"), the former Chief Financial Officer ("CFO") of Brocade Communications Systems, Inc. ("Brocade"), will and hereby does move the Court for an order granting summary judgment in his favor on each and every claim asserted against him by the Securities and Exchange Commission ("SEC" or "agency") in this matter.

This motion is made on the grounds that the SEC cannot present evidence sufficient to permit a jury to reasonably conclude that Mr. Canova acted with scienter or knowledge, which is an element of each claim the agency has alleged against him. As a result, Mr. Canova is entitled to summary judgment. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Mr. Canova seeks an order granting summary judgment as to all of the SEC's claims.

In the alternative, Mr. Canova moves to preclude the government from presenting the testimony of Robert Bossi, Brocade's former controller, at the trial in this matter. Mr. Bossi has assisted the SEC and/or the United States Attorney's Office pursuant to a limited grant of immunity, and the charges against Mr. Canova in this case are based in large part on information provided by Mr. Bossi. However, because the government did not grant immunity to Mr. Bossi for purposes of his deposition in this action, Mr. Bossi asserted the Fifth Amendment, and refused to answer the questions put to him by Mr. Canova at his deposition. This Court has previously recognized that it has the authority to fashion a preclusive remedy in this troubling situation.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Andrea Brown filed concurrently herewith, and such further evidence and argument as may be presented to the Court at or before the hearing.

April 27, 2007

Respectfully submitted,

HELLER EHRMAN LLP

By /s/ Norman J. Blears
NORMAN J. BLEARS

HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Attorneys for Defendant
ANTONIO CANOVA

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS


**I. INTRODUCTION ....... 1**

**II. BACKGROUND ....... 3**

**III. SUMMARY OF THE SEC'S ALLEGATIONS ....... 5**

**IV. ARGUMENT ....... 6**

A. Under The Controlling Legal Standard, The Court Must Grant Summary Judgment Where Defendant's Overall Pattern Of Conduct Dispels An Inference Of Scienter. ....... 6

1. Plaintiff faces a difficult summary judgment burden where, as here, its claims are implausible. ....... 6

2. The substantive scienter standard is a demanding one. ....... 8

3. The Court must evaluate plaintiff's allegations in light of Mr. Canova's "overall pattern of conduct." ....... 9

B. The Uncontroverted Evidence Shows That Mr. Canova Was A Conservative CFO Who Consistently Erred On The Side Of Disclosure And Who Made Financial Statement Judgments Adverse To Brocade Where Appropriate. ....... 10

1. Mr. Canova was not involved in Brocade's stock option granting process. ....... 10

2. Auditors and finance professionals viewed the stock option granting process as low risk. ....... 11

3. Mr. Canova's approach to known accounting issues further negates any inference of scienter. ....... 13

C. The Evidence Shows That Mr. Canova Strove To Ensure Accuracy And Transparency In All Of Brocade's Processes. ....... 16

D. There Is No Evidence That Mr. Canova Read, Much Less Focused On, The Assertion In Mr. Bossi's October 31, 2002 Email – Which Was Isolated And Completely Inconsistent With Mr. Bossi's Other Conduct And Statements. ....... 22

1. The history of the email ....... 22

2. The text of the email ....... 25

3. Mr. Bossi's disavowal....................................................................27

4. Mr. Bossi's assertion of the Fifth Amendment..........................................29

5. The future use of Mr. Bossi's testimony..................................................30

E. The Jieming Zhu Email Does Not Demonstrate Scienter......................................32

F. Paragraph 43 Remains A Mystery To Every Single Relevant Witness And Has Never Been Supported With Any Evidence. ..........................................34

G. Mr. Canova's Own Assertion Of The Fifth Amendment Does Not Alter The Outcome. .....................................................................................34

**V. CONCLUSION ....................................................................................................35**

## TABLE OF AUTHORITIES

**Cases**


*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 .......... 7

*California Architectural Building Prods., Inc. v. Fransicsan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987) .......... 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 1, 7

*Curtis v. M& S Petroleum, Inc.*, 174 F.3d 661 (5th Cir 1999) .......... 34, 35

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002) .......... 9

*Fidelity Funding of Cal. v. Reinhold*, 79 F. Supp. 2d 110 (E.D.N.Y. 1997) .......... 35

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) .......... 8

*Gutierrez-Rodriguez v. Cartagena*, 882 F.3d 553 (1st Cir. 1989) .......... 32

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) .......... passim

*In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) (en banc) .......... 33

*In re Ikon Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002) .......... 8

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.2d 970 (9th Cir. 1999) .......... 9

*In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489 (N.D. Cal. 1992), *aff'd in part and rev'd in part on other grounds*, 50 F.3d 615 (9th Cir. 1995) .......... 14, 21

*In re Sportsline.com Securities Litigation*, 366 F. Supp. 2d 1159 (S.D. Fla. 2004) .......... 13

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) .......... passim

*La Salle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995) .......... 34, 35

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994) .......... 10

*Ponce v. SEC*, 345 F.3d 722 (9th Cir. 2003) .......... 7

*Schuster v. Symmetricon, Inc.*, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) .......... 9

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993) .......... 7

*SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006) .......... 8

*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1999) .......... 35

*SEC v. Graystone Nash, Inc.*, 25 F.3d 187 (3d Cir. 1994) .......... 31

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) .......... 7, 9

*SEC v. Todd*, 2006 WL 1564892 (S.D. Cal. May 30, 2006) .......... 7, 8, 21

*Southland Securities v. INspire Ins. Solutions*, 365 F.3d 353 (5th Cir. 2004) .......... 33

**Statutes**

Securities Act of 1933
Section 17(a), 15 U.S.C. § 77q(a) .......... 7

Securities Exchange Act of 1934
Section 10(b), 15 U.S.C. § 78j(b) .......... 7, 8
Section 13, 15 U.S.C. § 78m .......... 7,8

Sarbanes-Oxley Act of 2002 .......... 8, 17

**Rules**

Rule 13a-14, 17 C.F.R. § 240.13a-14 .......... 8
Rule 13b2-1, 17 C.F.R. § 240.13b2-1 .......... 8
Rule 13b2-2, 17 C.F.R. § 240.13b2-2 .......... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

After extensive discovery in this action, the SEC's decision to charge Mr. Canova, Brocade's former CFO, remains as perplexing as it was the day the lawsuit was filed. In this, the first of the "option backdating" cases it has brought, the SEC alleges a broad-ranging scheme to manipulate strike prices for employee stock options, and contends that executives at Brocade routinely backdated such options. Mr. Canova, however, *is not alleged to have played any role in the option granting process*.

Instead, in a total of six paragraphs out of the 97-paragraph complaint, the SEC alleges that Mr. Canova should have pieced together the purported scheme because, over a two-year period, several scattered bits of allegedly suspicious information may have come to his attention. This falls woefully short of satisfying the stringent scienter standard applicable to each of the eight claims the SEC has alleged. Under controlling law, this Court must evaluate the agency's scienter allegations in light of Mr. Canova's "overall pattern of conduct," and must grant summary judgment if an inference of scienter is dispelled by that conduct. Here, it clearly is. Witness after witness has testified that Mr. Canova consistently worked to put into place at Brocade numerous mechanisms and procedures designed to achieve transparency and openness in all of the company's financial processes. Mr. Canova's goal, according to each of these witnesses, was to gather all information, positive or negative, necessary to ensure that the company's financial statements were accurate, and to report that information truthfully, regardless of the consequences for the company.

Numerous witnesses have also testified that Mr. Canova, a former auditor, was conservative in his approach to financial statement issues, and did not hesitate to inform and consult with the company's outside auditors whenever relevant issues arose. He was universally regarded as an open, proactive and approachable boss and manager of Brocade's finance department. His reputation among his peers – auditors, executives, directors – was stellar. It is simply not tenable that an executive who consistently devoted his time and effort to discovering and disclosing the truth would, at the same time, be concealing a purported fraudulent scheme. Under such circumstances, the Ninth Circuit declines to draw inferences of scienter, and affirms grants of

summary judgment in favor of defendants in securities cases.

Against the overwhelming evidence of Mr. Canova's good faith, the SEC attempts to satisfy its heavy scienter burden by clinging to the allegation that Mr. Bossi, Brocade's former controller, presented Mr. Canova with various pieces of information that should have put him on notice of the purported scheme. But there is *no evidence* that any of the alleged oral communications between Mr. Bossi and Mr. Canova *ever took place.* The agency therefore seizes on a single ambiguous clause in an email that Mr. Bossi sent to Mr. Canova in October 2002, in which Mr. Bossi abruptly announced that he was quitting the company. In the middle of the email, apparently included to illustrate an ancillary point, is the statement that some unnamed person had previously falsified offer letters and option paperwork to enable a customer service executive – who at the time of the email was soon to leave the company – to get a more favorable compensation package. There is no evidence that Mr. Canova ever *read* the clause on which the SEC relies, and the testimony is undisputed that the email itself was given to Mr. Canova under extremely pressured circumstances: Mr. Bossi had unexpectedly announced his resignation in the middle of the company's busy year-end close period, and other finance department employees had come to Mr. Canova for guidance. The SEC has not shown that Mr. Bossi ever expressed the concern about option paperwork voiced in the ambiguous clause to anyone at any time before or after he wrote the email, and Mr. Bossi has subsequently *disavowed* the position he took in the email.

There is virtually nothing left to the SEC's case once the Bossi email is dispensed with. The agency also relies on an email written by Jieming Zhu, a Brocade engineer who commented on the likely strike price a potential new hire might expect to receive if he came to the company and was granted stock options. The SEC has not come forward with a scrap of evidence concerning this email. As importantly, at the time the email was written, in April 2001, the pattern of events on which the SEC bases its scheme allegations had not yet begun to unfold, and therefore Mr. Zhu's cryptic remark could have meant little or nothing to Mr. Canova.

Finally, the SEC alleges that Mr. Canova helped conceal the purported scheme by directing anonymous finance department employees, at some unspecified time, to reconcile employment records with option paperwork. Yet again, the agency has not produced a shred of evidence that

this ever occurred. Meanwhile, all relevant witnesses have denied that Mr. Canova took the actions he is accused of.

