RICHARD MARMARO (Bar No. 91387)
rmarmaro@skadden.com
JACK P. DICANIO (Bar No. 138782)
THOMAS CHRISTOPHER (Bar. No. 185928)
RONDA J. MCKAIG (Bar No. 216267)
BRIAN C. BUSSE (Bar No. 241802)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Tel: (213) 687-5000
Fax: (213) 687-5600

CHRISTOPHER J. GUNTHER (admitted *Pro Hac Vice*)
cgunther@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-2000

Attorneys for Defendant
GREGORY L. REYES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

GREGORY L. REYES, ANTONIO CANOVA, and STEPHANIE JENSEN,

Defendants.

CASE NO. C 06-04435 CRB

**(1) GREGORY L. REYES'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF CLAIMS;**

**(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**

***FILED UNDER SEPARATE COVER*:**
**(3) DECLARATION OF RONDA MCKAIG IN SUPPORT THEREOF; and**

**(4) [PROPOSED] ORDER**

Date: June 15, 2007
Time: 10:00 a.m.
Judge: Hon. Charles R. Breyer
Courtroom: 8, 19th Floor

# TABLE OF CONTENTS

**Page**


NOTICE OF MOTION AND STATEMENT OF RELIEF REQUESTED ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ..... 1

II. PROCEDURAL HISTORY OF THE CASE ..... 1

- A. Background of this Action ..... 1
- B. The SEC's Unsuccessful Effort to Stay this Action ..... 2
- C. The Extensive Discovery ..... 2

III. FACTUAL BACKGROUND ..... 3

- A. Mr. Reyes Successfully and Ethically Built Brocade Into An Industry Leader ..... 3
- B. Brocade Remains Successful Today ..... 6

IV. THE SUMMARY JUDGMENT STANDARD ..... 7

V. MR. REYES IS ENTITLED TO SUMMARY ADJUDICATION ON COUNTS ONE AND TWO BECAUSE THE SEC CANNOT ESTABLISH THE ESSENTIAL ELEMENT OF SCIENTER ..... 9

- A. There Is No Evidence That Mr. Reyes Intended To File Materially False Financial Statements ..... 9
- B. There is No Evidence that Mr. Reyes Engaged in or was Aware of the Retroactive Pricing of ESOs ..... 11
- C. There is No Evidence that Mr. Reyes Falsified Documents or Directed Others to Falsify Documents ..... 12
- D. There is No Evidence that Mr. Reyes Understood the Accounting Rules Governing ESOs ..... 13
- E. Mr. Reyes's Reasonable Reliance on Experts Undermines any Inference of Scienter. ..... 14
  1. Mr. Reyes Reasonably Relied on the Board of Directors ..... 15
  2. Experienced Employees in the Finance Department Participated in the ESO Granting Process ..... 15
  3. The Human Resources and Legal Departments, as Well as Outside Counsel, Took Part in the ESO Granting Process ..... 17

4. Brocade's Highly Qualified Outside Auditors Reviewed the ESO Grants and Related Paperwork ........ 18

5. Brocade had Internal Controls in Place, and Reviewed and Improved its Processes During Mr. Reyes's Tenure as CEO ........ 19

6. Brocade Encouraged Open Communication and Integrity During Mr. Reyes's Tenure as CEO ........ 20

7. Mr. Reyes Had No Motive to Defraud Investors ........ 21

(a) There Is No Evidence That Mr. Reyes Granted Himself Options ........ 21

(b) There is No Evidence That Mr. Reyes Received Retroactively Priced Options ........ 21

(c) Recruiting and Retaining Talent is a Pure Motive ........ 22

VI. MR. REYES IS ENTITLED TO SUMMARY ADJUDICATION ON CLAIMS THREE THROUGH EIGHT ........ 22

A. Mr. Reyes is Entitled to Summary Judgment on Claims Three, Four and Six Because There is No Significantly Probative Evidence That Mr. Reyes Knowingly Violated Section 13 ........ 22

B. Mr. Reyes Is Entitled to Summary Judgment on Claims Five, Seven and Eight Because the SEC Cannot Demonstrate that Mr. Reyes Knowingly Aided or Abetted Any Brocade Reporting Violations ........ 24

VII. FIFTH AMENDMENT INVOCATIONS DO NOT PRECLUDE MR. REYES FROM PREVAILING ON THIS MOTION ........ 25

A. Mr. Reyes's Assertion of His Fifth Amendment Rights Does Not Preclude Summary Judgment ........ 25

B. Other Witnesses' Invocations of Their Fifth Amendment Rights Does Not Preclude Summary Judgment ........ 26

VIII. CONCLUSION ........ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505 (1986) ........ 8

*Basic Inc. v. Levinson*,
485 U.S. 224, 108 S. Ct. 978 (1988) ........ 10

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ........ 9

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2458 (1986) ........ 7

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ........ 10

*Cray Commc'ns v. Novatel Computer Sys., Inc.*,
33 F.3d 390 (4th Cir. 1994) ........ 8

*Daubert v. Merrell Dow Pharm.*,
43 F.3d 1311 (9th Cir. 1995) ........ 7

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000) ........ 25

*Fidelity Funding of Cal. v. Reinhold*,
79 F. Supp. 2d 110 (E.D.N.Y. 1997) ........ 25

*FTC v. Medicor*,
217 F. Supp. 2d 1048 (C.D. Cal. 2002) ........ 25

*Geffon v. Micrion Corp.*,
249 F.3d 29 (1st Cir. 2001) ........ 10

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) (en banc), *cert. denied*,
499 U.S. 976, 111 S. Ct. 1621 (1991) ........ 9

*In re Allergan Inc. Sec. Litig.*,
No. SACV 89-643 AHS (RWR), 1993 WL 623321 (C.D. Cal. Nov. 29, 1993) ........ 8

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ........ 18

*In re Int'l. Rectifier Sec. Litig.*,
No. CV-3357-RMT (BQRX), 1997 WL 529600 (C.D. Cal. Mar. 31, 1997) ........ 8

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........ 9

*In re Sportsline.com Sec. Litig.*,
366 F. Supp. 2d 1159 (S.D. Fla. 2004)....................14

*Ponce v. S.E.C.*,
345 F.3d 722 (9th Cir. 2003)....................24

*Reiger v. Price Waterhouse Coopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000)....................9

*Renovitch v. Kaufman*,
905 F.2d 1040 (7th Cir. 1990)....................22

*S.E.C. v. Lowy*,
396 F. Supp. 2d 225 (E.D.N.Y. 2003)....................22

*S.E.C. v. Rubera*,
350 F.3d 1084 (9th Cir. 2003)....................9

*S.E.C. v. Sandifur*,
No. C05-1631C 2006 U.S. Dist. LEXIS 12243 (W.D. Wash. Mar 2, 2006)....................24

*S.E.C. v. Todd*,
No. C03-CV 2230 BEN (WMC) 2006 U.S. Dist. LEXIS 41182 (S.D. Cal. May 30, 2006)....................24

*Schlifke v. Searfirst Corp.*,
866 F.2d 935 (7th Cir. 1989)....................10

*Schuster v. Symmetricon, Inc.*,
No. C9420024 RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)....................22

*Stavroff v. Meyo*,
No. 95-4118, 1997 WL 720475 (6th Cir. Nov. 12, 1997)....................19

*Tages v. Univision Television Group, Inc.*,
No. 04 C 3738, 2005 U.S. Dist. LEXIS 24580 (N.D. Ill. October 20, 2005)....................11

*Triton Energy Corp. v. Square D Co.*,
68 F.3d 1216 (9th Cir. 1995)....................8

**<u>Statutes</u>**

Fed. R. Civ. P. 56(c)....................7

Fed. R. Civ. P. 56(e)....................8

## NOTICE OF MOTION AND STATEMENT OF RELIEF REQUESTED

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 15, 2007, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the above-referenced court, before Honorable Charles R. Breyer, Defendant Gregory Reyes will, and hereby does move this Court for an order granting summary judgment.

The Motion is based on this Notice, the Memorandum of Points and Authorities attached hereto, the pleadings and papers previously filed, the Declaration of Ronda J. McKaig, the accompanying exhibits, and any oral argument presented.

