IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GREGORY L. REYES, et al.,<br><br>　　　　Defendants.　　　　　　　　／ | No. C 06-04435 CRB<br><br>**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF MATERIALITY** |

　　　　The SEC filed this enforcement action against three former executives of Brocade Communications Systems, Inc. ("Brocade") for their alleged participation in a scheme to backdate stock options. Now pending before the Court is a motion for partial summary judgment filed by Defendant Gregory Reyes ("Reyes"), Brocade's former CEO. The issue presented is one of first impression for the federal courts: Does stock options backdating matter to investors? Put another way, the Court must consider whether the information concealed by the alleged backdating scheme at Brocade "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Reyes argues that no reasonable juror could reach such a conclusion. This Court disagrees.

**BACKGROUND**

A stock option confers a right to buy stock at a fixed price, called the "strike price." When the strike price is lower than the prevailing price on the stock market, an option is said to be "in-the-money." When the strike price is equal to the market price, an option is said to be "at-the-money." When the strike price is less than the market price, an option is said to be "out-of-the-money."

It is no small feat, however, to figure out how much a stock option is truly worth. At any given point in time, finding the "intrinsic value" of a stock option involves a straightforward calculation: an option is worth the amount by which the market price exceeds the strike price. For instance, if the strike price is $5, and shares are trading on the stock exchange for $25, then the option is "worth" $20.

But the clock complicates matters. Stock markets fluctuate; economies heat up and slow down; companies become more or less profitable over time. All of these and other variables influence the price of securities, so an option worth $5 today may be worth $10 tomorrow and may be out-of-the-money the following day. Further, an option usually does not "vest" until some period of time elapses, meaning that the recipient of the option cannot exercise it immediately. Options may never even vest at all, for a variety of reasons-- employees leave or get fired; the company goes bankrupt or cancels the option. And even after an option vests, the option-holder generally enjoys some sort of discretion in deciding whether and when to exercise it.

In short, it is nearly impossible to tell how much a stock option is ultimately going to cost the issuer. It may cost the company a great deal, since the exercise of an in-the-money option requires the company to purchase its own shares on the open market or to sell treasury stock at a discount. But it may never cost the company a penny, if the option never vests, is never exercised, or is never in-the-money. Thus, to the companies that issue them, stock options are inchoate expenses. It is anyone's guess what cost they will ultimately impose.

The rules of accounting nonetheless require companies to account for the expense of stock options in specific ways, notwithstanding their inchoate nature. One such accounting

convention is Accounting Principles Board Opinion No. 25 ("APB 25"). Promulgated in 1972, this rule demands that companies disclose the "intrinsic value" of a stock option at the time it is granted, *i.e.* the difference between the market price and the stock price on the day of the grant. In other words, under APB 25, companies must tell investors whenever they grant in-the-money options. Moreover, the rule requires companies to treat such grants as a form of compensation, with the intrinsic value of the grant deducted from revenues like any other expenses. Companies need not account for at-the-money or out-of-the-money options, which have no intrinsic value at the time they are issued.

Backdating allows a company to evade APB 25. By retrospectively choosing a favorable historical strike price and then purporting to have granted the option on that previous date, a company can disguise an in-the-money option as having been granted at-the-money or even out-of-the-money. The company thereby avoids recording a compensation expense, which otherwise would have to be counted against revenues and would make the company appear, at least on paper, less profitable. It is assumed for present purposes that Brocade improperly failed to disclose the full amount of its "APB 25 expenses." That is, insofar as this summary judgment motion is concerned, Reyes concedes that a scheme to backdate stock options existed at Brocade, resulting in the understatement of compensation expenses on Brocade's public financial statements between 2000 and 2004.

That understatement, Reyes argues, is immaterial. He claims that reasonable investors would not have considered the concealed APB 25 expenses important, however large they may have been, in deciding whether to buy and sell Brocade stock. Reyes claims he is therefore entitled to summary judgment as to all claims that require the SEC to prove the materiality of the alleged misrepresentations.

**STANDARD OF REVIEW**

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party is entitled to judgment as a matter of law, however, only "when there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(a), or in this particular case, as to the

3

materiality of any fact. As the Supreme Court has explained, on a motion for summary judgment "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Reyes can prevail on the motion only if he demonstrates that no reasonable juror could return a verdict in favor of the SEC on the issue of materiality. In reviewing a motion for summary judgment, the Court is constrained to consider the evidence in the light most favorable to the nonmoving party--here, the SEC--and to draw all reasonable inferences its favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157-59 (1970); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1220 (9th Cir. 1995).