To the extent that any doubt remains on the element of scienter, that doubt can flow only from the single ambiguous clause contained in Mr. Bossi's email. But to force Mr. Canova to remain in limbo for months longer, and eventually to stand trial on the basis of that clause, would be exceedingly unjust. As the Court is aware, Mr. Canova has been *denied* the opportunity to dispel any lingering doubt about the Bossi email: He has been precluded from taking Mr. Bossi's deposition by the government's and the SEC's strategic use of immunity grants. This Court has already recognized that it would be deeply unfair to withhold legal rights to which Mr. Canova is otherwise entitled – including the right to summary adjudication where plaintiff does not present a genuine issue of fact for trial – on the basis of the agency's gamesmanship. The Court should not reward the SEC's self-serving behavior by allowing the agency to evade summary judgment. Should the Court nevertheless determine that the SEC somehow *can* meet its summary judgment burden, then, in the alternative, the agency should be precluded from calling Mr. Bossi as a witness at trial.

In the final analysis, however, we do not believe the Court needs to reach that issue. When Mr. Canova's scienter is judged, as it must be under Ninth Circuit law, against the background that has emerged from the extensive discovery already conducted in this case, it remains a mystery why Mr. Canova was ever charged here. The SEC's claims against him should be dismissed now.

## II. BACKGROUND

Mr. Canova graduated from Santa Clara University in 1984 with a business degree in accounting. After college, Mr. Canova became a California CPA and joined KPMG. In 1995, he became a partner in the firm's audit practice, where he led audits of public and private companies. In 1998, Mr. Canova became an audit partner in KPMG's San Jose office. In 2000, he left KPMG to pursue managerial opportunities in the business sector; in December of that year, he joined Brocade as its Vice President of Finance. In April 2001, Mr. Canova was promoted to CFO, a

position he held until December 2005. Ex. A, Brocade 2003 Form 10-K at 9.[1] Numerous finance department employees who served under Mr. Canova, as well as the outside auditors with whom he worked and his successor in the CFO position, have testified that Mr. Canova performed his job with integrity, fostered open processes at Brocade, was conservative in his approach to accounting, and brought issues to outside auditors where appropriate. *Infra* at 13-19.

At Brocade, Mr. Canova's primary responsibilities were accounting, facilities, financial planning, investor relations, information technology and, in 2005, legal. He was never responsible for the granting or pricing of options. *Infra* at 10-11. The finance department under Mr. Canova had approximately 60 employees.

In late October 2002, in the middle of Brocade's year-end close, the company's controller, Robert Bossi, sent Mr. Canova an email in which he unexpectedly resigned from his position, citing difficulties he was having with Michael Byrd, then the company's Chief Operating Officer. *Infra* at 22-25. It is this email that is the lynchpin of the SEC's case against Mr. Canova. After initially resigning in October 2002, Mr. Bossi remained Brocade's controller until the spring of 2003, when he decided to leave the company for good and was replaced, after a month-long transition period, by Richard Deranleau. Mr. Deranleau is currently Brocade's CFO.

In October 2004, Daniel Cudgma, a former Brocade sales executive who was embroiled in a legal dispute with the company, sent Brocade a draft complaint containing allegations that certain Brocade employees had told him to falsely backdate his employment start date in order to obtain more favorable pricing on his stock options. Ex. J, Cudgma Dep. at 106:14-107:3; Complaint ("Com.") ¶ 36. Although Mr. Cudgma never filed the complaint, his actions led, in late 2004, to an internal investigation by Brocade's Audit Committee and its legal and forensic accounting consultants. As a result of the investigation, Brocade concluded that the company had not accounted properly for certain option grants, and would consequently need to restate its financial statements for fiscal years 2002 and 2003. These findings were set forth in press releases dated

[1] All lettered "Ex. _" citations in this brief refer to exhibits to the Declaration of Andrea Brown, filed herewith. Numbered citations to "Dep. Ex. _" refer to exhibits marked at the depositions taken in this action. The "Dep. Ex. _" exhibits are also attached to Ms. Brown's declaration, together with authenticating testimony.

January 6, 2005 and January 24, 2005, and in a restatement dated January 24, 2005. Ex. B, 01/06/05 press release; Ex. C, 01/24/05 press release. This appeared at the time to have concluded Brocade's inquiry into stock option issues at the company.

Nevertheless, in March 2005, after the initial restatement had been completed and the investigation was over, Mr. Canova became concerned that one of the Human Resources department employees on whom both he and the investigators had relied had provided inaccurate information during the first investigation, and that the restatement consequently may not have gone far enough. *Infra* at 19-20. Mr. Canova asked Mr. Deranleau to question the employee, Grace Ward, and her partial recantation of answers she had given earlier led to a second investigation. *Id.* That investigation – which would not have been initiated but for Mr. Canova – culminated in a May 16, 2005 press release detailing additional issues in the company's option granting and accounting processes. Ex. D, 05/16/05 press release. These issues were later addressed more fully in a second restatement dated November 14, 2005. Ex. E, 11/14/05 press release; Ex. F, Brocade Form 10-K/A. The second restatement was significantly smaller than the first restatement. Like the first restatement, the second restatement was concerned solely with accounting for stock options.

## III. SUMMARY OF THE SEC'S ALLEGATIONS

On the basis of Brocade's restatements, the SEC has alleged a wide-ranging "fraudulent scheme," in which executives routinely backdated option grants in order to give employees more favorably priced options. According to the SEC's allegations, the company then improperly failed to recognize the non-cash compensation expense that should have followed from a grant of in-the-money options.

What is striking about this purported scheme from Mr. Canova's perspective, given his status as a defendant in this lawsuit, is that he is not alleged to have been a part of most of it. Mr. Canova is not alleged to have mispriced or misdated a single option grant, or, indeed, to have played any role at all in the option granting process. The SEC's case against Mr. Canova is limited to the allegation that certain facts he may have learned should have put him on notice of the purported scheme, and that at one point, he facilitated the scheme by helping to conceal it. These

allegations are in themselves quite limited; more importantly for present purposes, they are unsupported or actually contradicted by the evidence. There are three basic allegations:

- *Communications from Mr. Bossi.* The SEC alleges that on several occasions in 2001 and 2002, Mr. Canova had conversations with employees at Brocade, including Mr. Bossi, that should have alerted him to the alleged scheme. Com. ¶¶ 41-42. *The record does not contain a scrap of evidence showing that any of these conversations occurred.* The SEC also relies on the October 2002 email Mr. Bossi sent announcing his unexpected departure; an ambiguous clause in that email refers to an outgoing executive for whom some unnamed person had been "forging option paperwork and offer letters so he could get better priced options." Com. ¶ 42. There is no evidence that Mr. Canova *ever read* this portion of the email, which was delivered to him in the midst of the crisis occasioned by Mr. Bossi's sudden threatened departure.

- *The Jieming Zhu email*. The SEC also alleges that in April 2001, before he became Brocade's CFO, Mr. Canova received an email in which a Brocade manager (Jieming Zhu) observed to a potential new recruit that Brocade's option price was "usually the lowest closing price" experienced between board meetings in which options were granted, and that Mr. Canova subsequently asked that the manager not make such statements. Com. ¶ 40. *The SEC has yet to present any evidence concerning this email*.

- *Paragraph 43*. Finally, the SEC alleges that, at some unspecified time, Mr. Canova "helped facilitate the fraud" by directing finance department employees to match Compensation Committee meeting minutes with employee records, and to ensure that inconsistencies were removed. Com. ¶ 43. The SEC *has not presented a shred of evidence to support this allegation*, and every finance department employee who has been deposed has denied that Mr. Canova ever directed him or her to do any such thing.

In light of this evidence – or lack of evidence – Mr. Canova is entitled to summary judgment.

## IV. ARGUMENT

### A. Under The Controlling Legal Standard, The Court Must Grant Summary Judgment Where Defendant's Overall Pattern Of Conduct Dispels An Inference Of Scienter.

#### 1. Plaintiff faces a difficult summary judgment burden where, as here, its claims are implausible.

Under Rule 56(c), the district court must grant summary judgment where there is "no genuine issue as to any material fact," and the moving party is "entitled to judgment as a matter of law." Although this Court is doubtless already very familiar with the summary judgment standard,

it is worth re-emphasizing in this context the central features of that standard – features delineated by the United States Supreme Court in its landmark summary judgment decisions two decades ago. A defendant who does not bear the burden of persuasion at trial on a given element meets its summary judgment burden by merely pointing to the record and noting the absence of material facts that plaintiff would need to prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand the motion, the plaintiff must then show that there are "*genuine* factual issues that properly can be resolved only by a finder of fact because they may *reasonably* be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (emphasis added). Moreover, "[i]f the factual context makes the [plaintiff's] claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Building Prods., Inc. v. Fransicsan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (emphasis in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Cal. Architectural Building Prods*., 818 F.2d at 1468. Rather, plaintiff must show by means of *specific facts* that a *genuine issue* remains – an issue that can *reasonably* be resolved in plaintiff's favor, and that is supported by *additional persuasive evidence* insofar as the court is asked to infer that defendant behaved in an implausible fashion.

The SEC has the burden of proof at trial, and with respect to *all* of the eight claims it has alleged against Mr. Canova, must prove scienter.[2] Thus if the SEC is unable to identify facts that

[2] Scienter is an element of the SEC's first and second claims, for alleged violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) ("A showing of scienter is an element of an enforcement action pursuant to the antifraud provisions of the Securities Acts"); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Scienter is also an element of the SEC's fourth claim, for alleged violation of Rule 13b2-2 (false statements to an accountant). *See SEC v. Todd*, 2006 WL 1564892, at *10 (S.D. Cal. May 30, 2006) (collecting cases in which violations of Rule 13b2-2 were found only when defendants acted knowingly or recklessly, and granting summary judgment for defendant on Rule 13b2-2 claim where defendant had established, with respect to other claims, that he lacked scienter and had acted in good faith). The same goes for the SEC's fifth, seventh and eighth claims, for aiding and abetting various purported violations of Section 13 of the Exchange Act. *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003) (SEC must show that defendant "had knowledge of the primary violation and of his or her own role in furthering it").

show a genuine, material dispute as to this element, Mr. Canova is entitled to summary judgment with respect to the SEC's case in its entirety. Significantly, courts do not hesitate to grant summary judgment dismissing claims brought by the SEC where the agency cannot satisfy its burden on the element of scienter. *E.g., SEC v. Todd,* 2006 WL 1564892, at *7-8 (S.D. Cal. May 30, 2006). And both the Ninth Circuit and other circuit courts have repeatedly affirmed grants of summary judgment in securities actions where plaintiff fails to show a genuine dispute of material fact on scienter. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-27 (9th Cir. 1994); *In re Apple Computer Sec. Litig*., 886 F.2d 1109, 1116-18 (9th Cir. 1989); *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666-77 (3d Cir. 2002); *Geffon v. Micrion Corp.*, 249 F.3d 29, 37-38 (1st Cir. 2001).