Dated: May 11, 2007

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Richard Marmaro
RICHARD MARMARO

Attorney for Defendant
GREGORY L. REYES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

Defendant Gregory L. Reyes respectfully submits this Memorandum of Points and Authorities in support of his Motion for Summary Judgment. As demonstrated below, Mr. Reyes is entitled to summary adjudication of all claims in the complaint because there is no genuine issue of material fact regarding whether Mr. Reyes engaged in any of the alleged wrongful conduct with the state of mind required to impose liability under the federal securities laws. After extensive discovery: including the depositions of over 50 witnesses, written discovery such as interrogatories and requests for admission, and the production of over 2,500,000 pages of documents, the Securities and Exchange Commission ("SEC") is no more able to prove its claims against Mr. Reyes today than it was when it filed this action in July 2006. Specifically, the SEC remains unable to marshal sufficient evidence to create triable issues of fact regarding whether Mr. Reyes (1) intentionally or knowingly made or caused Brocade to make materially false or misleading statements to the marketplace regarding Brocade's financial results; (2) intentionally or knowingly engaged in or was aware of any misconduct regarding the retroactive pricing of stock options; (3) knew or was reckless in not knowing of the alleged errors in Brocade's books, records, and accounts; or (4) knowingly aided or abetted Brocade in the making of any materially false or misleading statements to the SEC or the marketplace. As explained below, Mr. Reyes is therefore entitled to summary judgment on all of the SEC's claims.

## II. PROCEDURAL HISTORY OF THE CASE

### A. Background of this Action

The SEC filed its complaint against Mr. Reyes on July 20, 2006. As alleged in the complaint, Mr. Reyes was the Chief Executive Officer of Brocade Communications Systems, Inc. ("Brocade") from mid-1998 through approximately January 2005, and a member of the Board of Directors for the majority of that time. The complaint contains eight claims for relief. The first claim alleges a violation of section 17(a) of the Securities Act, and the second claim alleges a violation of section 10(b) of the Exchange Act, and the SEC rules promulgated thereunder. The

other claims for relief (three through eight) allege violations of section 13 of the Exchange Act and the rules promulgated thereunder.

All the claims generally arise from an alleged "scheme" to "backdate" options at Brocade that was "orchestrated by" Mr. Reyes. (Complaint ¶¶ 20-25.) According to the complaint, the backdating "scheme" occurred when Mr. Reyes falsified Brocade's compensation committee minutes to create the appearance that Employee Stock Options ("ESO") had been granted on earlier dates with lower stock prices. (*Id.* ¶ 2.) The SEC asserts that this alleged "scheme" allowed Brocade to avoid recording a compensation expense in its financial statements and allegedly caused Brocade to materially overstate its income and understate its expenses. (*Id.* ¶ 36.)

### B. The SEC's Unsuccessful Effort to Stay this Action

On September 15, 2006, the Department of Justice ("DOJ") filed a motion to stay this action, and on September 29, 2006, the SEC filed a statement of non-opposition to that motion. (McKaig Decl. Ex. 1 (DOJ motion)[1], Ex. 2 (SEC response in support).) The Court rejected this joint effort to prevent discovery by order of October 4, 2006, with these words:

> It appears to me that when the SEC decides they want to charge people with a violation of securities law, which they are entitled to do and have a right to do and duty to do, they invite, of course, the defense to respond; and the defendant has the right to respond in civil litigation, and so I don't understand the logic if the SEC is filing charges against people and then saying, "Oh, by the way, don't do any discovery, we'll wait a year or so".
>
> When I say I don't understand the logic, what I am saying is I don't really appreciate the fundamental fairness of that approach or the fairness of that approach. The decision whether or not to file charges remains with the SEC, but not when you're the plaintiff can you dictate how the defense should proceed and when the defense should proceed.

(Ex. 3 (Tr. of Record at 4-5, *U.S. v. Reyes*, No. CR-06-0556, (N.D. Cal. Oct. 4, 2006)).)

### C. The Extensive Discovery

After the Court rejected the DOJ/SEC's attempt to stay the case, the parties engaged in extensive discovery. The SEC obtained discovery in the form of interrogatories, requests for admission, and requests for production to Mr. Reyes and the other defendants in this case.

[1] All exhibits referenced herein ("Ex. __") are to the exhibits attached to the Declaration of Ronda McKaig in Support of Mr Reyes's Motion for Summary Judgment.

(McKaig Decl. at ¶¶ 2 & 3.) The SEC also sent more than 36 administrative or Rule 45 subpoenas to non-parties, and received documents pursuant to its requests from at least 27 persons. (Ex. 4 (SEC's Responses to Mr. Reyes's RFA Nos.2 and 3).) To date, over 500,000 documents (approximately 2,500,000 pages) have been produced. (McKaig Decl. at ¶ 3.)

In addition to the expansive written discovery, over 50 depositions have been taken. (*Id.* at ¶ 4.) These deponents include Brocade employees at various levels of reporting responsibility, such as officers, managers, and assistants. (*Id.*) They also include employees from various Brocade departments, such as human resources, finance and accounting, legal, marketing, payroll, and sales. (*Id.*) In addition, nine present and former Brocade directors have testified at depositions – including members of the Board's Compensation, Audit and Corporate Governance Committees. (*Id.* at ¶ 5.) Finally, Brocade's outside auditors, including audit partners, associates, and managers, have testified at length about Brocade's ESO programs, its general accounting practices, its safeguards, its best practices, and the audits themselves. (*Id.*) [2]

Throughout this robust discovery process, not a single witness has testified that Mr. Reyes: 1) intended to materially misstate Brocade's books and records; 2) intended to defraud investors; 3) engaged in or was aware of the alleged retroactive pricing of ESO grants; or 4) knew that retroactively priced ESOs required an accounting charge. As a result, there is no evidence that can create a triable issue of fact on the essential elements of scienter (with respect to claims one and two) and knowledge (with respect to claims three through eight), and Mr. Reyes's Motion for Summary Judgment should be granted.

## III. FACTUAL BACKGROUND

### A. Mr. Reyes Successfully and Ethically Built Brocade Into An Industry Leader

In July 1998, at age 36, Gregory Reyes was hired as CEO of Brocade, a San Jose based company that designs, manufactures, and sells storage networking solutions and associated management applications. (Ex. 5 (Brocade IPO Prospectus filed 5/25/99 at 41), Ex. 6 (Neiman Tr.

---

[2] In contrast to Mr. Reyes's efforts to conduct robust discovery in this action, the SEC (in concert with the DOJ) was successful in preventing eleven witnesses with whom they had already spoken from being deposed by Mr. Reyes.

11:7-10, 18:22-24), Ex. 7 (O'Brien Tr. 13:2-10).) Mr. Reyes's professional background was in sales, and he had no formal training in accounting or finance. (Ex. 8 (Dempsey Tr. 186:17-21).) Mr. Reyes's tenure as CEO of Brocade was a remarkable success story; he led a fledgling start-up ($68 million in annual revenues) into a technology industry leader (nearly $600 million in annual revenues) within six years. (Ex. 9 (Brocade fiscal year 2001 Form 10-K filed 1/22/02 at p. 22), Ex. 10 (Brocade fiscal year 2004 Form 10-K filed 1/31/05 at p. 24).) Indeed, several directors testified that Mr. Reyes essentially created the industry and built Brocade into a market leader. (Ex. 6 (Neiman Tr. 11:11-12:25), Ex. 13 (Sonsini Tr. 246:11-247:10).)

Mr. Reyes's success in building Brocade required the rapid hiring of people to fill positions throughout the Company. Under Mr. Reyes's leadership, the Company grew from around 100 employees to well over 1,000 employees. (Ex. 5 (Brocade IPO Prospectus filed 5/25/99 at 40), Ex. 10 (Brocade fiscal year 2004 10-K filed 1/31/05 at p. 9).) From early 2000 through early 2001, Brocade was hiring over 100 people per fiscal quarter. (Ex. 11 (Cuevas Tr. 150:13-17).) To facilitate Brocade's efforts to attract and retain talented employees, the Board of Directors gave Mr. Reyes the sole authority as a director to grant ESOs to non-executive employees. (Ex. 12 (02/21/2001 Brocade Board Action by Unanimous Written Consent), Ex 8 (Dempsey Tr. 25:11 – 26:4), Ex 6 (Neiman Tr. 26:13-27:10).) The Board, however, did not give Mr. Reyes any instructions on the processes and procedures to use when granting ESOs. (Ex. 13(Sonsini Tr. 53:18-54:7), Ex. 8 (Dempsey Tr. 27:24-28:8), Ex. 6 (Neiman Tr. 27:21-28:18).)