This familiar summary judgment standard bears emphasis where, as here, the disputed issue is the materiality of an alleged misrepresentation. Under Supreme Court precedent, a company's failure to disclose information is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, 426 U.S. at 449. In other words, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to buy or sell the company's stock. Id.

A summary judgment motion is rarely the appropriate vehicle for resolving this inquiry. Assessing the materiality of a misrepresentation requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts," and "these assessments are peculiarly ones for the trier of fact." Id. at 150. "Only if the established omissions are 'so obviously [un]important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." Id. (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970)).

//

//

**DISCUSSION**

Before turning to the more substantive arguments presented in the summary judgment motion, it is worth refuting some of the observations Reyes has offered about what matters in this case. First, it does not matter that Brocade was, or is, a successful business enterprise.[1] Profitable companies, too, owe a duty of honesty to their shareholders. Second, it does not matter whether Reyes himself ever exercised a backdated grant.[2] Undisclosed use of a company's vault is improper, whether it lines the pockets of the chief executive or his preferred employees. Moreover, the observation that Reyes never personally profited from backdating is somewhat misleading, for it establishes only that Reyes never *exercised* any backdated grants, not that he never *received* any. Simply put, a defendant is not absolved of liability by remitting his loot. Finally, the Court finds little significance in the fact that many of Brocade's stock options were ultimately cancelled. Reyes repeatedly cites the cancellation of stock options as evidence that they are a "hypothetical expenditure."[3] Yet this argument is akin to getting caught with a cookie in hand, putting it back in the jar, and speaking of the theft as only a "hypothetical snack." What ultimately becomes of a backdated option is of limited significance. The law assesses the materiality of a misrepresentation at the time it is made, not after intervening events or remedial action have rendered it harmless. Having dispensed with these arguments, the Court turns to the thrust of Reyes' motion.

---

[1] See Def. Gregory L. Reyes' Motion for Partial Summ. J. at 14-15 (hereinafter "Motion") (noting various analyst reports indicating that a restatement of ESO expenses "was immaterial to Brocade's [otherwise solid] business fundamentals"); id. at 8 ("Mr. Reyes's tenure as CEO was a remarkable success story, with the fledgling start-up ($68 million in annual revenues) becoming a technology industry leader ($600 million in annual revenues) within six years.").

[2] See Motion at 3 ("Gregory Reyes, who did not profits from the stock options at issue in this case, built Brocade from start-up to industry leader in six years, with a remarkable record of growth and performance."); id. at 2 ("The [SEC's action] exploits the wave of outrage with executive pilfering and self-dealing not raised by the facts of *this* case. Mr. Reyes was not self-enriched by the conduct alleged; he did not exercise any of the options at issue.").

[3] See Motion at 32 ("Again using Brocade's own option data, Mr. Stanton demonstrates that 95% of the options granted between 2000 and 2004 were never exercised, and 87% were cancelled before they had even vested."); id. at 3 ("Indeed, 95% of the ESOs at issue in this case were never exercised--meaning, quite literally, that no exchange of cash for securities ever occurred, and no financial impact to Brocade, its option holders, or anyone ever materialized."); id. at 2 ("The vast majority of the stock options at issue in this case--95%--were never exercised. They were either cancelled, unvested or 'under-water.'").

5

Reyes advances two principal reasons why any APB 25 expenses concealed by the alleged backdating scheme were immaterial to investors. First, he contends that investors ignore non-cash expenses, such as stock option grants, when deciding whether to purchase or sell securities. Second, he argues that Brocade in fact disclosed adequate information about the stock options it granted; as a result, he says, any particular misrepresentations about APB 25 expenses were insignificant. The Court addresses each of these arguments in turn.

## I. Stock Option Expenses

Analysts and investors frequently disregard non-recurring, non-cash expenses when they evaluate a company. By excluding expenses like stock options--one-shot events whose ultimate effect on a company's bottom line may be difficult to discern--it is often possible to obtain a better understanding of the company's value and performance. For this reason, many shareholders look to "pro forma" or "non-GAAP" earnings statements, which eliminate certain extraneous expenses, accounting formalities, and other economic clutter. Such statements focus instead on revenues and cash flow, which are widely, if not universally, regarded as the best indicators of a company's financial health. In turn, many companies, including Brocade, have accommodated investors' desire for a clear picture by providing "pro forma" or "non-GAAP" earnings statements. Consistent with this approach, after Brocade announced that it would restate stock option expenses, many analysts emphasized that the restatement would have no impact on many of the company's most important financial disclosures. See Weinstein Decl., Exs. 25-29 (collecting a series of analyst reports, all of which reassured investors in January of 2006 that Brocade's forthcoming restatement of stock option expenses likely would not affect revenues, cash positions, or non-GAAP earnings). According to Reyes, the financial community's reliance on these streamlined statements shows that stock option expenses are immaterial to investors.