**2. The substantive scienter standard is a demanding one.**

Scienter, which is an element of each of the SEC's eight claims, is a state of mind requiring intent. Although the scienter requirement may in certain circumstances be satisfied by a showing of reckless misconduct, only a heightened form of recklessness – "deliberate recklessness" – suffices under controlling law:

> Our definition of recklessness . . . strongly suggests that we continued to view it as a form of intentional or knowing misconduct. We used the terms "known" and "must

---

The SEC's third claim alleges violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1. The text of the statute prohibits a person from "knowingly" circumventing or "knowingly" failing to implement a system of internal accounting controls, or "knowingly" falsifying any books or records, and the SEC alleges that Mr. Canova "knowingly" falsified books, records, or accounts. Com. ¶ 74. Thus the SEC has itself embraced a scienter standard with respect to this claim. The sixth and final claim alleges violations of Rule 13a-14, which implements Sarbanes-Oxley's Section 302 certification requirement. In the principal portions of the certifications the SEC challenges, Mr. Canova stated, in accordance with the governing statute, that "*based on [his] knowledge*," the attached SEC filings did not contain untrue statements, and that "*based on [his] knowledge*," the attached financial statements fairly presented the financial position of the company. Ex. A at 31.2; 15 U.S.C. § 7421 (emphasis added). Thus this claim also depends on a showing that Mr. Canova acted with scienter.

With respect to certain of the claims at issue here, the scienter standard may be *higher* than deliberate recklessness, which suffices for a Section 10(b) primary liability claim. For example, several courts have found recklessness insufficient to sustain an aiding and abetting claim. *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334-35 (S.D.N.Y. 2006) (collecting authorities, and concluding that "knowing misconduct must now be shown" to establish an aiding and abetting claim under Section 10(b)). This Court need not parse the variations among the knowledge requirements applicable to each of the SEC's claims, however, because the agency has failed to demonstrate scienter under even the lowest applicable standard.

> have been aware," which suggest consciousness or deliberateness. . . . *[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct*.

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.2d 970, 977 (9th Cir. 1999) (emphasis added); *SEC v. Rubera*, 350 F.3d 1084, 1095 (9th Cir. 2003) (applying *Silicon Graphics*' definition of scienter in an action brought by the SEC, and in a post-pleading decision). "Deliberate recklessness," accordingly, is "conduct involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers *that is either known to the defendant or is so obvious that the actor must have been aware of it*." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)) (emphasis added).

**3. The Court must evaluate plaintiff's allegations in light of Mr. Canova's "overall pattern of conduct."**

In determining whether a plaintiff has come forward with sufficient evidence of scienter to withstand summary judgment, the Ninth Circuit examines "defendants' overall pattern of conduct" to determine whether it is consistent with the accusation of conscious or deliberate fraud. *Worlds of Wonder*, 35 F.3d at 1425; *Apple*, 886 F.2d at 1117-18. Where the inference of scienter plaintiff seeks to create is dispelled by the defendant's larger pattern of conduct, the court will grant summary judgment in defendant's favor. *Worlds of Wonder*, 35 F.3d at 1425 (granting summary judgment where plaintiffs' contention that defendants made knowingly or recklessly false expressions of optimism was contradicted by defendants' participation in various corporate initiatives that showed their belief in the challenged statements); *Apple*, 886 F.2d at 1117-18 (same).

In addition to considering the overall pattern of a defendant's conduct in assessing scienter, "courts do not presume that corporate officers make false statements simply out of spite or to impress others." *Schuster v. Symmetricon, Inc.,* 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000). Nor, indeed, will courts presume on summary judgment that a defendant acted to enrich

himself, since such a "nihilistic" approach would largely eviscerate the scienter requirement. *Id.* at *7-8 (quoting and citing *Melder v. Morris*, 27 F.3d 1097, 1102-03 (5th Cir. 1994)). Instead, the court examines a defendant's conduct in its entirety; where plaintiff's allegations of scienter are inconsistent with that conduct, summary judgment is appropriate unless plaintiff comes forward with additional persuasive evidence. The SEC has not come close to doing so here.

**B. The Uncontroverted Evidence Shows That Mr. Canova Was A Conservative CFO Who Consistently Erred On The Side Of Disclosure And Who Made Financial Statement Judgments Adverse To Brocade Where Appropriate.**

The pattern revealed by the entirety of Mr. Canova's conduct could not be further removed from the SEC's accusation – namely, that he knowingly turned a blind eye to financial statement fraud for years. The uncontroverted evidence establishes that Mr. Canova was consistently conservative in his approach to the company's financial statements, and that he did not hesitate to make judgments that adversely affected the company's earnings where appropriate – for example, by recording compensation expenses when the circumstances required it, and declining to recognize revenue when the accounting rules did not permit it. Mr. Canova's peers have noted that, even as a CFO, he continued to approach financial statement issues like the auditor he once had been, and witnesses both inside and outside the company admired (and continue to admire) him for such tendencies. Ex. O, Isom Dep. at 206:21-208:15; *infra* at 16 & n.4.

**1. Mr. Canova was not involved in Brocade's stock option granting process.**

In assessing the SEC's allegations, it is important to understand how disconnected Mr. Canova was from the process that the SEC has challenged in this action. Specifically, the witnesses deposed in this case have uniformly testified that Mr. Canova was *not* involved in the decisions to grant and price stock options, save to recommend – as other managers routinely did – what number of options should be granted to the employees in his department. This has been the testimony of the company's Human Resources ("HR") employees, finance department employees, including the Stock Administrator, and directors. Ex. P, Kada Dep. at 117:5-11 (HR); Ex. T, E. Moore Dep. at 208:2-12 (Stock Administrator); Ex. L, Deranleau Dep. at 221:18-222:6 (finance department); Ex. W, Paisley Dep. at 284:11-285:19 (director).

The work that Brocade's finance department performed in administering the company's stock option program, significantly, did not begin until *after* the options had already been granted and priced. Brocade's HR department delivered to Elizabeth Moore – who was the company's Stock Administrator and a member of the finance department – the signed board or committee minutes that authorized option grants. Ms. Moore then entered the data contained in the minutes into the company's stock option database, and generated the necessary paperwork for the employees. Ex. T, E. Moore Dep. at 13:7-14:3, 99:17-24, 103:1-25; Ex. L, Deranleau Dep. at 220:22- 221:17. But Ms. Moore was not involved in the process by which the minutes were created and signed, and she knew nothing about the process HR used to make and authorize corrections to the grants. Ex. T, E. Moore Dep. at 13:7-14:3, 94:7-21. After Ms. Moore had completed her data entry task and created the options paperwork, Brocade's controller (first Mr. Bossi and then Mr. Deranleau) reviewed the paperwork to verify that it faithfully reflected the information in the minutes delivered to Ms. Moore by HR. Ex. T, E. Moore Dep. at 99:9-24, 100:19-101:2. Like Ms. Moore herself, the controller who reviewed her work took the information presented in the minutes as a *starting point*. *Id.* In other words, the stock administration function performed by the finance department began only after the grants had been made. When the recipients of option grants were Brocade directors or Section 16 officers, Mr. Canova signed the Forms 4 – the required SEC filings reporting their transactions in Brocade stock. Ex. L, Deranleau Dep. at 221:20-24. Mr. Canova's task in this respect, like Ms. Moore's, was performed only *after* the price, size, and date of each grant was set.

**2. Auditors and finance professionals viewed the stock option granting process as low risk.**

For the most part, Mr. Canova had little reason to focus on the option granting process from the standpoint of a CFO. On the contrary, witnesses have repeatedly testified that at the time the alleged fraud took place, auditors and other finance professionals did not view the stock option granting process as an area in which there was a significant risk of misstatement, much less fraud. This was the determination of Arthur Andersen, Brocade's outside auditor until mid-2002, who assigned to a very junior team member the task of auditing option grants – that is, matching grants

with the committee minutes showing that the grants had been authorized. Ex. M Gugler Dep. at 158:3-159:18, 164:8-167:13; Ex. EE Dep. Ex. 353; Ex. FF Dep. Ex. 366. It was also the view of KPMG, which succeeded Arthur Andersen as Brocade's auditor. Ex. S, Miotto Dep. at 211:7-212:17, 223:20-224:13. It is the understanding of Charles Read, Brocade's current controller, whose technical competence was highly regarded at KPMG, where he spent seven years as an auditor. Ex. Y, Read Dep. at 261:25-262:24; Ex. S, Miotto Dep. at 202:13-203:12. As Mr. Read noted, "the granting process itself was always low-risk." Ex. Y, Read Dep. at 262:25-263:17. Richard Deranleau, Brocade's current CFO, is in agreement. Mr. Deranleau testified that when he came to Brocade in May 2003, to replace Mr. Bossi as controller, the areas of revenue recognition and warranty and inventory reserves were recognized as high-risk, but option grants were not. Ex. L, Deranleau Dep. at 194:22-195:24. This view is also shared by Nicholas Moore, the former CEO of PricewaterhouseCoopers and a member of Brocade's audit committee. Ex. U, N. Moore Dep. at 11:13-12:3, 324:8-325:11.

In fact, the only financial statement risk associated with Brocade's stock options prior to 2004 was a low risk of unintentional error stemming from the essentially clerical function of stock administration. Arthur Andersen explained in a 2001 audit work paper that the risk here was that due to the company's large volume of grants, cancellations and regrants, the Stock Administrator might become overwhelmed and unintentionally commit an error. Ex. M, Gugler Dep. at 98:16-99:3; Ex. DD, Dep. Ex. 352. This risk – which Arthur Andersen also deemed to be low – had nothing to do with the granting of options. It was a risk of innocent error in the administration of stock option grants, not a risk of fraud in the process itself. And Arthur Andersen controlled for the risk: The auditors designed and applied an auditing procedure verifying that option grants entered into the Stock Administration database matched the authorizing documents from the relevant committee. Ex. M, Gugler Dep. at 104:13-25; Ex. EE, Dep. Ex. 353.