Brocade hired experienced senior executives to be responsible for essential functions within the organization. For example, Brocade hired Michael Byrd, an experienced CPA, as Chief Financial Officer ("CFO") to ensure that its finance and accounting department performed properly and reported accurate financial information.[3] (Ex. 8 (Dempsey Tr. 11:21-12:13), Ex. 6 (Neiman Tr. 14:3-15:5).) Brocade also hired Stephanie Jensen, an experienced human resources manager,

[3] Mr. Byrd was succeeded as CFO in 2001 by Defendant Antonio Canova. (Ex. 22 (Tobias Tr. 139:15-24).) Like Mr. Byrd, Mr. Canova was experienced and well qualified. Mr. Canova has a business degree in accounting, is a CPA with over 20 years experience, and was a former KPMG partner in its audit practice group. (Ex. 9 (Form 10-K, filed 1/24/02 for period ending 10/27/01 at p. 10).).

as Vice President of Human Resources. (Ex. 8 (Dempsey Tr. at 16:21-24).) Laurie Webb, a member of Brocade's legal department, held both industry and law firm positions, including over four years at Cooley Godward, before she joined Brocade in 2002. (Ex. 14 (Webb Tr. 10:4-11:5, 13:18-22).)

The members of the Board and outside experts that Brocade relied on to monitor essential functions within the Company held equally impressive credentials. For example, Brocade's Board included experienced lawyers, accountants, auditors, and officers of public companies. (Ex. 13 (Sonsini Tr. 9:23-12:1), Ex. 15 (N. Moore Tr. 9:22-12:14), Ex. 7 (O'Brien Tr. 10:2-11:19), Ex. 16 (Paisley Tr. 11:6-12:25).) Brocade's outside auditors were Arthur Andersen and later KPMG, and its outside legal counsel included the prestigious firm of Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"). (Ex. 17 (Miotto Tr. 43:17-45:14), Ex. 18 (BRCD-DOJ 014672), Ex. 19 (BRCD-DOJ 014685).)

Brocade's internal and external experts were extensively involved in its option granting process. Internally, Brocade's finance and accounting, human resources, and legal departments monitored and documented the ESO granting process and procedures. (Ex. 20 (E. Moore Tr. 204:24-205:12), Ex. 21 (Zemlin Tr. 20:10-21:11), Ex. 14 (Webb Tr. 69:9-25).) Brocade's outside counsel and external auditors provided additional oversight. As Brocade's stock administrator testified, its ESO granting processes and paperwork – **including changes that were made to the grant lists after the grant date** -- were always open to inspection by its finance department and outside auditors, and, in fact, **Brocade's outside auditors inspected the ESO paperwork on "several occasions."** (Ex. 20 (E. Moore Tr. 61:7-62:25, 204:24-205:12).)

Brocade implemented and management supported many internal safeguards under Mr. Reyes's leadership, such as the formation of a Corporate Governance Team, which evaluated Brocade's processes (including the ESO granting process) and made recommendations to ensure that Brocade had best practices in place. (Ex. 14 (Webb Tr. 41:25-44:7, 76:16-77:5, 192:21-24; 207:12-213:20.) This evaluation and assessment was in addition to Brocade's quarterly stock administration audit, in which a finance department employee analyzed a sample of grants,

exercises, and cancellations to ensure they were done correctly. (Ex. 22 (Tobias Tr. 43:16-25, 48:1-49:6, 59:17-21), Ex. 23 (eBRCD-SEC 1695532 – 570).)

The CFO held quarterly meetings for the managers in the finance department that were designed to provide the finance managers with an open forum to raise any concerns about any area of the company. (Ex. 24 (Parker Tr. 72:1-73:6), Ex. 25 (Hurley Tr. 36:17-37:2).) In addition, the CFO held in-depth meetings ("binder review sessions") with the finance team prior to quarterly earnings calls, in which the finance team was given an open forum to raise any concerns about Brocade's financial reporting. (Ex. 24 (Parker Tr. 74:17-75:16), Ex. 26 (Deranleau Tr. 206:1-207:5).) These binder review sessions were considered a "best practice" by Brocade's outside auditors. (Ex. 26 (Deranleau Tr. 207:10-208:8).)

In addition to input from internal and external experts, the overall culture within Brocade fostered open and honest communication. (Ex. 11 (Cuevas Tr. 77:19-78:3).) Mr. Reyes solicited company-wide input. For example, there were several forums where employees throughout the organization could raise issues or concerns and ask questions anonymously or informally, such as "Birthday Bagels with the Boss" and "Pizza with the Prez." (Ex. 21 (Zemlin Tr. 28:8-14; 30:20-31:6; 34:1-15).)[4] Corporate surveys provided another mechanism for Brocade employees to communicate any concerns with the Company's executives. (Ex. 11 (Cuevas Tr. 81:10 – 82:3).) During Mr. Reyes's tenure as CEO, "[Brocade] encouraged forums to provide [its] senior-level management an opportunity to share what the strategies of the company were and to also hear from the employees with regard to their ideas or their concerns or their questions." (*Id.* at 79:19-23).)

### B. Brocade Remains Successful Today

The Company that Mr. Reyes helped build is still a success today – "a market leader in storage networking infrastructure." (Ex. 27 (Brocade fiscal year 2006 Form 10-K filed 01/09/2007 at p. 3).) Former Brocade director, Seth Neiman, testified to Brocade's present success and Mr. Reyes's importance to it:

---

[4] Both of these forums were opportunities for employees in informal small group settings to connect with executives like Mr. Reyes and Mr. Byrd. At these regularly held events, employees could ask any questions and raise any concerns they may have had, or they could submit questions anonymously in advance of these events. *Id.*

> Q. And did his performance indicate that you were correct?
>
> A. Yes. I would say that Greg's performance as the CEO of Brocade exceeded even my high expectations.
>
> * * * * *
>
> And then after Greg came on, the business, Brocade, reseized sort of the industrywide initiative and essentially grew the businesses to its point today where, again, I don't have the correct figures at hand but it's on the order of a 700 million dollar a year business, took the company public in one of the most successful IPOs in the history of the NASDAQ and really formed an industry.
>
> Q. And what credit do you give Greg Reyes for that?
>
> A. I give him about 99 percent of the credit. I don't think anybody familiar with the company's history or with the industry's history would judge it differently.

(Ex. 6 (Neiman Tr. 11:15-12:25).) (*See also* Ex. 13 (Sonsini Tr. 246:24-247:10), Ex. 8 (Dempsey Tr. 12:18-13:25).)

## IV. THE SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), the moving party is entitled to summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2458, 2552 (1986) (quoting Fed. R. Civ. P. 56(c)). A party seeking summary judgment bears the initial burden of establishing that summary judgment is proper under Federal Rule 56(c). *Id.* at 323. This burden can be satisfied after adequate time for discovery in one of two ways. The moving party can either (1) negate an essential element of the non-moving party's case or (2) where the moving party does not bear the burden of proof on an element at trial, by noting that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

The Ninth Circuit has interpreted *Celotex* as not requiring the moving party to submit *any affirmative evidence at all* negating the non-moving party's claim; rather, the movant can simply note that the evidentiary record does not contain evidence sufficient for the non-moving party to prevail on an essential element of its claims. *See Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Because plaintiffs bear the ultimate burden of proof on causation, [the defendant] had only to point to the absence of a genuine issue of material fact; it wasn't required to

produce any evidence at all."). Once the moving party notes the lack of evidence on an essential element of the non-moving party's claims, summary judgment will be granted unless the party opposing the motion produces "specific facts showing that there is a genuine issue for trial." *Cray Commc'ns v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 394 (4th Cir. 1994) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). It is not enough to produce "colorable" evidence; the evidence plaintiffs provide must be "significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510-2511 (1986).

In the context of claims requiring the plaintiff to prove scienter, the non-moving party can meet its burden simply by stating that the record does not contain sufficient evidence of scienter and establishing that adequate discovery has occurred. *See Cray*, 33 F.3d at 394 (affirming a defendant's summary judgment on scienter grounds stating that it was enough for the defendant to simply point out in his opening brief the number of depositions taken, the approximate number of documents produced, and claim in a conclusory way that nothing in the depositions or documents established scienter). A movant is entitled to summary judgment unless the defendant produces "significant probative evidence" that defendants acted with "actual knowledge of material misstatements," or an "extreme departure . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *In re Int'l. Rectifier Sec. Litig.*, No. CV-3357-RMT (BQRX), 1997 WL 529600, at *12 (C.D. Cal. Mar. 31, 1997) (citation omitted).

Moreover, courts have noted that "securities fraud claims which are unsupported by the evidentiary record and which are based solely on questionable inferences are particularly appropriate for resolution on a motion for summary judgment; such time-consuming and costly litigation 'should be brought to a conclusion at the first opportunity.'" *In re Allergan Inc. Sec. Litig.*, No. SACV 89-643 AHS (RWR), 1993 WL 623321, at *20 (C.D. Cal. Nov. 29, 1993) (citation omitted). As demonstrated below, Mr. Reyes is entitled to summary judgment.