As a theoretical matter, the Court rejects the idea that a misrepresentation is immaterial unless it affects "pro forma" or "non-GAAP" calculations. Investors may consider stock option expenses, or other items excluded from "pro forma" or "non-GAAP" statements, less significant than other financial facts. That an expense is less significant does

6

not mean it is immaterial. Not even Reyes' experts suggest that investors always consider expenses excluded from "pro forma" or "non-GAAP" statements immaterial. Indeed, as Brocade's own press releases recognize, such streamlined statements are "a supplement to, and not a substitute for, [the] financial results presented in accordance with GAAP." Weinstein Decl., Ex. 54, at 2.

Investors may care most that a company is profitable, but they may also find it significant that a profitable company is meanwhile giving away assets in the form of discounted treasury stock. However inchoate such expenses may be, the Court cannot conclude that they are necessarily unimportant to investors. To hold that such non-cash or non-GAAP expenses are immaterial as a matter of law would provide amnesty for companies to deceive shareholders about any items or expenses that do not appear on "pro forma" or "non-GAAP" earnings statements. Reyes provides no authority for this startling proposition, and the law appears contrary to it.[4]

---

[4] In one of its most significant recent decisions, the Ninth Circuit held that a group of shareholders had "adequately pled fraud [due to the company's] alleged misuse of the GAAP protocols and alleged misstatements regarding employee training and turnover." In re Daou Systems, Inc., 411 F.3d 1006, 1022 (9th Cir. 2005). In that decision, the Court sustained the shareholders claims of securities fraud, even though there was no allegation that the company had actually misrepresented the total amount of revenues it would ultimately receive, see id. at at 1017-20, and even though many of its alleged misrepresentations pertained to non-cash considerations such as the true rate of employee retention, see id. at 1020.

The Ninth Circuit's decision in Daou emphasized that a company's failure to comply with GAAP itself may give rise to a claim for securities fraud, if pled with specificity. Id. at 1018 ("The case law indicates, therefore, that . . . overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud . . . ."). Accord In re Craftmatic Sec. Litig., 890 F.2d 628, 641 n.17 (3d Cir. 1989) ("Disclosures mandated by law are presumably material."). The Ninth Circuit focused on whether the alleged GAAP violations were "minor or technical in nature" or whether they "constituted widespread and significant inflation of revenue." Daou, 411 F.3d at 1020 (quoting In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000)). The Ninth Circuit gave no indication that such GAAP violations must also affect "pro forma" or "non-GAAP" financial statements. Here, of course, the alleged backdating scheme involves precisely the type of GAAP violation that concerned the Ninth Circuit in Daou, that is, one that resulted in the "widespread and significant inflation" of a company's bottom line--in this case, due to the understatement of expenses Id.

The record currently before the Court suggests that the SEC routinely files lawsuits against companies that fail to report expenses accurately, including non-cash expenses. According to one of the SEC's experts, the agency has filed more than a hundred lawsuits for "improper expense recognition." Seidler Decl. ¶ 26. The expert states that "most" of these lawsuits related to "non-cash items." Id. Indeed, a formal report issued by the SEC at

7

Moreover, there is ample evidence for a reasonable jury to conclude that investors actually cared about Brocade's stock option expenses. When Brocade first announced that it would record "additional stock-based compensation expense as a result of an internal review," its stock price dropped more than seven percent. Salzmann Decl., Ex. 4, at 1; Woodward Decl., Appx. D.2, at 1. When the company later announced that there would be additional adjustments based on "improprieties in connection with the documentation of stock option grants" and the unreliability of certain "recorded measurement dates," shares dropped an additional five percent. Salzmann Decl., Ex. 51, at 1; Woodward Decl., Appx. D.2, at 1. When Brocade finally filed its formal financial restatements, shares immediately rebounded by seventeen percent. Salzmann Decl., Ex. 53, at 1; Woodward Decl., Appx. D.2, at 4. These dramatic drops and jumps in the share price all occurred notwithstanding Brocade's multiple press releases emphasizing that the restatement of stock option expenses would not affect the company's revenues, cash positions, or non–stock option operating expenses. On Reyes' view of the financial world, investors should have ignored these various announcements. Clearly, they did not.