In contrast to stock options, other areas of a technology company's financial statements, such as revenue recognition and reserves, were deemed to present a higher risk of misstatement. Brocade's auditors knew that if someone wished to manipulate a company's financial statements, these would be the areas in which he or she would try to do so. Ex. O, Isom Dep. at 21:5-23:4.

Predictably, these areas, not peripheral issues such as stock option accounting, were the focus of attention for those charged with getting the financial statements right. This fact is highly significant in evaluating whether a defendant could have had scienter with respect to stock-option-based mistakes in the financial statements. Thus, for example, in *In re Sportsline.com Securities Litigation*, 366 F. Supp. 2d 1159 (S.D. Fla. 2004), as in this case, the company had restated its financials to record an additional non-cash expense for stock options granted to certain employees. The court dismissed, on scienter grounds, a federal securities action brought by shareholders. The court noted that accounting for an employee stock option plan was "not part of [the company's] core business," and as a result rejected plaintiffs' argument that scienter could be inferred on the basis of the company's financial statement errors. *Id.* at 1170. The court contrasted the status of option dating issues with revenue recognition – an area that was so much at the center of accounting and legal commentary and activity that it had already given rise to a highly developed scienter jurisprudence in securities cases. *See id.* at 1166, 1170.

In *Sportsline*, the court dismissed plaintiff's claims on scienter grounds on a pleading motion. Here, with the benefit of a developed record, it is even clearer that dismissal is warranted. Brocade's auditors never raised any issues relating to the option granting process prior to the November 2004 investigation and the record is crystal-clear that other finance professionals also uniformly regarded this as a low-risk area. Ex. Z, Tobias Dep. at 46:13-47:21, Ex. Y, Read Dep. at 31:8-25; Ex. U, N. Moore Dep. 323:14-324:6; Ex. K, Dempsey Dep. at 195:25-196:3. A financial statement error in such an area is just that – an error. Nothing in the record supports the leap the SEC would make from purported error to knowing or deliberately reckless misstatement.

**3. Mr. Canova's approach to known accounting issues further negates any inference of scienter.**

While Mr. Canova was not involved in the routine granting of stock options, it is instructive to note that when a stock-option accounting issue *was* brought to his attention, he directed that the appropriate accounting treatment be applied, and that charges be taken to earnings as necessary. Thus, when Brocade issued stock at a penny per share to certain employees in the software development group, the company recognized that the options were in the money when they were

granted, and appropriately recorded a compensation charge for them. Ex. L, Deranleau Dep. at 218:18-220:21, Ex. GG, Dep. Ex. 432. Mr. Canova's position on the issue was that the company should do whatever was right from an accounting perspective, regardless of the financial statement impact. Ex. L, Deranleau Dep. at 220:7-21. The fact that Mr. Canova took this position weighs heavily against any inference of scienter. Courts addressing scienter issues on summary judgment have recognized that where a defendant appropriately accounts for a given transaction about which the relevant facts are known, this is inconsistent with the inference that the defendant acted fraudulently in making an alleged financial statement error in accounting for a similar transaction with respect to which he may not have known all the facts. *See In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489, 1505 & n.34 (N.D. Cal. 1992) ("the fact that Deloitte often reduced revenue when it discovered negative information is inconsistent with scienter"), *aff'd in part, rev'd in part on other grounds*, 50 F.3d 615 (9th Cir. 1994). Here, Mr. Canova's treatment of the penny per share options cuts sharply against any inference that he acted with scienter in connection with the option grants that were later the subject of the company's restatements.[3]

The SEC's allegations are similarly undercut by Mr. Canova's treatment of the revenue recognition issues that occupied a central place in the concerns of financial and other executives in Silicon Valley in the first years of the millennium. Here too, Mr. Canova took a typically conservative approach. Ex. L, Deranleau Dep. at 214:15-21; Ex. Y, Read Dep. at 279:12-280:10; Ex. N, Hurley Dep. at 43:18-44:8. For example, after Mr. Deranleau had started to work at

---

[3] Courts have also recognized that where a defendant reveals in one portion of an SEC filing the very information allegedly concealed in the challenged statements, scienter cannot be shown as a matter of law. *Worlds of Wonder*, 35 F.3d at 1425 ("the detailed risk disclosure in the Debenture Prospectus negates an inference of scienter"). Even if the disclosures are not sufficient to nullify the effect of the challenged statements, the existence of the disclosures shows that the author of the document was not being purposely misleading. *Geffon,* 249 F.3d at 37 (risk disclosures are inconsistent with scienter, despite the fact that defendant "could have provided still more information" about the subject at issue). Here, as Mr. Reyes has pointed out in his summary judgment motion on the element of materiality (a motion Mr. Canova has joined), Brocade included in the footnotes to its financial statements a wealth of detailed information concerning the option grants. The compensation expenses identified in the footnote disclosures are *larger* than the expenses the SEC maintains should have been recognized in the financial statements. Reyes SJM at 4, 11. If Mr. Canova had indeed been bent on deceiving investors, he would not have included such detailed footnote disclosures.

Brocade, Mr. Canova became concerned about the integrity of point of sale reporting coming from several Chinese resellers. Brocade's policy was to recognize revenue in connection with product sold to these resellers only when Brocade received a report that the product had been shipped out of the reseller's facilities to an end user or other purchaser further down the distribution chain. Ex. L, Deranleau Dep. at 211:4-24. When Mr. Canova began to suspect that the resellers' reporting might not be accurate, he asked Mr. Deranleau to investigate the matter – and to include both the Audit Committee and KPMG in his work. *Id.* at 211:25-212:13; Ex. S, Miotto Dep. at 264:17-265:9.

Mr. Canova took a similarly conservative approach to revenue recognition in the area of post-contract support deferral. Companies like Brocade may be required to defer a portion of contract revenues where their products include a software component for which they are obligated to provide purchasers with customer support and future upgrades. Ex. Y, Read Dep. at 276:12-277:17. The need to defer revenue in these circumstances is triggered by a determination that the software component of the product in question is more than incidental to the hardware component. *Id.* at 277:21-278:5. Mr. Canova initiated and drove the process that eventually led to the conclusion that Brocade should in fact begin deferring revenues for post-contract software support. *Id.* at 278:15-279:8.

Notably, when KPMG conducted a forensic re-audit in connection with the internal investigation, the auditors found *no* inaccuracies and *no* mistakes in judgment with respect to any of the revenue recognition issues they reviewed – or, indeed, with respect to any other high-risk aspects of Brocade's financial reporting. Ex. S, Miotto Dep. at 250:21-254:11.

It is also worth noting that in both of the areas just discussed – post-contract support and the Chinese resellers – Mr. Canova's actions ultimately affected Brocade's *revenues* – real money, not the non-cash expense associated with stock options that are granted in the money. Witness after witness has testified to Mr. Canova's "conservatism" in this area. *Supra* at 14. The record is also clear that if there was any potential that revenues might be improperly inflated, by persons inside or outside Brocade, Mr. Canova *brought the issue to KPMG's attention*. Ex. S, Miotto Dep. at 264:5-265:9.

More generally, the record demonstrates that Mr. Canova sought to create "transparent,

repeatable, consistent, timely processes," at Brocade, and that he worked constructively and transparently with the company's outside auditors. Ex. L, Deranleau Dep. at 215:10-216:14. It strains credulity to suggest that a CFO who had repeatedly worked for open processes, who had consistently approached issues of financial reporting and disclosure in a conservative way, who had invited outside auditors into the process when he had concerns, and who had accordingly built an enviable reputation as a respected financial executive,[4] would have done all of this at the same time that he was concealing and participating in a fraudulent scheme.

### C. The Evidence Shows That Mr. Canova Strove To Ensure Accuracy And Transparency In All Of Brocade's Processes.

As noted in the preceding section, Mr. Canova "wanted transparent, repeatable, consistent, timely processes" at Brocade. In keeping with that policy, he instituted or was instrumental in maintaining numerous processes designed to ensure that the company's financial reporting was accurate, and that Brocade's work was conducted without errors, and in keeping with ethical and professional standards.

***The "what keeps you up at night" sessions.*** Mr. Canova held quarterly meetings for the managers in the finance organization – half-day to full-day meetings that have been described as "communications vehicles." Ex. X, Parker Dep. at 72:1-73:6. When he became CFO in April 2001, Mr. Canova introduced a new component to the meetings: an hour-long session called "what keeps you up at night." *Id.* at 73:7-23; Ex. L, Deranleau Dep. at 204:15-205:12. As the name implies, this session was designed to provide finance managers with an open forum in which they could raise any concerns they had about any area of Brocade; as Brian Hurley, the manager of accounting operations, noted, "[Mr. Canova] wanted to hear from everybody." Ex. N, Hurley Dep. at 36:17-37:2. At various points during Mr. Canova's tenure as CFO, managers raised issues at these sessions touching on possible risks to the company, including risks connected with revenue

---

[4] *E.g.*, Ex. V, Neiman Dep. at 213:8-215:3 (Mr. Canova was an "outstanding CFO," with a "temperament that is disposed to the facts and the truth"); Ex. U, N. Moore Dep. at 319:20-320:18 ("[Mr. Canova] was forthcoming and that he was competent, that he had a real grasp of what his responsibilities were and that he was gifted from a communications standpoint"); Ex. K, Dempsey Dep. at 199:25-200:8 (Mr. Canova was "a great CFO," and the Audit Committee "always got numbers that I always thought were accurate and correct").

recognition and expansion into foreign jurisdictions. Ex. L, Deranleau Dep. at 205:13-19; Ex. X, Parker Dep. at 73:23-74:12. At one point, James Parker, then the company's tax director, raised an issue concerning option grants, and the complexity inherent in matching the terms of option plans and grant documentation to applicable rules in the new jurisdictions into which the company was expanding. *Id.* No one has testified that any issues or concerns regarding the integrity of the option granting process were ever raised at these sessions.