## ARGUMENT

### V. MR. REYES IS ENTITLED TO SUMMARY ADJUDICATION ON COUNTS ONE AND TWO BECAUSE THE SEC CANNOT ESTABLISH THE ESSENTIAL ELEMENT OF SCIENTER

Scienter is an essential element of claims one and two – which respectively allege violations of Section 10(b) of the Exchange Act and Section 17(a)(1) of the Securities Act. The elements of a Section 10(b) claim are: (1) a false or misleading statement or omission; (2) materiality; (3) scienter; (4) reliance; and (5) loss causation. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Section 17(a)(1) of the Securities Act also requires the material false or misleading statement be made with scienter. *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003). Absent evidence of scienter, Mr. Reyes is entitled to summary adjudication of claims one and two.

#### A. There Is No Evidence That Mr. Reyes Intended To File Materially False Financial Statements

An intent to file *false* financials is not sufficient to establish scienter. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc), *cert. denied*, 499 U.S. 976, 111 S. Ct. 1621 (1991). Instead, the SEC must demonstrate that Mr. Reyes intended to cause the filing of *materially false* financials that would defraud investors.[5] *Hollinger* leaves no doubt that scienter can only be established where the defendant actually knew that materially misleading statements were being made to the marketplace or where the "danger of misleading buyers or sellers" was "so obvious that the actor must have been aware of it." *Id.* at 1569.

---

[5] Although a showing of recklessness can be sufficient to demonstrate scienter, the recklessness must be so extreme that it effectively amounts to intentional misconduct. The Ninth Circuit has noted that "[o]ur definition of recklessness . . . strongly suggests that we continued to view it as a form of intentional or knowing misconduct. . . . Indeed, we expressly acknowledged our own prior statement that 'recklessness is a form of intent rather than a greater degree of negligence.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 976-977 (9th Cir. 1999) (citation omitted); *see also Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000) ("As recently clarified by the Ninth Circuit: Our definition of recklessness ... strongly suggests that we continued to view it as a form of intentional or knowing misconduct. We used the terms 'known' and 'must have been aware,' which suggest consciousness or deliberateness... Recklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct. (citation omitted)").

Supreme Court authority establishes that only material misstatements can possibly present "a danger of misleading investors" because it is only material statements that a reasonable investor would rely upon in making a decision about whether to buy, hold or sell stock. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-232, 108 S. Ct. 978, 983 (1988) (defining materiality under the Exchange Act as statements that would influence the investment decision of a reasonable investor). In other words, in order to possess scienter, Mr. Reyes must have consciously intended, or it must have been "so obvious" to Mr. Reyes, that his alleged conduct would lead to public misstatements that would mislead investors. This elevated standard is echoed in the Ninth Circuit's Model Jury Instructions for scienter, which require:

> highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Ninth Circuit Model Civil Jury Instructions Section 21.3 (Securities-Scienter).

Other Courts of Appeal agree that scienter requires proof that the defendant not only *knew* of the misstatements but also *intended* that they be material enough to defraud investors. For example, the First Circuit has specifically ruled that summary judgment on scienter will be granted if there is no evidence that the defendant must have known his statements would materially mislead the investing public. *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001) (affirming summary judgment on scienter grounds and stating that "[e]ven if the statements at issue were material and false or misleading, **the evidence does not support a finding that defendants knew the statements would materially mislead the investing public**") (emphasis added).

Similarly, the Seventh Circuit has stated:

> The plaintiffs submit that the Bank's actual knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this argument misconstrues the relevant inquiry. The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the "*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing." (*citing Sundstrand*, 553 F.2d at 1045) (emphasis in original). The record does not contain any such showing of scienter.

*Schlifke v. Searfirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989); s*ee also City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001) (the requirement of knowledge may be satisfied only where "the defendant's knowledge of a fact that was so obviously material that the

defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.").

The SEC cannot meet its burden of showing scienter. Despite the extensive discovery in this case, no evidence remotely demonstrates that Mr. Reyes intended for Brocade to file materially false financial statements, or that the danger of misleading investors was "so obvious" that Mr. Reyes must have been aware of it.[6] Absent such evidence, summary adjudication must be granted as to causes of action one and two.

**B. There is No Evidence that Mr. Reyes Engaged in or was Aware of the Retroactive Pricing of ESOs**

Not only is there no evidence that Mr. Reyes intended to file *materially false* financial statements that he knew would mislead the public, there is no evidence that he intended to file even *false* financial statements. Having undertaken extensive discovery in this action, no testimony or document demonstrates that Mr. Reyes was specifically aware of, or directed retroactive pricing of ESO grants. The SEC's proof of Mr. Reyes's intent and knowledge remains the same as it was on the day its complaint was issued – namely, mere conclusory allegations in its pleadings about Mr. Reyes's state of mind. "It is axiomatic that pleadings are not facts, and that allegations in a complaint do not create a material issue of fact." *Tages v. Univision Television Group, Inc.*, No. 04 C 3738, 2005 U.S. Dist. LEXIS 24580, at *7-8 (N.D. Ill. October 20, 2005) (granting motion for summary judgment on breach of contract claims).

Indeed, the testimony has been uniform that Mr. Reyes conducted himself ethically and did not engage in or direct the retroactive pricing of options. *See* Ex. 28 (Cudgma Tr. 41:4 – 41:11), Ex. 8 (Dempsey Tr. 76:4-8, 89:1-4, 135:2-6, 172:13-19, 175:6-11, 179:16-20, 187:24-188:2, 279:22-280:2, 280:4-281:7), Ex. 26 (Deranleau Tr. 33:8-11, 182:25-183:4), Ex. 29 (Duffy: 69:4-9, 70:2-13, 172:18-173:2), Ex. 30 (Geruson Tr. 55:25-56:4, 56:25-57:4, 118:19-22, 175:20-176:7, 178:15-24), Ex. 25 (Hurley Tr. 83:4-84:24, 86:12-88:1), Ex. 31 (Kada Tr. 46:24-47:2, 108:20-

---

6 The fact that Brocade's alleged misreporting of non cash expenses is demonstrably immaterial (*see* Summary Judgment Motion on Materiality) defeats any suggestion that Mr. Reyes could have intended to make materially false statements.

109:7), Ex. 7 (Neiman Tr. 187:16-188:2), Ex. 24 (Parker Tr. 35:15-20, 46:14-23), Ex. 22 (Tobias Tr. 133:5-23), Ex. 32 (Traut Tr. 56:19-23, 129:14-21, 141:9–142:1, 145:6-146:3), Ex. 14 (Webb Tr. 62:21-25, 63:2-7, 153:1-8, 156:16-18, 183:8-13, 185:19-22, 186:4-11, 187:5-188:1), Ex. 21 (Zemlin Tr. 50:10-13, 63:23-64:1, 105:5-15), Ex. 11 (Cuevas Tr. 235:23-25). Accordingly, the SEC has no evidence that Mr. Reyes engaged in or was aware of the retroactive pricing of stock options, much less that he intended the Company to file materially false financial statements.

### C. There is No Evidence that Mr. Reyes Falsified Documents or Directed Others to Falsify Documents

There is also no evidence that Mr. Reyes was specifically aware of, or directed the falsification or destruction of documents. Rather, the testimony indicates just the opposite. For example, Richard Deranleau, who was the controller of Brocade during Mr. Reyes's tenure as CEO and whose responsibilities included ensuring that the Company's financial statements and public filings were done completely, accurately and timely testified:

> Q. Do you have any information that Greg Reyes instructed anyone ever to falsify a company record?
> A. No.
>
> * * * * *
>
> Q. Did you ever see or hear Greg Reyes say or do anything that was not in the best interests of Brocade?
> A. No.
> Q. Based on your observations of Greg Reyes during the time that you and he overlapped at Brocade, do you believe that all of his conduct was motivated to serve the best interests of Brocade?
> A. That's my belief.
> Q. Do you have any information that Greg Reyes asked anyone to cover up anything that he had done at Brocade?
> A. No
> Q. Do you have any information that Greg Reyes asked anyone to conceal anything from anyone?
> A. No.
> Q. Did Greg Reyes ever ask you or direct you to hide anything from Brocade's Board?
> A. No.
> Q. From Brocade's auditors?
> A. No.
> Q. From anyone else within Brocade's finance department?
> A. No.

(Ex. 26 (Deranleau Tr. 12:13 -18, 186:2-187:21).)