It is admittedly a hazardous business to try reading the tea leaves of the stock market. Reasonable minds can disagree about the causes and significance of movements in the price of stocks.[5] In truth, any number of reasonable inferences can be drawn about what may have

---

Congress's behest indicates that, between July 1997 and July 2002, the agency filed actions to punish "a wide variety of accounting practices usually intended to understate or defer expenses, and therefore overstate net income." Securities and Exchange Commission, Report Pursuant to Section 704 of the Sarbanes-Oxley Act of 2002 at 13 (Jan. 24, 2003), available at http://www.sec.gov/news/studies/sox704report.pdf. The SEC's report identifies agency actions relating to the misrepresentation of non-cash expenses, including intentionally misleading assessments about the value of "bad debts" or "asset impairments," such as depreciation. Id. at 18.

[5] It is worth noting that there is no dispute that some statistically significant event occurred in the context of Brocade's announcements and restatements. Both Reyes' expert and the SEC's expert agree that the seven percent drop following Brocade's initial press release on January 6, 2005, was statistically significant. Gulley Decl. ¶ 21 & Ex. C; Woodward Decl. ¶ 3 & Ex. D.1, at 2-9. The parties also agree that the seventeen percent jump following Brocade's formal restatement on November 14, 2005, was a meaningful event. See Gulley Decl. ¶ 21 & Ex. C; cf. Woodward Decl. ¶¶ 25-26 (providing an independent estimation of the expenses associated with Brocade's stock options as a way to demonstrate their significance to investors, an approach that is similar in substance, if not in methodology, to the company's own restatement, which caused an jump in the price of Brocade stock). The experts disagree about

8

been in the minds of investors when they responded to these announcements by trading shares of Brocade in unusually high numbers. Reyes attributes the market's reactions to mere "uncertainty."[6] Another reasonable and straightforward inference, however, is that investors reacted to announcements about increases in stock option compensation expenses because, well, they cared about increases in stock option compensation expenses.

The present motion does not require the Court to decipher the ups-and-downs of the price of Brocade stock. All that must be said here is that a reasonable juror could conclude from these fluctuations that there is a "substantial likelihood" investors considered Brocade's stock options expenses "important" in deciding whether to buy or sell shares. TSC Industries, 426 U.S. at 449. The Court finds that a reasonable juror could so conclude.

## II. FAS 123 Disclosures

As noted above, it is difficult to tell how much stock options ultimately are going to cost the companies that issue them. To grapple with the inchoate cost of stock options, various rules of accounting exist.[7] One such rule is APB 25. This rule requires companies to

---

the significance of Brocade's second press release, on January 25, 2005, when the company directly acknowledged that many stock option grant dates were unreliable. Compare Gulley Decl. ¶ 22 & n.6 (concluding that a five percent drop was "not statistically significant" based on a particular market theory that requires a "95 percent confidence level in rejecting null hypothesis concerning abnormal returns and explanatory variables"), with Woodward Decl. ¶ 31 (describing as "puzzling" the conclusion of Reyes' expert conclusion that a five percent drop is unimportant). What is undisputed, however, is that investors reacted in meaningful ways to Brocade's various announcements. The only dispute is what these meaningful reactions really mean.

[6] Reyes' expert is likely correct that investors were been unnerved by the "uncertainty" of Brocade's forthcoming earnings restatement. See Gulley Decl. ¶ 22. Arguably, mere "uncertainty" would fail to establish that the subject matter of the restatement is itself material. But such a suggestion certainly begs the question why investors would care about uncertainty for uncertainty's sake if they do not care about the uncertain expenses themselves. For its part, the SEC has suggested that investors punished Brocade's stock simply because the company's financial statements had been inaccurate, or in other words, because they believed Brocade's executives had lied. This observation may be true, too, but it is a woefully insufficient basis for finding that the misrepresentations are "material" as a matter of law. If a misrepresentation is deemed material simply because it is a misrepresentation, then the law's materiality requirement is altogether meaningless.

[7] To say that valuation is difficult is not to say that it is impossible to make an educated guess. Economists have won Nobel Prizes for coming up with accurate estimates of a stock option's likely cost. And the SEC is forever tinkering at finding a more effective equation. Obviously, some kinds of information are more helpful than others in assessing the likely

9

identify the "intrinsic value" of an option on the day it is granted, to treat an in-the-money option as a compensation expense, and to deduct the intrinsic value of such in-the-money options from the company's bottom line. Often criticized as simplistic because it fails to account for the effect of time on the value of an option, APB 25 was the prevailing approach to accounting for stock options for more than three decades after it was first issued in 1972.