***The binder reviews.*** Mr. Canova also opened up to others in the finance department the process of preparing for quarterly earnings calls – one of the principal vehicles the company used to communicate with analysts and the investing community. Mr. Canova's predecessor as CFO, Michael Byrd, had typically prepared for these calls by himself. Ex. X, Parker Dep. at 75:24-76:5. In keeping with his move toward greater transparency and open communication, Mr. Canova initiated the binder review process. *Id.* A binder review consisted of an in-depth meeting, typically held on a Saturday morning, in which Mr. Canova went through the financial statements with his staff to make sure he thoroughly understood all the issues that would or might be discussed in the earnings call. *Id*. at 74:17-75:16, Ex. Z, Tobias Dep. at 137:22-139:11. These meetings, like the "what keeps you up at night" sessions, provided the finance team with an open forum in which they could bring any concerns about the accuracy of the company's financial statements to Mr. Canova's attention. Ex. L, Deranleau Dep. at 206:1-207:5. Mr. Canova's binder review process was better and more extensive than comparable processes at other public companies, and was considered a "best practice" by Brocade's outside auditors. *Id.* at 207:10-208:5.

***The Corporate Governance Team.*** In the wake of the Sarbanes-Oxley Act of 2002, Brocade formed a Corporate Governance Team, which studied and evaluated many of the company's most sensitive processes, and made recommendations to ensure that the company had best practices in place. Ex. AA, Webb Dep. at 41:25-43:2, 76:16-77:5, 192:21-24. Among other things, the team instituted a new code of ethics for senior executives, and a code of conduct applicable to directors, officers and employees. *Id.* at 42:15-43:2; Ex. L, Deranleau Dep. at 209:17-210:2. The team also adopted procedures that allowed employees to lodge complaints anonymously. *Id.* at 43:5-23. The team discussed the process for handling stock option grants, and

refined the documentation processes to eliminate the lag time between action taken by the stock option committee and the recording of that action. *Id.* at 209:1-212:3.

The Corporate Governance Team at Brocade was formed as part of a nationwide effort by public companies to comply with Sarbanes-Oxley's new requirements, and to address the problems that had led to the passage of that legislation. Ex. AA, Webb Dep. at 192:11-20. While Mr. Canova did not create that team in the same way that he created the binder review and "what keeps you up at night" processes, Mr. Canova was "extremely supportive," and in fact "instrumental" in the work of the team. *Id.* at 195:13-196:2. He was particularly involved in the team's formulation of a new insider trading policy. Consistent with his approach to many other issues discussed above, Mr. Canova was adamant that the company's new insider trading policy be structured tightly and conservatively. Ex. L, Deranleau Dep. at 210:10-24.

***Mr. Canova's response to HR problems.*** In 2003, after Richard Deranleau had been working as Brocade's Controller for a few months, he became aware of administrative errors being made in the HR department in connection with stock option grants. Ex. L, Deranleau Dep. at 28:4-17, 222:7-16. When Mr. Deranleau brought the problem to Mr. Canova's attention, Mr. Canova's response was swift and unambiguous. Mr. Canova asked Mr. Deranleau to address the problem directly by working with the relevant HR personnel to "make sure that you get accurate, timely, and [auditable] transparent information." *Id.* at 226:11-227:5. With Mr. Canova's support, Mr. Deranleau then formed an ad hoc committee consisting of himself, June Weaver (the responsible HR employee) and Laurie Webb (an in-house attorney working on the Corporate Governance Team). The ad hoc committee met numerous times, and, at Mr. Canova's direction, "worked . . . to try to come up with a more repeatable, more clear, less error prone process" – a goal Mr. Deranleau believes the committee accomplished. *Id.* at 227:17-228:11. Mr. Canova's approach here, once again, was to investigate, disclose and remedy problems – not to conceal them.

***The stock option audit.*** As noted above, in the course of making Brocade's processes more transparent and error-free, Mr. Canova did not ignore the area of stock options. To the contrary, between 2001 and 2003, Mr. Canova set up a quarterly audit of the stock administration function. Ex. Z, Tobias Dep. at 48:1-49:6. The finance department employee assigned to conduct the stock

audit analyzed a sample of grants, exercises, and cancellations, and matched them to ensure they were done correctly. *Id.* at 43:16-25, 48:1-49:1, 59:17-21. These procedures mirrored the processes previously put in place by the company's outside auditors, and addressed the same risk. *Supra* at 11-12 and exhibits cited there (describing processes used by Arthur Andersen); Ex. Z, Tobias Dep. at 48:20-21 (employee conducting stock option audit was "basically doing an exercise that's very similar to what our external auditors would do"). The stock option audits initiated by Mr. Canova were done quarterly, and they did not reveal any improprieties. *Id.* at 56:6-57:11.

***The second investigation.*** As noted above, Brocade's stock option investigation was ultimately conducted in two entirely separate stages. The first stage was commenced in response to Mr. Cudgma's complaint, and culminated in the company's January 24, 2005 restatement. The second investigation was prompted by Mr. Canova himself, and led to the press release of May 16, 2005, and the restatement of November 14, 2005.

In March 2005, after the company had issued its January restatement, and after Morrison & Foerster had completed its work at Brocade, Mr. Canova became concerned about one aspect of the prior investigation. Ex. L, Deranleau Dep. at 160:14-161:16. Specifically, Mr. Canova began to suspect that Grace Ward, one of the HR employees interviewed as part of the first investigation, may have misled the investigators relative to certain of the conclusions they had reached regarding Brocade's stock option granting process, and that as a result, the January restatement might not be accurate. *Id.*[5]

On the basis of this concern, Mr. Canova directed Mr. Deranleau to investigate further. As Mr. Deranleau testified, Mr. Canova "coached me not to be aggressive with Grace but to try to draw the truth out from Grace as opposed to badgering her." *Id.* at 239:24-240:4. Mr. Canova also encouraged Mr. Deranleau to bring additional resources to bear on Ms. Ward's re-interview. He

[5] The information initially provided by Ms. Ward was also used by Mr. Canova and Mr. Deranleau to determine that a basis existed to rely on the Compensation Committee minutes with respect to option grants made after August 2003. Ex. L, Deranleau Dep. at 160:23-161:16. Ms. Ward later disclosed that the factors that led to the company's decision to stop relying on Compensation Committee minutes through August 2003 had in reality existed in the August 2003 - November 2004 period. *Id.* at 242:10-21. Brocade issued its second restatement in part to reflect this change.

suggested that the interview be conducted in the presence of Jim Ravelli, an IT specialist who could (and ultimately did) use computer forensic techniques to check the truth of Ms. Ward's statements, and Charles Read, who had been integral in the first investigation and was the technical expert on the accounting treatment of option grants. *Id.* at 240:5-242:4.[6] At the interview, Ms. Ward confirmed Mr. Canova's suspicions, and recanted significant parts of her earlier accounts to investigators. *Id.* at 242:10-21. What is most significant for present purposes, however, is Mr. Canova's own conduct. Far from attempting to conceal any aspect of Brocade's option granting processes, he worked strenuously to ascertain the truth about the information previously given by Ms. Ward – after Ms. Ward had initially concealed the truth from him and the Audit Committee's investigators. Simply put, Mr. Canova was instrumental in the second investigation; indeed, it *would not even have occurred* but for his renewed efforts to discover the truth, and to disclose it in the company's financial statements. Ex. U, N. Moore Dep. at 333:1-334:5; Ex. Q, Krause Dep. at 371:5-372:2.

In each of the six areas discussed above – the binder reviews and "what keeps you up at night" meetings, the Corporate Governance Team and the stock audits, the investigations into errors by HR and allegations of option dating difficulties – Mr. Canova worked to ensure that processes were open, that errors were addressed and resolved, and that the truth was revealed and disclosed. Courts have had little difficulty in granting summary judgment where such activity on the part of a securities defendant belies the SEC's scienter allegations. For example, in *Todd*, an SEC enforcement action recently filed in the Southern District of California, the defendant CEO showed on summary judgment that, in response to concerns about revenue recognition, he had followed up with a team put together to vet the accounting issues; the CEO also showed that during his tenure, the company had established an Office of Ethics and Compliance and an internal auditing function, and had initiated an assessment of internal controls. The district court granted the CEO's summary judgment motion, concluding not only that the SEC had failed to create a triable issue of fact as to scienter on this record, but also that the CEO had made an affirmative showing of good faith. 2006

[6] Mr. Read ultimately did not attend the interview.

WL 1564892, at *7-10.[7] Other cases are in accord. *E.g.*, *Software Toolworks*, 789 F. Supp. at 1505 (granting summary judgment on scienter grounds where defendant "has shown that when presented with negative information it investigated and acted upon it"). Mr. Canova's lengthy record of truth-seeking and proactive conduct mandates the same result.

In addition to initiating or assisting in the specific processes outlined above, Mr. Canova more generally ran Brocade's finance department in a transparent manner. The employees who worked for him have uniformly testified that he was open to communication and was a very approachable supervisor. Ex. Z, Tobias Dep. at 140:19-141:5; Ex. N, Hurley Dep. at 36:17-37:18; Ex. X, Parker Dep. at 83:3-13; Ex. L, Deranleau Dep. at 212:19-213:15. This was also the observation of the in-house attorney who headed the Corporate Governance Team. Ex. AA, Webb Dep. at 196:18-197:24. According to the witnesses who worked most closely with him, Mr. Canova's response to problems that arose at Brocade was not to conceal them, but rather to understand them, to make sure the company's financial statements reflected them accurately, and to take steps to prevent them from occurring again. Ex. L, Deranleau Dep. at 213:2-15. As Brocade's current CFO has testified, when he brought a problem to Mr. Canova's attention, "[h]e was supportive . . . I felt he empowered me to go fix it by making the process better." *Id*. at 40:9-14. In keeping with their observations about how he ran his department, current and former Brocade employees have testified repeatedly that Mr. Canova was a man of integrity, with high ethical standards. Ex. AA, Webb Dep. at 47:11-49:23; Ex. N, Hurley Dep. at 107:18-24; Ex. Y, Read Dep. at 290:5-7; Ex. L, Deranleau Dep. at 214:4-11.