The other evidence has been uniform with Mr. Deranleau's testimony. *See also* Ex. 28 (Cudgma Tr. 64:21-24), Ex. 29 (Duffy Tr. 68:22-69:3, 70:14-18, 173:3-7, 201:5 – 17), Ex. 30 (Geruson Tr. 55:20-24, 56:5-24, 57:5-9, 118:16-18, 118:23-:119:1, 175:20-176:13), Ex. 25 (Hurley Tr. 83:4-84:24, 103:19-21), Ex. 33 (Klayko Tr. 208:19-210:10), Ex. 24 (Parker Tr. 35:15-36:13), Ex. 34 (Read Tr. 256:15-257:4, 257:12-258:8), Ex. 32 (Traut Tr. 56:24-57:13, 129:22-:130:10, 141:9-142:24), Ex. 21 (Zemlin Tr. 63:23-64:1, 105:5-23), Ex. 11 (Cuevas Tr. 235:23-25), Ex. 31 (Kada Tr. 108:20-109:18), Ex. 22 (Tobias Tr. 133:21-134:3, 134:5-15), Ex. 14 (Webb Tr. 62:21-25, 63:2-7, 63:15-19, 156:16-18, 183:8-13, 185:19-22,185:24-186:2, 186:4-22, 187:5-188:1). Here again, the SEC will be unable to provide substantially probative evidence to establish that Mr. Reyes actually engaged in conduct that could even theoretically lead to the filing of a materially false financial statement.

### D. There is No Evidence that Mr. Reyes Understood the Accounting Rules Governing ESOs

Mr. Reyes is not a CPA, an accountant, or an auditor. (Ex. 8 (Dempsey Tr. 186:17-187:3).) Rather, his background is in sales, and as Brocade's CEO he was naturally heavily involved in its strategic product, sales, and competitive issues. (Ex. 33 (Klayko Tr. 23:5-7), Ex. 8 (Dempsey Tr. 186:17-187:3), Ex. 35 (Leslie Tr. 61:8-62:19).) No Brocade employee has testified to having had any conversation with Mr. Reyes regarding how to document his granting decisions or how to account for retroactively priced stock options, to the extent there were any such options. For example, Seth Neiman, who hired Mr. Reyes as Brocade's CEO, attended all Board meetings with Mr. Reyes and worked with Mr. Reyes throughout his entire tenure at Brocade, testified:

> Q. Do you remember ever hearing Greg Reyes speak about his knowledge of stock option accounting?
> A. No.
> Q. Did you ever attend a meeting where people were speaking or instructing on the details of stock option accounting in Greg Reyes' presence?
> A. Not that I recall.
> Q. Do you believe that it's appropriate for a CEO of a company to rely on others within his or her organization for accounting expertise?
> [objection]
> A. Yes, I do.
> Q. Did you ever attend a discussion in which Greg Reyes indicated an understanding of APB 25?
> A. Not that I recall.

Q. What about FAS 123?
A. Same answer.
Q. What about FAS 123R?
A. Same answer.

(Ex. 6 (Neiman Tr. 186:8 – 187:3), *see also* Ex. 33 (Klayko Tr. 206:11-207:15), Ex. 8 (Dempsey Tr. 186:17-187:3).)

Mr. Reyes's lack of accounting expertise generally, and particularly with his lack of stock option accounting expertise, undermines any inference that he intended Brocade to issue materially misleading financial statements.[7] In addition, there is no evidence that Mr. Reyes was aware that Brocade's accounting for ESOs was inconsistent with GAAP or improper in any way. To the contrary, Brocade's legal counsel and tax director, among others, testified that they never had discussions about stock option accounting rules with Mr. Reyes, nor had Mr. Reyes been present during meetings where the rules were discussed. (*See e.g.*, Ex. 24 (Parker Tr. 33:18-34:13), Ex. 14 (Webb Tr. 183:15-184:6).) Absent evidence of this threshold knowledge, the SEC cannot pursue causes of action one and two.

**E. Mr. Reyes's Reasonable Reliance on Experts Undermines any Inference of Scienter.**

Throughout Mr. Reyes's tenure as CEO, he reasonably and consistently relied on experts, both internal and external, to ensure that Brocade's accounting for stock options was done properly. These experts had unfettered access to Brocade's books and records – including its ESO accounting records – and they inspected the ESO accounting records at issue in this case on many occasions. (Ex. 20 (E. Moore Tr. 61:7-62:25), Ex 17 (Miotto Tr. 35:1-20, 40:24-41:16, 101:13-102:8).) Such unobstructed access proves that there was no "scheme" to conceal or falsify ESO granting decisions.

---

7 This is particularly true in the present case because all of the SEC's claims rely on the interpretation of an ambiguous accounting pronouncement, APB 25, and its unclear definition of the "measurement date" for determining stock option costs. (Ex. 34 (Read Tr. 71:9-15).) In fact, the only reported judicial decision to address APB 25 found the definition of "measurement date" so opaque that its alleged violation failed to raise even an inference of scienter for a civil securities fraud action. *See In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1168-69 (S.D. Fla. 2004) (motion to dismiss granted; "interpretations of the measurement date criteria embodied in APB No. 25 are far from obvious" (emphasis added)).

#### 1. Mr. Reyes Reasonably Relied on the Board of Directors

Brocade had an experienced and well-credentialed Board. For example, the Board included preeminent securities lawyer, Larry Sonsini, who joined the Board in January 1999. Mr. Sonsini has been practicing law in the Silicon Valley for forty years, has served on numerous boards, is a member of the SEC Advisory Committee on Capital Formation and Regulatory Processes, and considers himself in the "upper echelons" of lawyers who advise CEOs on corporate governance issues. (Ex. 13 (Sonsini Tr. 8:20-9:22, 13:3-14).)[8]

Brocade's experienced and esteemed Board granted Mr. Reyes the sole authority to grant ESOs to non-executive employees (Ex. 12 (02/21/2001 Brocade Board Action by Unanimous Written Consent), Ex. 8 (Dempsey Tr. 25:11 – 26:4), Ex. 6 (Neiman Tr. 26:13-27:10)), but did not provide any guidance or instruction to Mr. Reyes on how to implement that authority or document his granting decisions. (Ex. 13 (Sonsini 53:18-54:7), Ex. 8 (Dempsey Tr. 28:1-5), Ex. 6 (Neiman Tr. 27:21-28:6).) There can be no doubt that Mr. Reyes was entitled to rely on the Board's advice that the authority granted to him was appropriate and that no guidelines were needed.

#### 2. Experienced Employees in the Finance Department Participated in the ESO Granting Process

Members of the finance department were consistently involved in various aspects of Brocade's stock option processes, such as the pricing and documentation of ESOs. (Ex. 36 (Rado Tr. 88:11-89:6), Ex. 20 (E. Moore Tr. 17:19-23), Ex. 37 ( eBRCD-SEC 1776580-83).) For example, Mr. Byrd was an experienced CPA and former Ernst & Young partner hired as Brocade's Chief Financial Officer ("CFO") to ensure that its finance and accounting department performed properly and reported accurate financial information. (Ex. 8 (Dempsey Tr. 11:21-12:13), Ex. 6 (Neiman Tr. 14:3-15:5), (Ex. 48 (eBRCD-SEC 1399640-58).) Mr. Reyes relied on the CFO for his

---

8 Board member Nicholas Moore has a law degree from U.C. Hastings and was the former CEO and Global Chairman of PricewaterhouseCoopers. (Ex. 15 (N. Moore Tr. 10:1-2, 11:22-12:14).) Board member Bill O'Brien was a former partner, Vice Chairman, and Chief Operating Officer of Coopers & Lybrand. (Ex. 7 (O'Brien Tr. 10:2-12).) He has experience in stock option accounting and understands APB 25. (Id. at 11:15-21.) Board member Chris Paisley was Senior Vice President of Finance and CFO of 3-Com, was chairman of the audit committee of several companies, and is familiar with stock option accounting, including APB 25. (Ex. 16 (Paisley Tr. 11:18-22, 12:13-22).)

financial expertise. (Ex. 14 (Webb Tr. 184:9-22).) Mr. Byrd was heavily involved in implementing stock option processes and advising HR and other employees about stock pricing. (*See* Exs. 38, 39 and 40 (eBRCD-SEC 1386296 (advising HR executive Stephanie Jensen to "handle" setting a stock price to the date a candidate first interviewed); eBRCD-SEC 1406200 (advising Ms. Jensen to "make sure all of the documentation is in agreement" with an option grant to a potential employee); eBRCD-SEC 1386000 (advising a hiring manager that options can be granted anytime within a 3 month period).)