In 1994, however, another approach emerged: Statement of Financial Accounting Standards No. 123 ("FAS 123"). The approach embodied in this regulation is to focus not on the value of the option at the time of the grant, but instead on the ultimate cost an option is likely to impose on the issuer. Recognizing that *all* stock options may eventually impose a cost, it directs companies to provide an estimate of the "fair value" of all outstanding stock options, not just those granted in-the-money. In calculating the fair value of options, companies must take into account several factors, including the stock price at the grant date; the exercise price; the expected life of the option; the volatility of the stock in question; the dividends that the stock is expected to pay; and the value of what is essentially a risk-free interest rate over the life of the option. FAS 123 thereby offers a comparatively comprehensive view of an option's value.

Between 1995 and 2004, which includes the time period relevant to this lawsuit, public companies had a choice about how to apply these rules. They could disclose stock option expenses using the newer "fair value" approach of FAS 123. Or they could stick with the older "intrinsic value" method of APB 25. Companies opting for the older APB 25 approach, however, had to make certain additional disclosures. These additional disclosures typically appeared in footnotes to annual financial reports, advising investors how much the stock options would have cost the company if their cost had been calculated under the fair value approach, and how much they would have affected the company's earnings. See generally FAS 123 ¶¶ 45-48.

---

financial impact of a stock option. The usefulness of different types of information about stock options, some of which were disclosed by Brocade and some of which (it is assumed) were not, is discussed in greater detail below. For now, it is worth noting that the financial world has devoted lots of attention to the task of developing better estimates of stock option expenses. All this attention further suggests that somebody, somewhere, cares about them.

10

Between 2000 and 2004, the alleged duration of the alleged backdating scheme, Brocade elected to provide "intrinsic value" disclosures under APB 25. It is assumed for purposes of this motion that these disclosure were inaccurate. Yet Brocade also provided "fair value" disclosures under FAS 123 in the footnotes to its annual financial reports. For instance, between 2000 and 2004, the company revealed that it granted stock options with an approximate "fair value" of nearly $1.5 billion. Stanton Decl. ¶ 16 & Ex. 4. Brocade's reports further describe the effect that these expenses would have had on earnings. In one *pro forma* earnings statement, for example, Brocade advised investors that expenses from stock-based compensation would have more than doubled the company's $130 million loss in 2003, would have transformed its $60 million profit into a $410 million loss in 2002, and would have changed a slim $3 million gain into a whopping $590 million loss in 2001.

These additional disclosures were not insignificant. To be sure, the FAS 123 footnotes gave investors more complete information about Brocade's stock option expenses than they would otherwise have had.

Reyes argues that, as a result of these additional disclosures, any APB 25 compensation expenses, whether concealed by Brocade or not, could not reasonably be viewed as important. Reyes contends that Brocade's FAS 123 footnotes, which accompanied each of its annual financial statements between 2000 and 2004, gave investors not merely adequate, but superior information about the stock options issued by the company. Reyes says this alternative disclosure gave investors an accurate understanding of the costs of Brocade's stock options, rendering any misrepresentation of compensation expenses under APB 25 immaterial.

For three reasons, the Court concludes that the FAS 123 footnotes, however helpful they may have been to investors, do not require summary judgment. First, the purportedly accurate information appeared *at a different time* than the alleged misrepresentations. FAS 123 disclosures appeared only once a year--in footnotes--in Brocade's 10-K financial reports. By contrast, APB 25 expenses appeared, inaccurately, in one quarterly statement after another. Thus, it is not as if each of Brocade's alleged misrepresentations about

compensation expenses under APB 25 was accompanied by a corresponding disclosure about the options' fair value under FAS 123. Instead, Reyes' argument is that a yearly footnote renders harmless any deceit perpetrated by the company's quarterly earnings statements. A reasonable jury could reject that argument, on the basis that the purported cure was unavailable when the injury occurred.