Under Ninth Circuit law, the Court must evaluate the SEC's scienter case in light of Mr. Canova's "overall pattern of conduct." *Supra* at 9. The activities described above, together with the unequivocally positive testimony of Brocade's employees, show that Mr. Canova sought at all times to learn and disclose the truth at Brocade – the truth about the company's financial performance, the truth about errors made by employees, and the truth about the company's option

---

[7] The good faith showing was relevant in the *Todd* case because the SEC had alleged a control person claim, and good faith is a defense to such a claim. *Id.* at *8-9. Because there is no control person claim in the present case, the standard remains scienter here, and the burden remains on the agency to prove it.

granting and accounting practices. None of this is remotely consistent with the allegation that Mr. Canova was aware of and somehow concealed a fraudulent scheme to backdate option grants. A person seeking to conceal a fraud would not at the same time work tirelessly to implement processes designed to elicit the truth; there is nothing in either the case law or the record that requires the Court to adopt the view that Mr. Canova acted in such a purposely self-defeating manner. On the contrary, the law is clear that courts should *not* indulge the inference that a securities defendant has acted in a counterintuitive or implausible manner. *Worlds of Wonder*, 35 F.3d at 1425 (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), which cautioned against "indulging irrational inferences"). Under controlling law, where the record on summary judgment shows that a securities defendant has committed his efforts to a given initiative, the court must decline to draw the inference that the defendant did not himself believe in that initiative. *Worlds of Wonder*, 35 F.3d at 1425; *Apple*, 886 F.2d at 1118. Here, where the record shows that Mr. Canova worked tirelessly to understand and expose the truth about Brocade's finances and processes, the Court should not infer that he was at the same time participating in a fraudulent scheme bent on hiding the very same facts.

### D. There Is No Evidence That Mr. Canova Read, Much Less Focused On, The Assertion In Mr. Bossi's October 31, 2002 Email – Which Was Isolated And Completely Inconsistent With Mr. Bossi's Other Conduct And Statements.

#### 1. The history of the email

In contrast to the wealth of evidence demonstrating Mr. Canova's consistent focus on truthful and accurate financial accounting, the SEC's case rests almost entirely on an ambiguous clause in an isolated email written by Robert Bossi, then Brocade's controller, and sent to Mr. Canova on October 31, 2002. The email, whose admissibility for trial purposes is highly debatable, contains Mr. Bossi's resignation and details a history of conflicts with Michael Byrd, then Brocade's Chief Operating Officer. Ex. CC, Dep. Ex. 76. The email responds to a message from Mr. Canova to Mr. Bossi, in which Mr. Canova noted that Mr. Byrd had raised questions about a loan made to Richard Geruson, an outgoing Brocade executive. *Id.* Mr. Canova's brief email to Mr. Bossi made no mention of stock options.

The history behind the email, together with the events surrounding Mr. Canova's receipt of it, have been elucidated by Eileen Tobias, who at the time was Brocade's accounting manager and reported directly to Mr. Bossi. Ms. Tobias has explained that in October 2002, Mr. Byrd had been considering terminating Mr. Geruson's employment, and as a result, was working to resolve outstanding financial issues between Mr. Geruson and the company. Ex. Z, Tobias Dep. at 109:15-21. One such issue was a loan the company had made to Mr. Geruson, which at the time had been funded but not secured. *Id.* at 108:2-21 This in turn was because Brocade had agreed to forgive the loan if Mr. Geruson reached certain performance milestones. *Id.* at 107:15-24. Because of uncertainty about what precisely these milestones were, Brocade's accounting staff – Mr. Bossi and Ms. Tobias – had been unable to complete the paperwork necessary to secure the loan when it was first taken out. *Id.*

Against this background, Mr. Canova emailed Mr. Bossi and Ms. Tobias, alerting them that Mr. Byrd was looking into the finance department's failure to secure the loan, and was "questioning the process." Ex. BB, Dep. Ex. 75. Mr. Bossi sent two emails in response. First, he forwarded Mr. Canova's message to Ms. Tobias with his own notation: "here we go." *Id.* An hour later, Mr. Bossi wrote the email on which the SEC stakes its case. The email concludes with the following statement:

> I'm sick of Mike [Byrd] as his style complicating everything he touches and then laying blame on people trying to execute the concoctions he comes up with. We work our asses off and try to do the right things. We shouldn't be blamed for Mike hiring mistakes and the fact we now have to fire a guy [Mr. Geruson] less than a year after hiring him.
>
> I have had it. My badge and pager are in your office.

Ex. CC Dep. Ex. 76. Early on the same morning that he sent this email to Mr. Canova, Mr. Bossi called Ms. Tobias, who was still at home, and told her he was quitting. He also told her about the email that he had sent to Mr. Canova, and asked her to go into his office and pick up a copy of this email, which he had left there. Ex. Z, Tobias Dep. at 112:6-113:1.

Ms. Tobias has described her reaction to Mr. Bossi's sudden announcement that he was quitting:

> I received a phone call from Bob on my cellphone, I don't recall the exact timing, but it was first thing in the morning . . . informing me that he had – he had resigned from the company and that he wasn't going to be at work that day. So obviously I was – well, as one might assume, I was really surprised because my boss was calling me to tell me that he was resigning from the company or had resigned from the company.
>
> You know, the other – the other factor, significance about this day is that it was right in the middle of our fiscal year-end close. So, you know, the corporate controller is calling me to tell me that he quit four days into the fiscal year-end close, he wasn't coming to the office, that he was frustrated, that he wasn't coming in, and that he had written an email to – he told me he had sent an email to Tony [Canova] with his resignation and that he had left a copy of it in his office and when I went to the office would I mind going in and picking it up.

*Id*. Significantly, Ms. Tobias has not identified stock options or "forgery" as factors of "significance" in the email and the phone call – or, indeed, as items that were discussed *at all* on October 31, 2002.

As requested, Ms. Tobias picked up the copy of the email Mr. Bossi had left in his office. She and Gary Blucher, another finance department employee, then discussed it.

> [W]e sat in Bob's office and we read the email and then we – it was just the two of us. We were discussing amongst ourselves what we should do because the corporate controller had quit during the year-end close and we were really surprised that we hadn't heard anything from Tony. And since both of us reported to Bob, we were figuring, well, if Tony had seen the email, he may not tell us specifically about the email but he might say something to us like I heard Bob's not going to be here today or – you know, he may or may not tell us that Bob had quit, but we thought it was odd that he hadn't said anything to us about it.

*Id.* at 116:8-20. Ms. Tobias and Mr. Blucher then went in search of Mr. Canova. They found him in a meeting with people from outside the company – analysts or investors. They showed him the email.

> We handed it to him, he read it, and then what I recall is he asked Katrina [his assistant] to leave the room and the three of us briefly talked.
>
> He asked me if, in my opinion, Bob was serious, if he had really quit, and I said – I just said I don't know, you know, I spoke to him, this is what he said during the call. And then, from what I recall, Tony, you know, he took the email and he said, you know, I'll take care of it, I'm going to try to contact Bob. The two of you go and – you know, go do whatever for the close, and if anyone asks, Bob is – Bob's out of the office.
>
> [The meeting was] really brief. Like I said, [Mr. Canova] had to go to another

> meeting . . . .

*Id.* at 117:22-118:13. Ms. Tobias later learned that Mr. Canova and Mr. Bossi had met the following day, and that Mr. Bossi had agreed not to resign. Ms. Tobias and Mr. Bossi did not discuss the details of the email at any point – although Mr. Bossi did apologize to Ms. Tobias for temporarily leaving her without a boss during the stressful close period. Ex. Z, Tobias Dep. at 121:6-15. They never discussed Mr. Geruson's loan, and the job of loan documentation was thereafter handled by Brocade's in-house legal department. *Id.* at 121:18-25.

Until the time of Brocade's internal investigation two years later, Ms. Tobias "would have described the email as talking about the Rich [Geruson] loan." *Id.* at 143:16-25. This is hardly surprising. As Ms. Tobias has testified, at no time during this entire incident did either she or anyone else – Mr. Blucher, Mr. Bossi or Mr. Canova – ever raise the issue of improprieties in the stock option grant process.

**2. The text of the email**

The SEC has nevertheless chosen to bring fraud charges against Mr. Canova based on the highlighted clause in the first paragraph of Mr. Bossi's email:

> Tony – I'm not spending another minute on explaining the process around Geruson's note. Both Eileen and I have communicated to you, Ron [Epstein, Brocade's General Counsel] and Stephanie [Jensen] more than once over the last several months that Rich was dicking around with his note and no VP at this company would help us drive this to closure. As we already explained we found out his house was going to close and he needed the money three days before the closing. We told Mike we needed to fund his house. He said fine, but make sure we secure with a second. He did not say don't fund until you have the second. We interpreted it as fund and then get the thing secured. If you recall we had all been jumping through hopes [sic] and bending over backwards for this guy *including forging option paperwork and offer letters so he could get better priced options*. So we thought we were doing the right thing. And again we let everyone know including Mike that his loan paperwork was dragging because Rich would not focus on it and because Mike and HR would not get us the performance language for the forgiveness clause.

Ex. CC, Dep. Ex. 76 (emphasis added). In light of both the text of the email and the context provided by Ms. Tobias, the highlighted clause cannot possibly bear the weight the SEC places on it.

First of all, there is no evidence that Mr. Canova ever *read* that particular clause, let alone

focused on it. Ms. Tobias has made clear that Mr. Canova received the email in a rushed, pressured setting – the company controller was quitting in the middle of the fiscal year-end close, while Mr. Canova himself was about to go into a meeting with analysts or investors. Ex. Z, Tobias Dep. at 117:3-8, 118:9-13. Mr. Canova clearly had not seen the email before Ms. Tobias handed it to him; nor did he have the luxury of reading it in a relaxed fashion. Instead, he read it quickly, with Ms. Tobias and Mr. Blucher anxiously hovering over him. Ms. Tobias has also made clear that Mr. Canova's natural reaction was to focus on the crisis at hand – Mr. Bossi's resignation – rather than the details of Mr. Bossi's unhappiness with Mr. Byrd or other aspects of Mr. Geruson's situation. *Id.* at 119:4-11.