Similarly, Elizabeth Moore worked in Brocade's accounting and finance department and has served as Brocade's stock administrator in the finance department ever since she joined the Company in April of 2000. (Ex. 20 (E. Moore Tr. 9:25-10:5).) Ms. Moore had the responsibility of recording Brocade's ESO grants. (*Id.* at 26:14-18).) She would receive the signed Board or committee minutes that authorized ESO grants (and any subsequent corrections or addendums) from the human resources department and then record the grants. (*Id.* at 13:20-23, 26:14-27:20.) She retained all option grant lists, compensation committee minutes, and associated corrections on her desk in binders, which were open to inspection by other members of the finance department and the outside auditors. (*Id.* at 61:7-62:25)

After Ms. Moore had completed her stock option recording task and created the options paperwork, Brocade's controller and treasurer, Mr. Deranleau, also reviewed the paperwork to verify that it faithfully reflected the information in the compensation committee minutes delivered to Ms. Moore by the human resources department. Richard Deranleau, who was hired in May 2003, is a CPA who worked in the Coopers & Lybrand audit department for approximately four and a half years prior to joining Brocade. (Ex. 26 (Deranleau Tr. 8:20-10:11).) In addition, Mr. Deranleau previously worked for nearly 20 years in the finance departments of various companies. (*Id.*) Mr. Deranleau testified that he reviewed notices of the grants and compensation committee minutes. (*Id.* at 25:25-26:17).)[9]

---

9 Brocade controller Robert Bossi had significant involvement in Brocade's option granting processes. (Ex. 51 (BRCD-SEC 137038, advising HR employees that new hire grants can happen "whenever you want" within the week).) Similarly, Gary Blucher (SEC's reporting manager) was involved in Brocade's option granting processes. (*See, e.g.*, Ex. 52 (Blucher Tr. 20:20 – 23:3).)

Despite its unrestricted oversight of the ESO granting process and paperwork, nobody in Brocade's finance department ever raised any issues relating to the option granting process to Mr. Reyes, nor did they suggest that the Company was not properly accounting for the option grants.

### 3. The Human Resources and Legal Departments, as Well as Outside Counsel, Took Part in the ESO Granting Process

Brocade's human resources department, which included several senior employees with experience at established companies (Ex. 20 (E. Moore Tr. 9:4-10:3), Ex. 11 (Cuevas Tr. 26:10-29:1)), was responsible for preparing the compensation committee meeting minutes that detailed the ESO grants and delivering them to the finance department. (Ex. 20 (E. Moore Tr. 26:14-22, 77:11-78:7).) The finance department would then record the ESO grants and produce the appropriate records. (*Id*. at 17:19-19:4, 99:9-101:2, Ex. 41 (eBRCD-SEC 0220806 – 817).)

Both Brocade's internal legal department and its outside counsel, Wilson Sonsini, reviewed ESO issues, including the granting process. (Ex. 13 (Sonsini Tr. 120:2-121:25).) For example, one of the option granting programs at Brocade was the part time program, wherein employees could start work on a part time basis to become eligible to have their options priced at an earlier date. (Ex. 24 (Parker Tr. 20:25 – 22:10).) Offer letters that included this part time information were sent to Brocade's general counsel for review. (*See, e.g.*, Ex. 49 (eBRCD-SEC 1790795-98)[10], Ex. 42 (eBRCD-SEC 0308187-90).) In addition, Wilson Sonsini advised Brocade on offer letters (Ex. 19 (BRCD-DOJ 014685)), including letters with part time start dates. (Ex. 18 (BRCD-DOJ 014672).)

Laurie Webb, an attorney who worked in Brocade's legal department from April 2002 to May 2005, had meetings with Mr. Deranleau from the finance department and Ms. Weaver from the human resources department beginning in 2003 to review and discuss improvements to the option granting processes at Brocade. (Ex. 14 (Webb Tr. 14:4-7, 18:4-18, 69:9-17, 75:22-25).) In

---

10 In January 2002, Ms. Jensen sent former Brocade General Counsel Ron Epstein a copy of an offer letter to employee candidate Richard Geruson. The offer letter was dated October 30, 2001, and stated that Mr. Geruson would start with the Company on a part time basis on October 30, 2001. The SEC complaint alleges that Mr. Reyes "backdated" Mr. Geruson's option grant because Mr. Geruson was included on an October 30, 2001 grant list (along with hundreds of other employees). (Compl. ¶ 50.) Mr. Geruson has testified that his compensation arrangements were all handled by Mr. Byrd. (Ex. 30 (Geruson Tr. 70:4-23, 72:21 – 73:6, 78:15-24, 79:18-25, 87:1-10, 89:13 – 90:7).)

Ms. Webb's review of Brocade's option granting process, she took "a critical eye" towards the ESO granting process and identified only a need to reduce "unintentional" "administrative errors" made in the documentation of the option grants. (*Id.* at 92:16-93:22, 94:18-95:15; 106:3-107:10.)

Despite being intimately involved in the process, there is no evidence that Brocade's HR department, legal department, or outside counsel ever raised an issue relating to the option granting process to Mr. Reyes, nor did they suggest that the Company was not properly accounting for option grants.

**4. Brocade's Highly Qualified Outside Auditors Reviewed the ESO Grants and Related Paperwork**

KPMG and Arthur Andersen provided additional safeguards to ensure the accurate reporting of Brocade's finances and specifically reviewed the ESO grant paperwork on "several occasions" without raising any concerns. Elizabeth Moore testified that she gave the auditors (and people within Brocade) full access to the stock option granting paperwork, including the compensation committee minutes with interlineations and words like "addendum" written on them. (Ex. 20 (E. Moore Tr. 61:7-62:25).)

Brocade's auditors specifically reviewed Brocade's option granting processes (Ex. .43 (Gugler Tr. 136:5 – 24)), employee offer letters, which included references to Brocade's part time start date program (*Id.* at 200:16 – 201:24), and the delegation of sole authority to Mr. Reyes to grant options to non-16(b) employees (*Id.* at 149:1 – 152:3).[11]

With full access to Brocade's ESO paperwork, Brocade's outside auditors attested to the cleanliness of Brocade's books and records on several occasions.[12] Arthur Andersen and KPMG,

---

11 Like Brocade's Board of Directors, Brocade's auditors failed to provide Mr. Reyes with any guidelines or instructions as to best practices for carrying out his responsibilities as a committee of one. Arthur Andersen's work papers indicate that after a cursory review of the delegation of authority to Mr. Reyes, there was "No Further Work Required." Ex. 43 (Gugler Tr. 150:7-14).

12 In the absence of any evidence of scienter, the reasonable inference to be drawn from the reviews conducted and the unqualified "clean" audit opinions received during the period alleged in the complaint is that Mr. Reyes reasonably believed Brocade's financial results were accurate when reported. *See In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 (W.D.N.C. 2001) ("These financial statements were audited by independent auditors, KPMG, who provided a clean opinion that the Company's financial statements were fairly presented in accordance with GAAP. .

*(cont'd)*

after "examining on a test basis, evidence supporting the amounts and disclosures in the financial statements" and assessing the "accounting principles used" by the Company, provided unqualified audit opinions that Brocade's financial statements "present[ed] fairly, in all material respects, the financial position of Brocade…in conformity with generally accepted accounting principles." (*See* Ex. 44 (Brocade fiscal year 2000 Form 10-K filed 1/26/01 at p. 25); *see also* Ex. 10 (Brocade fiscal year 2004 10-K filed 1/31/05 at p. 43).) These facts (and the absence of any facts to the contrary) demonstrate that there was no "scheme" to conceal option granting decisions from Brocade's auditors. At no time did the auditors ever raise an issue about the option granting process to Mr. Reyes, nor did they suggest that the Company was not properly accounting for the option grants.

**5. Brocade had Internal Controls in Place, and Reviewed and Improved its Processes During Mr. Reyes's Tenure as CEO**

Brocade instituted and maintained a number of internal procedural safeguards and process improvements during Mr. Reyes's tenure as CEO to ensure that its accounting and financial reporting were accurate. For example, Brocade created a corporate governance team that evaluated Brocade's processes "on a continual basis." The goal of the team was to ensure that Brocade had best practices in place. (Ex. 14 (Webb Tr. 41:25-43:23, 76:16-77:5, 192:21-24).)

As a further check on the ESO granting process, Brocade set up a quarterly stock administration audit through its finance department. (Ex. 22 (Tobias Tr. 48:1-49:6), Ex. 23 (eBRCD-SEC 1695532 – 570).) In this audit, a finance department employee analyzed a sample of grants, exercises, and cancellations to ensure they were done correctly. (Ex. 22 (Tobias Tr. 43:16-25, 48:1-49:1, 59:17-21).) The procedures of this internal audit mirrored the processes previously put in place by the Company's outside auditors. (*Id.* at 48:20-21.)