Second, even the supplemental FAS 123 footnotes never disclosed that Brocade granted stock options in-the-money. That is, only the compensation expenses identified under APB 25 give shareholders any indication that there has been an immediate, albeit incipient, transfer of wealth. A reasonable juror could conclude that shareholders would find it important that a company is giving away treasury stock at below-market rates. Further, the incentives created by different types of stock options are not always the same. Options granted in-the-money confer an immediate benefit, thought it may not be immediately realized. Options granted at-the-money or out-of-the-money offer only the prospect of financial gain. By disguising grants with intrinsic value as having none, backdating gives a distorted picture of the incentives actually created by stock options. It suggests to investors that the option is a carrot, when it is truly, at least in part, a gift. As Reyes himself recognizes, investors recognize and care about the incentives created by stock options, which are arguably mischaracterized by backdating. A jury could conclude that this illusory incentive--which is not dispelled by any of the information contained in the FAS 123 footnotes--would be material to reasonable investors.

Third, Brocade's own actions belie its argument. The company *itself* recognized the significance of APB 25 expenses. Given a choice between using APB 25 and FAS 123 to account for its stock option expenses, the company chose the former. Its choice was not without a purpose. As Brocade's executives fully appreciated, this choice allowed the company to avoid recording expenses for at-the-money or out-of-the-money grants, all to the benefit of the company's quarterly earnings statements. That the company understood itself as benefitting from the opportunity to reduce formal stock option expenses is evident from a number of Brocade's own internal e-mails and memos.

Brocade executives, including Reyes, voiced vehement opposition to a proposed revision of the accounting rules that would have required companies to deduct the fair value of all stock options from their bottom line, as opposed to giving them the option of deducting only the intrinsic value. See Salsmann Decl., Ex. 67, at 1 (Memorandum from Gregory Reyes to Tony Canova and Jennifer Hart (April 22, 2002)) (describing the proposed rules as "well meaning but misguided legislation" that "could have a negative effect on the Silicon engine of innovation"). Brocade opposed a change in the accounting rules precisely because it would have forced the company to record greater compensation expenses. Brocade's executives understood that such formal expenses would have affected not only the company's quarterly earnings statements, but also its stock price, notwithstanding the fact that the company already included FAS 123 footnotes in its annual reports. See Salzmann Decl., Ex. 40, at 1 (E-mail from Beth Fogarty on Behalf of Tony Canova to Brocade North (June 21, 2004)) ("If the rules are enacted, any company offering stock options/ESPP plans will see a reduction in there [sic] reported earnings *which may detrimentally affect the company's valuation/stock price*. Historically, no such expense/earnings reduction has been required." (emphasis added)).

Having recognized the significance of assessing option expenses against the company's reported earnings, and having expressed concern that an increase in such expenses would be viewed unfavorably by investors (regardless of its own FAS 123 footnotes), and having voiced concern that investors would respond to increased option expenses by punishing the price of its stock, Brocade now asks this Court to rule that no investors could do the same. The Court rejects that invitation.

## CONCLUSION

What Reyes' motion essentially seeks is nothing short of a judicial proclamation that the SEC's rules of accounting are meaningless. He argues that stock option expenses are all unimportant to investors. Specifically, he argues that APB 25 provides investors with worthless information in light of the other metrics used to advise investors about the potential cost of stock options. By implication, he suggests that the SEC's rules and regulations about

13

1 how to account for stock options are either flawed or superfluous, and may be ignored or
2 manipulated, so long as the company gives investors other, arguably more helpful
3 information.

4     The proper forum for such an argument, truly, is with the SEC.  If the strictures of
5 APB 25 are as insignificant or misleading as Reyes claims, then the remedy for such a
6 misguided accounting principle is to seek its reformation.  The proper response is not to
7 adopt that principle voluntarily as the rule that will govern the company's financial
8 statements, violate it, and, when caught, claim that the rule was stupid anyway.  As the SEC
9 justifiably observes, if Brocade executives truly believed that APB 25 expenses were
10 unimportant to investors, it is difficult to imagine why they would have gone to so much
11 trouble to hide them, which, after all, is the chief effect of backdating.

12     It is also important to reiterate here, however, that this Court reaches no conclusion,
13 and does not mean to suggest any, about whether the backdating of stock options is, in fact,
14 material.  As the evidence submitted by the parties make clear, there exists a vociferous
15 debate among academics, analysts, executives, lawyers, and financiers about the harm that
16 backdating may or may not perpetrate on investors.  The Court takes no position on that
17 debate here.  Rather, the Court holds only that a reasonable juror could agree with the SEC
18 that stock options backdating matters to reasonable investors.  For all of the reasons set forth
19 above, Reyes' motion for summary judgment is hereby DENIED.

20     **IT IS SO ORDERED.**

23 Dated: May 17, 2007                              CHARLES R. BREYER
                                                     UNITED STATES DISTRICT JUDGE

*United States District Court*
*For the Northern District of California*