The text of the email also places the focus far from the highlighted clause. The point of the email is that Mr. Bossi is quitting, and is doing so because of his difficulty in working with Mr. Byrd. The events surrounding Mr. Geruson's *loan* – not his options – are cited as the primary example of this difficulty, and as the catalyst for Mr. Bossi's decision. As a secondary point, Mr. Bossi defends his treatment of the loan, and as a tertiary point, he argues that giving favorable treatment to Mr. Geruson in connection with the loan was justified in light of the company's previous treatment of this executive: "If you recall, we had all been jumping through hopes [sic] and bending over backwards for this guy." The reference to forgery and options is then provided as an illustrative example supporting this tertiary point. It is quite literally the portion of the email furthest removed from the point of the email.

Moreover, the structure of the sentence on which the SEC relies leaves entirely unclear whether "If you recall" is intended to refer to the alleged forgery or only to the more general "jumping through hoops" and "bending over backwards," of which the purported forgery is apparently supposed to be an example. If the phrase "If you recall" refers only to the more general point, then there is clearly no reason to believe Mr. Canova had ever before had any exposure to the alleged forgery. In any event, the operative phrase is "*if* you recall" – and not, for example, "as you know" – suggesting that Mr. Canova may not previously have known anything about even the more general accommodations made to Mr. Geruson, let alone the purported "forging," and that Mr. Bossi knew this to be the case. Finally, the reference to forgery and options is confined to a single

employee – Mr. Geruson. No suggestion is made by Mr. Bossi that there is any larger problem with options at Brocade.

Ms. Tobias's account of the events surrounding the Bossi email, as described above, further confirms that the language relating to "option paperwork" was not a central focus for anyone involved. Mr. Bossi himself did not refer to this portion of the email in either his call to Ms. Tobias or his later conversation with her. Ex. Z, Tobias Dep. at 113:12-114:22, 121:6-15. Neither Ms. Tobias nor Mr. Blucher mentioned the clause when they read the email together in Mr. Bossi's office. *Id.* at 142:18-22 . And when Ms. Tobias and Mr. Blucher went to Mr. Canova's office to announce Mr. Bossi's resignation to him, none of the three referred to the language on which the SEC now relies so heavily. *Id.* at 142:23-143:4. Simply put, this brief reference in the email was not relevant to any aspect of Mr. Bossi's surprise resignation, and therefore, was not discussed (or perhaps even read) by any of the day's key participants.

**3. Mr. Bossi's disavowal**

The clause on which the SEC focuses is isolated in another telling way as well. It constitutes the *only* documented instance in which Mr. Bossi ever raised any concerns about Brocade's option grant practices to Mr. Canova or anybody else at the company. Mr. Bossi did not express these concerns in the binder reviews or the "what keeps you up at night" sessions – the forums Mr. Canova had created precisely in order to ensure open communication and maximum accuracy in the company's financial statements. Ex. X, Parker Dep. at 76:12-23. Nor did Mr. Bossi raise any concerns privately to his colleagues in the finance department. Ex. T, E. Moore Dep. at 16:20-24; Ex. Z, Tobias Dep. at 64:6-65:13; Ex. N, Hurley Dep. at 89:2-90:3; Ex. Y, Read Dep. at 286:18-287:18. Similarly, Mr. Bossi never raised concerns about stock options with Neil Miotto, the KPMG partner who was responsible for auditing Brocade's financial statements, and with whom Mr. Bossi had numerous interactions regarding KPMG's audits. Ex. S, Miotto Dep. at 255:2-14, 256:21-258:7. Mr. Bossi also did not express any concerns about option grants to Mr. Deranleau during the 30-day transition period in which Mr. Bossi handed off his duties as controller to Mr. Deranleau. Ex. L, Deranleau Dep. at 196:13-23. This was despite the fact that Mr. Bossi and Mr. Deranleau had long been acquainted with one another and had previously worked together.

*Id*. at 197:10-19. Mr. Bossi used the opportunity provided by the lengthy transition period to raise issues of concern in other areas, such as reserves – but never to identify any problems with option grants, much less "forgery." *Id.* at 198:7-200:19.

Finally, Mr. Bossi did not express concerns about option dating at his interview with Morrison & Foerster during the internal investigation – an investigation that was commenced precisely because of an allegation of stock option backdating. To the contrary, Mr. Bossi stated at his interview that he was *not aware of any misconduct connected with option grants*. Ex. II, Dep. Ex. 615 at MOFO 01256; Ex. R, Martin Dep. at 538:20-539:17. One of the attorneys present at Mr. Bossi's internal investigation interview summarized Mr. Bossi's statements as follows: "Not aware of any improper backdating, forward dating, et cetera, or to give a lower strike price or to give more shares." Ex. II, Dep. Ex. 615. Mr. Bossi never told the attorneys conducting the investigation anything about "forged" paperwork for Mr. Geruson, in connection with options or anything else. Ex. R, Martin Dep. at 543:1-6. And Mr. Bossi had nothing but praise for Mr. Canova: He described him as "very smart – substantive – straight shooter, do the right thing," and noted that he "enjoyed working for him." *Id.* at 537:25-538:9; Ex. II, Dep. Ex. 615 at MOFO 01254.[8]

An isolated clause in an email written by this witness in the emotional context of a sudden resignation is nevertheless the basis of the SEC's case against Mr. Canova. But any inference of scienter that the single clause may create is dispelled, under Ninth Circuit law, by the context surrounding the email itself, together with Mr. Canova's record of consistently open proceedings and conservative accounting. *See Worlds of Wonder*, 35 F.3d at 1425; *Apple*, 886 F.2d at 1117. Against the background of Mr. Canova's consistent focus on truthfulness and accuracy, a single clause in an email he read – *if at all* – under highly pressured and distracting circumstances cannot raise a genuine factual issue on the question of whether Mr. Canova acted with knowledge of falsity, or with a degree of recklessness so high that it reflected intentional misconduct.

---

[8] That description was echoed by Mr. Byrd, another of the witnesses on whom the SEC has built its case. Mr. Byrd told the attorneys conducting the internal investigation that Mr. Canova was a "very smart, pretty independent guy, good auditor, good accountant." Ex. HH, Dep. Ex. 606 at MOFO 00385; Ex. R, Martin Dep. at 544:22-545:11.

**4. Mr. Bossi's assertion of the Fifth Amendment**

To the extent that any possible inference of scienter arising from the Bossi email is not already dispelled, this is the result not of the merits of Mr. Canova's case but rather of the SEC's unfair and self-serving litigation tactics. Any remnant of persuasive force that the isolated and ambiguous clause may have could be stripped away by means of vigorous cross-examination – except that, as the Court knows, Mr. Canova and the other defendants have effectively been denied access to Mr. Bossi. Although Mr. Bossi has cooperated with the SEC in this case, and with the United States Attorney's Office in the related criminal proceeding, he provided only the following non-answers to Mr. Canova's questions at deposition:

> Q. Mr. Bossi, the court reporter has handed you a document that was marked as an exhibit in the deposition of Eileen Tobias. My first question is do you recognize this document?
>
> A. I invoke my Fifth Amendment right.
>
> Q. It appears to be an email from you dated October 31st, 2002. *Did you send this email?*
>
> A. *I invoke my Fifth Amendment right.*
>
> Q. *And what was your purpose in sending the email, if you did send it?*
>
> A. *I invoke my Fifth Amendment right.*
>
> Q. I'd like to direct your attention to the first paragraph and specifically the fifth line from the bottom of the first paragraph that begins "If you recall." Do you see that? I'm just asking if you see the language that I'm referring to.
>
> A. Yes.
>
> Q. Okay. So I'll read it. It says "If you recall, we had all been jumping through hopes [sic] and bending over backwards for this guy, including forging option paperwork and offer letters so he could get better priced options."
>
> *What did you mean by that?*
>
> A. *I invoke my Fifth Amendment right.*
>
> Q. If I ask you any further questions relating to this document, Exhibit 76, or the subject matter discussed in it, would you invoke your Fifth

Amendment rights?

A. Yes.

Ex. I, Bossi Dep. at 21:10-22:13 (emphasis added). As this colloquy shows, the SEC has continued to decline to secure immunity for Mr. Bossi for purposes of his deposition, notwithstanding the grant of immunity he was previously given for purposes of assisting the agency. The result of this tactic is that defendants are barred from elucidating the final piece of context: Mr. Bossi's own account of what the email means and why he wrote it. Instead, by means of its selective deployment of immunity, the SEC has attempted to freeze the single cryptic statement attributed to Mr. Bossi, and to ride it into trial. At the same time, Mr. Bossi will not even say *whether* he wrote the email, let alone *what it means*. To imperil Mr. Canova's livelihood on the basis of this document, and to put his life on hold for many months more, would be the height of unfairness, and entirely out of keeping with the purposes and policies behind civil discovery. The Court should not permit any lingering uncertainty about the Bossi email to stand in the way of summary judgment.

5. **The future use of Mr. Bossi's testimony.**

In the alternative, should the Court deny Mr. Canova's summary judgment motion, the SEC should be precluded from presenting Mr. Bossi's testimony at trial. As the Court knows, Mr. Bossi is among the "Silent Eleven" – witnesses who have assisted the SEC, the United States Attorney's Office or both, but who have invoked the Fifth Amendment at their civil depositions in this case, and have declined to testify about any matter relevant to this litigation. As the Court has previously recognized,

> [T]here can be no dispute that the government's power to circumscribe the scope of a witness's immunity has allowed it to reap the benefit of testimony from the Silent Eleven, while effectively preventing Defendants from accessing the same information. Such tactically beneficial conferrals of immunity are at odds with the purpose of discovery in civil cases, which is to ensure that litigants have the right to "every man's evidence" and to promote the search for truth by providing wide access to relevant facts.

Ex. G, Feb. 6, 2007 Order at 6 (internal quotation marks and citation omitted).