---

(cont'd from previous page)
. . [Because the] 'accounting firm approved the method by which the company recognized its losses, [it] arguably cast[s] doubt on the existence of any impropriety.'") (citation omitted). *See also Stavroff v. Meyo*, No. 95-4118, 1997 WL 720475, at *6 (6th Cir. Nov. 12, 1997) (reliance on "the guidance of outside auditors is inconsistent with the intent to defraud").

Brocade's CFO held quarterly meetings for the managers in the finance department. (Ex. 24 (Parker Tr. 72:1-73:15).) These half-day to full-day meetings were called the "what keeps you up at night" sessions and were designed to provide the finance managers with an open forum to raise any concerns about any area of Brocade. (*Id*.)

Brocade's CFO also held in-depth meetings ("binder review sessions") with the finance team prior to quarterly earnings calls. (*Id.* at 74:17-75:16.) In these meetings, the finance team was given an open forum to raise concerns about Brocade's financial reporting. (Ex. 26 (Deranleau Tr. 206:1-207:5).) Brocade's binder review sessions were better and more extensive than comparable processes at other public companies and were considered a "best practice" by Brocade's outside auditors. (*Id.* at 207:10-208:5.)

There is also documentary evidence that Mr. Reyes was committed to ensuring proper systems and controls within the Company. For example, in November 2003, Mr. Reyes sent an email to Richard Deranleau approving the funding for a Sarbanes-Oxley 404 Testing Project. In that same email, Mr. Reyes stresses that he is "eager to understand how we can also test the robustness of our systems to prevent fraud." (Ex.45 (eBRCD-SEC 1866923).) Mr. Reyes assigned the CFO and the Controller to that task.

These examples of procedural safeguards instituted at Brocade evidence Mr. Reyes's desire for accuracy and compliance and demonstrate that there was no "scheme" to hide or conceal Brocade's options granting practices.

### 6. Brocade Encouraged Open Communication and Integrity During Mr. Reyes's Tenure as CEO

Brocade encouraged employees to speak up during Mr. Reyes's tenure as CEO. (Ex. 21 (Zemlin Tr. 28:8-14; 30:20-31:6; 34:1-15).) There were several forums where people could raise issues and ask questions anonymously or informally, such as anonymous company-wide surveys, "Birthday Bagels with the Boss" and "Pizza with the Prez." (Ex. 11 (Cuevas Tr. 81:10 – 82:3), Ex. 46 (eBRCD-SEC 1978747-95).)

### 7. Mr. Reyes Had No Motive to Defraud Investors

#### (a) There Is No Evidence That Mr. Reyes Granted Himself Options

The SEC alleges that Mr. Reyes granted himself options as part of his motivation to engaged in the alleged "scheme." Compl. ¶ 46. There is no evidence to support this allegation, further establishing that Mr. Reyes had no intent to defraud. The evidence conclusively proves that Mr. Reyes never granted himself any options and that all of his options were granted by the members of Brocade's Compensation Committee. Seth Neiman and Neal Dempsey, members of the Compensation Committee, testified to these facts, and there is no evidence to the contrary.

> Q. Who set Greg Reyes' compensation?
> A. The compensation committee, in essence, made a recommendation to the full Board.
> Q. Did Greg Reyes set his own compensation?
> A. No.
> Q. Did Greg Reyes grant himself options?
> A. No.

(Ex. 6 (Neiman Tr. 16:24 – 17:5).)

> Q. Now, am I correct that at no time did the executive officers of the company, including Mr. Reyes, grant themselves options?
> A. You are correct.

(Ex. 8 (Dempsey Tr. 17:18-21).)

#### (b) There is No Evidence That Mr. Reyes Received Retroactively Priced Options

Similarly, there is no evidence to support the SEC's allegation that Mr. Reyes received retroactively priced options. Compl. ¶ 45. To the contrary, the members of Brocade's Compensation Committee testified that Mr. Reyes did **not** receive retroactively priced options:

> Q. All I'm asking is that you and your colleagues on the compensation committee -- and I think I've already asked this, but you and your colleagues on the compensation committee never looked back to a point in the past in order to set a grant date for any of the executive grants, did you?
> A. No, absolutely not.

(Ex. 6 (Neiman Tr. 25:11 – 17).)

> Q. Do you have any reason to believe that any option grant authorized by you at Brocade at any time was retroactively priced or backdated?
> A. No. No.

(Ex. 8 (Dempsey Tr. 31:7-10).)

#### (c) Recruiting and Retaining Talent is a Pure Motive

The SEC also claims that Mr. Reyes was motivated to engage in the alleged "scheme" in order to attract and retain talent. Compl. ¶¶ 48-50. This is a motive of all corporations, and does not suggest (let alone prove) an intent to defraud investors. Indeed, when a company seeks to attract and retain employees, it has the interest of its shareholders in mind. Such pure motives – attributable to all public companies – cannot defeat summary judgment here.

With the SEC's theories of motive debunked and disproved, it simply defies logic that anyone would engage in the "scheme" that Mr. Reyes is alleged to have engaged in. As Judge Whyte said in granting summary judgment in a securities class action, "courts do not presume that corporate officers make false statements simply out of spite or to impress others." *Schuster v. Symmetricon, Inc.*, No. C9420024 RMW, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000); *see also Renovitch v. Kaufman*, 905 F.2d 1040, 1046-1047 (7th Cir. 1990) (summary judgment in favor of defendant affirmed where defendant "did not gain financially" and where no profit motive existed to support claim of scienter). There is no evidence that Mr. Reyes had any nefarious motive to engage in the alleged "scheme."

For all the foregoing reasons, there is simply no evidence that Mr. Reyes knew or that it was "obvious" to Mr. Reyes that his alleged conduct would result in the filing of materially false financial statements. Accordingly, the SEC will be unable to establish the element of intent and Mr. Reyes is entitled to summary adjudication of claims one and two as a matter of law.

## VI. MR. REYES IS ENTITLED TO SUMMARY ADJUDICATION ON CLAIMS THREE THROUGH EIGHT

### A. Mr. Reyes is Entitled to Summary Judgment on Claims Three, Four and Six Because There is No Significantly Probative Evidence That Mr. Reyes Knowingly Violated Section 13.

In claims three, four and six of the complaint, the SEC alleges that Mr. Reyes violated section 13(b)(5) of the Exchange Act and SEC Rule 13b2-1, SEC Rule 13b2-2, SEC Rule 13a-14. Section 13 and Rule 13 claims require the SEC to establish that Mr. Reyes engaged in the alleged violations knowingly. A "standard of reasonableness" applies in determining whether or not a section 13 violation occurred. *See S.E.C. v. Lowy*, 396 F. Supp. 2d 225, 250 (E.D.N.Y. 2003).

Mr. Reyes is entitled to summary adjudication of these claims because there is no significantly probative evidence establishing that Mr. Reyes acted knowingly in the alleged violation of any of these provisions.[13]

Claim Three – To succeed on this claim, the SEC must submit significantly probative evidence that Mr. Reyes *knowingly* falsified books, records, or accounts of Brocade, or knowingly circumvented or failed to implement a system of internal accounting controls in violation of section 13(b)(5) of the Exchange Act and SEC Rule 13b2-1 thereunder.[14] No significantly probative evidence exists in the voluminous discovery record that Mr. Reyes directed or was aware of the alleged falsification of any documents. (*See* Sections V.B. and V.C. above.) Moreover, Brocade had appropriate employees and controls in place to ensure that options were properly documented and that expenses were properly accounted for. (*See* Section V.E. above.) Accordingly, Mr. Reyes is entitled to summary judgment on claim three.

Claim Four – To defeat summary adjudication, the SEC must offer significantly probative evidence that Mr. Reyes *knowingly* made a materially false or misleading statement, or omitted a material fact to Brocade's independent auditors in violation of SEC Rule 13b2-2. *See S.E.C. v. Todd*, No. 03 CV 2230 BEN (WMC) 2006 U.S. Dist. LEXIS 41182, at **29-30 (S.D. Cal. May 30, 2006) ("The Court's own research has similarly turned cases assigning liability for a rule 13b2-2 violation **only** when the individual knew or had reason to know the statements or omissions he was making to the auditors were false.") (emphasis added). Mr. Reyes is entitled to summary judgment on claim four because there is no significantly probative evidence that Mr. Reyes was aware, or

---

13 The sheer volume of stock option issues sweeping the nation shows that the retroactive pricing of stock options was consistent with industry practices, and suggests that executives were not "knowingly violating" the securities laws. According to proxy-research firm Glass Lewis, to date 118 companies have disclosed their stock option practices are under investigation by the SEC, 57 companies have disclosed investigations by the Department of Justice, and 236 have announced internal investigations. (*See* Edward Iwata, "Backdating Probes Take Time, Regulators Say, Because of All the Papers to Review," USA Today, Mar. 9, 2007, Ex. 47 at 2.) Notably, the final reports of these internal investigations often conclude that there was no intentional misconduct and that executives involved in the option granting process were confused by or did not appreciate the accounting implications.