The government's – and the SEC's – persistence in the selective use of immunity grants continues to infringe on Mr. Canova's rights as a civil litigant, and to hamper his efforts to prepare

and present his defense, including this motion. Yet in order to pursue its claims against Mr. Canova, the SEC has relied heavily on Mr. Bossi: Two of the three paragraphs setting forth the ways in which Mr. Canova is supposed to have learned of the purported fraud are based either on the Bossi email or on information allegedly furnished by "Brocade's controller" – Mr. Bossi. Com. ¶¶ 40-42. At the same time, in contrast to the SEC, Mr. Canova has been entirely cut off from access to Mr. Bossi. Should the Court deny Mr. Canova's summary judgment motion, it will do so on the basis of an incomplete record. Significantly, the sole reason the record is not complete is that the government has been unwilling to provide defendants with the same access to Mr. Bossi that the SEC itself enjoyed in formulating its case. We are unaware of any precedent permitting the government to make such one-sided and unfair use of a witness.

As this Court has previously noted, conduct such as the government has engaged in here has consequences:

> That the Court lacks power to compel a grant of immunity . . . does not mean that the Court is without power to assist Defendants. Numerous courts have fashioned remedies, ranging from the exclusion of certain testimony to more comprehensive preclusion orders, when information is unavailable to one party because of Fifth Amendment privileges, and particularly where the machinations of one party make that information unavailable to an adversary. Here, the Court would be prepared to fashion an exclusionary remedy, at an appropriate time, that would deprive the SEC of the benefit of the government's selective grants of immunity.

Ex. G, February 6, 2007 Order at 7-8 (citation and parenthetical omitted). The time is now ripe for the Court to effect the exclusionary remedy it previously discussed. If Mr. Canova is forced to proceed to trial, this will flow directly from the government's selective and unjust manipulation of immunity in this case. The government's conduct has caused Mr. Canova to be deprived of rights enjoyed by other civil litigants – the right to ascertain and present the relevant facts to the Court at the pre-trial stage, and the right to summary adjudication if the record does not reveal a genuine dispute of material fact. While there is likely no mechanism that can adequately remedy Mr. Canova for the loss of these rights, he should, at a minimum, be spared the injustice of having the very witness whose testimony he has been precluded from eliciting for summary judgment purposes appear against him at trial. *See, e.g., SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190-92 (3d Cir. 1994) (collecting cases excluding testimony where the Fifth Amendment has been invoked for

strategic purposes); *Gutierrez-Rodriguez v. Cartagena,* 882 F.3d 553, 576-77 (1st Cir. 1989) (precluding witness from testifying at trial because he asserted the Fifth Amendment and refused to answer questions during discovery); Ex. G*,* Feb. 6, 2007 Order at 7-8.[9] Because Mr. Canova has been prejudiced by the government's strategic use of immunity, and, if this motion is denied, will be forced to endure many more months of limbo before he can vindicate himself at trial, he is entitled to the exclusionary remedy previously referred to by this Court. Accordingly, Mr. Bossi should not be permitted to appear at the trial in this matter.

**E. The Jieming Zhu Email Does Not Demonstrate Scienter.**

When the Bossi email is dispensed with, little remains of the SEC's case. The agency contends in its complaint that a second email should also have put Mr. Canova on notice of the purported scheme. Com. ¶ 40. But this other email itself belies that assertion.

The email in question is dated April 9, 2001 – barely four months after Mr. Canova came to Brocade, and before he became the company's CFO. The email is addressed to Mr. Canova and Ms. Jensen, and was written by Jieming Zhu, then an engineer at the company. Specifically, Mr. Zhu forwarded an email that he had written to a recruit who had expressed "concern[s] about the company's financial stability." Ex. H. Mr. Zhu had written to the recruit that "[i]f history is any indication, the price [of a new hire grant] is usually the lowest closing price between now and the Board meeting." *Id.* Mr. Canova forwarded the email to Ms. Jensen with the following notation:

> Please caution jieming to not make statements about the board granting shares at the lowest price. To date this has been a complete coincidence. I actually worry that others may say the same.

*Id.* Other than quoting portions of this email in the complaint, the SEC has never explained how it is supposed to demonstrate that Mr. Canova knew about the alleged fraudulent scheme. No witness who has been deposed has testified about the email, and there has been no allegation that Mr. Zhu was aware of the alleged scheme itself.

---

[9] The Court noted at an earlier stage in this case that defendants had at that point "suffered no concrete prejudice" as a result of the government's selective use of immunity grants, save "the inconvenience of having to wait for the information they seek." Ex. G, Feb. 6, 2007 Order at 8. But if Mr. Canova is deprived of his right to move for summary judgment on the basis of a complete record, he clearly *will* have suffered concrete prejudice.

Whatever place Mr. Zhu's email may have in the SEC's case, it plainly cannot raise a genuine issue of material fact on scienter. In response to Mr. Zhu's cryptic remark, Mr. Canova concluded, based on what he knew at the time, that "to date [the grant of shares at a low price] has been a complete coincidence." Crucially, this conclusion on Mr. Canova's part must be assessed *as of the time it was made*, and without the benefit of hindsight. *E.g., Southland Securities v. INspire Ins. Solutions*, 365 F.3d 353, 383 (5th Cir. 2004) ("We agree with the district court that, because fraud cannot be proved by hindsight, subsequent [events] are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at [an earlier time"]; *In re Glenfed, Inc. Sec. Litig*., 42 F.3d 1541, 1548 & n.8 (9th Cir. 1994) (en banc) (securities fraud may not be shown by hindsight).

Applying this basic rule has a dramatic effect on the SEC's allegations concerning the Zhu email. The SEC has put together a chart entitled "Ten Consecutive Quarters of Options Granted At or Near Quarterly Low Stock Price." Com. App. A. At the time Mr. Canova received Mr. Zhu's email, only the first three purportedly suspect grants had been made. Two were made before Mr. Canova even began working at Brocade; the third was made only ten days after Mr. Canova had begun full-time employment with the company. Against this background – a single grant made at what the SEC contends was the quarterly low – there is nothing cynical in Mr. Canova's conclusion that this was coincidence. And against the larger background of Mr. Canova's proven integrity and search for truth at Brocade, Mr. Zhu's email is not sufficient to create a triable issue of fact on scienter.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

### F. Paragraph 43 Remains A Mystery To Every Single Relevant Witness And Has Never Been Supported With Any Evidence.

Finally, in what one third-party witness went out of his way to describe as a "poorly constructed" allegation,[10] the SEC has stated that Mr. Canova

> helped facilitate the fraud by directing finance department employees to ensure that the dates used for option grants in the Compensation Committee meeting minutes were consistent with employee records reflecting their hiring dates. Where the two types of records were inconsistent, Canova instructed employees to ensure that the Compensation Committee meeting minute dates corresponded to the hire dates of the employees listed in the minutes, which thus concealed date discrepancies from Brocade's external auditors.

Com. ¶ 43. The SEC does not bother to allege when this conduct is supposed to have occurred.

Every single witness who has testified about this allegation has flatly denied that Mr. Canova ever asked him or her – or anyone else – to do such a thing. Ex. L, Deranleau Dep. at 250:24-252:16; Ex. N, Hurley Dep. at 105:10-107:17; Ex. X, Parker Dep. at 84:21-85:18; Ex. Z, Tobias Dep. at 141:6-25. Brocade's current CFO went on to express amazement at the allegation. Ex. L, Deranleau Dep. at 250:24-252:8. We share his puzzlement. After dozens of depositions have been taken and millions of documents produced, Mr. Canova is not aware of a shred of documentary or other evidence that supports the allegations in paragraph 43. The SEC's unsubstantiated and outlandish accusation cannot save its case against Mr. Canova.

### G. Mr. Canova's Own Assertion Of The Fifth Amendment Does Not Alter The Outcome.

The SEC may argue that summary judgment is inappropriate because Mr. Canova's assertion of the Fifth Amendment in response to discovery propounded in this case creates an "adverse inference." The law is clear, however, that a defendant's assertion of the Fifth Amendment does not convert the allegations made in a complaint into evidence; the plaintiff is still required, both in moving for and opposing summary judgment, to come forward with independent evidence on every element of its claim. *Curtis v. M& S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir 1999); *La Salle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995). The law is also clear that a defendant may be entitled to summary judgment even where he has availed himself of the

[10] Ex. L, Deranleau Dep. at 250:24-252:16.

protections of the Fifth Amendment. Where a defendant has otherwise established the absence of a genuine issue of material fact on the element of scienter, the defendant's assertion of the Fifth Amendment will not defeat his summary judgment motion. *Curtis*, 174 F.3d at 675 (granting summary judgment where defendant, who had asserted the Fifth Amendment, demonstrated that plaintiff had not presented a genuine issue of material fact on the element of intentionality).

The adverse inference that may be drawn from a party's assertion of constitutionally protected rights is limited in the summary judgment context in any event. A court may not draw *any* adverse inference unless the party seeking the inference has come forward with *separate, independent* evidence of scienter. *Id.*; *LaSalle Bank*, 54 F.3d at 391. Even then, an adverse inference is far from an admission of guilt; it is merely *one facto*r to be considered in the totality of evidence presented for and against summary judgment. *LaSalle Bank*, 54 F.3d at 391; *see also Fidelity Funding of Cal. v. Reinhold*, 79 F. Supp. 2d 110, 116 (E.D.N.Y. 1997) (whether or not an adverse inference is drawn, a motion for summary judgment "must stand or fall on the merits of the evidence adduced"). The Court has considerable discretion in determining the effect to be given to an invocation of the Fifth Amendment. *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1999). In this case, it would be unjust to permit the SEC to escape summary judgment on the basis of any adverse inference to be drawn from Mr. Canova's assertion of his right to remain silent, especially given the SEC's own manipulative use of Fifth Amendment immunity with respect to other witnesses. *See Fidelity Funding*, 79 F. Supp. 2d at 117 (in particular circumstances presented by that case, declining to draw an adverse inference for summary judgment purposes, while acknowledging that the inference would be appropriate at trial). Mr. Canova's constitutionally protected invocation of his right to remain silent cannot substitute for the evidence the SEC has failed to adduce here.

## V. CONCLUSION

For all of the reasons stated above, the Court should grant Mr. Canova's motion for summary judgment and dismiss the SEC's claims against Mr. Canova in their entirety. In the alternative, the Court should enter an order *in limine* precluding the SEC from presenting Mr. Bossi's testimony at the trial in this matter.

April 27, 2007

Respectfully submitted,

HELLER EHRMAN LLP

By /s/ Norman J. Blears
NORMAN J. BLEARS

HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Attorneys for Defendant
ANTONIO CANOVA