14 The text of the statute prohibits a person from "knowingly" circumventing or "knowingly" failing to implement a system of internal accounting controls, or "knowingly" falsifying any books or records, and the SEC alleges that Mr. Reyes "knowingly" falsified books, records, or accounts. Compl. ¶ 74. Thus the SEC has itself embraced a "knowingly" standard with respect to this claim.

had reason to be aware, of the alleged retroactive pricing or the need for an accounting charge relating to retroactively priced options, and thus Mr. Reyes could not have knowingly misled Brocade's outside auditors. (*See* Sections V.B. and V.D. above.) Further, there is no evidence demonstrating that when Mr. Reyes signed Brocade's management representation letters he knew, or had reason to know, of the existence of material errors in Brocade's financials. (*See* Section V.A. above.) Accordingly, Mr. Reyes is entitled to summary judgment on claim four.

Claim Six – To prevail on this claim, the SEC must show that Mr. Reyes *knowingly* made false Sarbanes-Oxley certifications in violation of SEC Rule 13a-14 for signing various 10-Ks and 10-Qs of Brocade. *See* S.E.C. Release 33-8124 (2002) (certifications in this rule are "based on [the certifier's] knowledge."). The SEC cannot present any significantly probative evidence that Mr. Reyes (1) knew that Brocade's financials statements contained any material misstatements or omissions (*see* Section V.A. above), (2) did not believe Brocade's financial statements fairly presented Brocade's financial condition (*see* Section V.A. above), or (3) knew of any fraud or internal control deficiencies at Brocade but failed to disclose them (*see* Sections V.B., V.C., and V.E. above). Accordingly, Mr. Reyes is entitled to summary judgment on claim six.

**B. Mr. Reyes Is Entitled to Summary Judgment on Claims Five, Seven and Eight Because the SEC Cannot Demonstrate that Mr. Reyes Knowingly Aided or Abetted Any Brocade Reporting Violations**

Claims Five, Seven and Eight allege that Mr. Reyes aided and abetted violations of the securities laws. To withstand summary judgment on its claims of aiding and abetting, the SEC must present evidence that shows that: (1) there has been an underlying securities violation; (2) the alleged aider-abettor had knowledge of that act and of his own act in furthering the violation; and (3) the aider-abettor substantially assisted in the wrongdoing. *See Ponce v. S.E.C.*, 345 F.3d 722, 737 (9th Cir. 2003). *See also S.E.C. v. Sandifur*, No. C05-1631C 2006 U.S. Dist. LEXIS 12243, at **34-39 (W.D. Wash. Mar 2, 2006) (dismissing SEC claims that defendants aided and abetted issuer's violations of Section 13(a) where SEC failed to allege the "necessary knowledge element of an aiding and abetting claim").

Because the SEC cannot meet evidentiary requirements to establish the underlying securities law violations, the SEC cannot show that Mr. Reyes was an aider and abettor of any such violations. Accordingly, Mr. Reyes is entitled to summary judgment on these claims.

## VII. FIFTH AMENDMENT INVOCATIONS DO NOT PRECLUDE MR. REYES FROM PREVAILING ON THIS MOTION

### A. Mr. Reyes's Assertion of His Fifth Amendment Rights Does Not Preclude Summary Judgment

As the Court is aware, Mr. Reyes's related criminal trial is set to begin on June 18. In light of the real threat of criminal prosecution, Mr. Reyes justifiably asserted his Fifth Amendment rights when deposed by the SEC last month.[15] Mr. Reyes's assertion of his Fifth Amendment rights does not preclude summary judgment and, in this case, should not provide any adverse inference whatsoever.

An adverse inference in the civil context is proper only if independent evidence exists of the fact to which the party refuses to answer. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("Thus, an adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint . . . In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted.") The SEC cannot present independent evidence of Mr. Reyes's scienter. As a consequence, no adverse inferences can be drawn from Mr. Reyes's decision to invoke his Fifth Amendment right, and he is entitled to summary judgment on the complaint.[16]

---

15 Notably, while the SEC noticed the depositions of all three defendants in this case, the SEC permitted the other two defendants to continue their depositions until after the criminal case – a courtesy they refused to afford only to Mr. Reyes.

16 Even if the SEC could put forth enough evidence of Mr. Reyes's scienter or knowledge to draw an adverse inference against him, such inference alone would still be insufficient to enable the SEC to meet its burden on this motion to put forth significantly probative evidence regarding Mr. Reyes's alleged scienter. *See Fidelity Funding of Cal. v. Reinhold*, 79 F. Supp. 2d 110, 116 (E.D.N.Y. 1997) (whether or not an adverse inference is drawn, a motion for summary judgment "must stand or fall on the merits of the evidence adduced"); *see also FTC v. Medicor*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("The Court's ruling on Plaintiff's Motion for Summary Judgment rests on the evidence presented by the parties, not on any adverse inference.")

### B. Other Witnesses' Invocations of Their Fifth Amendment Rights Does Not Preclude Summary Judgment

In the months since the Court rejected the SEC's attempt to stay this action, the parties have engaged in extensive discovery. (*See* Section II.C.) Despite this wide-ranging and in-depth discovery, no evidence in the record establishes the essential elements of scienter and knowledge. In an effort to delay the inevitable, Mr. Reyes anticipates that the SEC will argue that it has not had ample opportunity for discovery due to the assertion of the Fifth Amendment by certain witnesses at their depositions. This argument has no merit.

It is undisputed that the SEC and DOJ have acted in close concert in prosecuting this action and the related criminal matter. To assist in the SEC's investigation, the DOJ – on numerous occasions – has granted immunity to witnesses and then asked the immunized witnesses to sit for interviews with the SEC. Only when Mr. Reyes and the other defendants sought information from these witnesses did they assert their Fifth Amendment rights and refuse to answer questions.

On January 9, 2007, defense counsel wrote to the SEC Staff and DOJ requesting that they come clean about the fact that these witnesses had no realistic fear of prosecution. (Ex. 50, Richard Marmaro letter to SEC of 1/09/07.) On January 23, 2007, after being ignored by the government, Mr. Reyes filed a motion to compel the deposition testimony of those witnesses invoking their Fifth Amendment rights. The motion argued that witnesses had no realistic fear of prosecution, and that the DOJ and SEC were acting in complicity to ensure their own access to the witnesses while preventing the witnesses from giving testimony to the defendants, which was accomplished by the government's refusal to acknowledge that the witnesses would not be prosecuted. In evaluating Mr. Reyes's motion, the Court agreed that "there can be no dispute that the government's power to circumscribe the scope of the witness's immunity has allowed it to reap the benefit of testimony . . ., while effectively preventing Defendants from accessing the same information." (Order at 6, *U.S. v. Reyes*, No. CR-06-0556, (N.D. Cal. Feb. 6, 2007). Recognizing the inherent unfairness of these circumstances, the Court stated that it "would be prepared to fashion an exclusionary remedy, at an appropriate time, that would deprive the SEC of the benefit of the government's selective grants of immunity." *Id.* at 8.

Thus, the SEC was warned that its tactical choice to take advantage of the DOJ's immunity powers to obtain informal and unsworn information from certain witnesses could backfire. It would be unfair for the SEC to now complain that it needs the testimony of these "silent witnesses" when the SEC was complicit in preventing these witnesses from testifying when Mr. Reyes sought their depositions.

Similarly, it would be unfair to force Mr. Reyes to continue to live under the cloud of the SEC's charges until it decides that it is ready prove its case. The simple fact is that the SEC has failed to marshal sufficient evidence to create a triable issue of fact regarding scienter and knowledge even after obtaining extensive testimony from over 50 witnesses and millions of pages of documents. The Court should therefore reject any claim by the SEC that it needs more time to take discovery and grant Mr. Reyes summary judgment on all claims.

## VIII. CONCLUSION

For the forgoing reason, Mr. Reyes respectfully requests that the Court grant his motion for summary judgment; or alternatively, summary adjudication of claims.

Dated: May 11, 2007

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Richard Marmaro
RICHARD MARMARO
Attorney for Defendant
GREGORY L. REYES